# UNITED STATES DISTRICT COURT

# MIDDLE DISTRICT OF PENNSYLVANIA

| | |
|---|---|
| JERRY HERRING, Individually and on Behalf of All Others Similarly Situated,<br><br>Plaintiff,<br><br>vs.<br><br>RITE AID CORPORATION, JOHN T. STANDLEY, DAVID R. JESSICK, JOSEPH B. ANDERSON, JR., BRUCE G. BODAKEN, KEVIN E. LOFTON, MYRTLE S. POTTER, MICHAEL N. REGAN, FRANK A. SAVAGE, MARCY SYMS, WALGREENS BOOTS ALLIANCE, INC., and VICTORIA MERGER SUB, INC.,<br><br>Defendants. | Civ. No.<br><br>CLASS ACTION<br><br>DIRECT SHAREHOLDER CLASS ACTION COMPLAINT FOR VIOLATIONS OF THE SECURITIES EXCHANGE ACT OF 1934<br><br>**DEMAND FOR JURY TRIAL** |

Plaintiff Jerry Herring ("Plaintiff"), by and through undersigned counsel, brings this Direct Shareholder Class Action Complaint for Violations of the Securities Exchange Act of 1934 (the "1934 Act") against the herein-named Defendants, and upon information and belief, based upon, *inter alia*, the investigation of counsel, Plaintiff alleges as follows:

## NATURE AND SUMMARY OF THE ACTION

1.     Plaintiff brings this direct shareholder class action individually and on behalf of the other public shareholders of Rite Aid Corporation ("Rite Aid" or the "Company"), against Rite Aid, the Company's Board of Directors (the "Board" or the "Individual Defendants") and Walgreens Boots Alliance, Inc. ("Walgreens") (collectively, "Defendants"), arising out of Defendants' dissemination of a materially false and misleading proxy statement in violation of Sections 14(a) and 20(a) of the 1934 Act, 15 U.S.C. §§78n(a) and 78t(a), and United States Securities and Exchange Commission ("SEC") Rule 14a-9 promulgated thereunder, 17 C.F.R. §240.14a-9, in connection with the proposed sale of Rite Aid (the "Proposed Transaction"). Plaintiff seeks equitable relief only.

2.     Rite Aid, a Delaware Corporation headquartered in Camp Hill, Pennsylvania, is a retail drugstore chain that sells prescription drugs and a range of other merchandise referred to as "front-end products." Walgreens is a global

pharmacy-led health and wellbeing enterprise that was created through the combination of Walgreens and Alliance Boots in December 2014.

3. On October 27, 2015, Rite Aid and Walgreens jointly announced that they had entered into an Agreement and Plan of Merger (the "Merger Agreement"), pursuant to which Walgreens will purchase Rite Aid for $9.00 per share in cash (the "Merger Consideration"). The Proposed Transaction is valued at $17.2 billion dollars.

4. The Proposed Transaction is the product of a hopelessly flawed process that failed to maximize shareholder value and was designed to ensure the sale of the Company to the buyer willing to pay significant merger-related bonuses, and provide acceleration and rollover of unvested equity interests, for the Board and Rite Aid management.

5. The sales "process," however, should not have taken place at all. Rite Aid was in a position of temporary weakness in its sector of the market as Defendants pursued a sale of the Company, and Walgreens took advantage of Rite Aid's weakness to make ever greater demands on the Company for terms that favored only Walgreens.

6. The only strategic alternative that the Board gave serious consideration to was what appears to be a stock-for-stock merger of equals with an entity referred to as "Party D." However, the Board's financial advisor, Citigroup Global Markets Inc. ("Citi"), suffered from conflicts of interest arising from its pre-existing relationship

with Party D, which prevented Citi from offering objective advice regarding a potential transaction with Party D.

7.     The Board then hamstrung itself with respect to a potential merger with Party D by succumbing to repeated pressure from Walgreens to enter into a "Notification Agreement" that required the Board to notify Walgreens of any alternative proposals it was discussing.  However, the Board treated the Notification Agreement as a *de facto* exclusivity agreement and suspended discussions with Party D and other interested parties.

8.     Just one month after the Board executed the Notification Agreement, negotiations with Walgreens reached an impasse.  Now left with no potential buyers, the Board ran back to Party D, but by that time, Party D had already undertaken an alternative direction and was not interested in re-engaging in negotiations with Rite Aid.  Had the Board continued simultaneous negotiations with both parties, it could have leveraged competing proposals for the Company, thereby increasing the value ultimately offered to the Company's shareholders.  Instead, Rite Aid had only one suitor at the end of the sales "process," which allowed Walgreens to make aggressive demands from a position of strength.

9.     From this position of strength, Walgreens first **lowered** its proposed purchase price (which supported the Board's decision to walk away from Party D) **from $10.00 to $9.00 per share** and then extracted numerous concessions from the

Company, including: (a) minimal commitments by Walgreens to assist in obtaining regulatory approval of the deal, which will certainly face regulatory scrutiny; (b) the right to engage in transactions with other entities during the regulatory review process; and (c) a limit on Rite Aid's ability to borrow under its existing credit facilities.

10.     While the Board agreed to these exploitative deal terms for the Company and its shareholders, it extracted favorable deal terms for its members and other Company insiders.  For example, the Company's senior officers and directors will be permitted to rollover most of their options and all of their restricted stock and performance units into Walgreens shares, the value of which ranges from just ***over $120,000.00 to $2.8 million*** for directors, and ***from $440,000.00 to $25 million*** for officers, with Defendant John T. Standley ("Standley"), the Company's Chief Executive Officer ("CEO") and Chairman of the Board, receiving the largest share. The fact that Rite Aid management negotiated a rollover of their lucrative Rite Aid equity awards into Walgreens stock is telling.   These Company insiders who negotiated and approved the deal clearly believe that the Proposed Transaction benefits Walgreens shareholders more than Rite Aid's, otherwise they would have simply cashed out their Rite Aid shares.

11.     To make matters worse, the Board members ensured that no topping bidder would emerge to offer more value to the Company's shareholders by agreeing to a number of preclusive provisions in the Merger Agreement designed to make Rite

Aid a financially unattractive acquisition candidate (the "Lockup Provisions"). Specifically, the Board locked up the sale of the Company to Walgreens by agreeing to: (a) a strict no-solicitation provision that prevents the Company or its employees from soliciting other potential acquirers or even in continuing discussions and negotiations with potential acquirers; (b) rapid information rights that require Rite Aid to share highly sensitive information about potential bidders with Walgreens and to notify Walgreens orally and in writing within 24 hours after receipt of an acquisition proposal or inquiry; (c) a provision that provides Walgreens with the opportunity to match any competing proposal in the event one is made; (d) a provision that prohibits the Board from withdrawing or modifying its recommendation of the Proposed Transaction except in narrowly prescribed circumstances; and (e) a provision that requires the Company to pay a termination fee of $325 million, in addition to out-of-pocket expenses of up to $45 million, in order to enter into a transaction with a superior bidder. These provisions, taken collectively, substantially and improperly limit the Board's ability to act with respect to investigating and pursuing superior proposals and alternatives.

12.    Then, on November 23, 2015, Defendants filed a materially false and/or misleading preliminary proxy statement with the SEC on Schedule 14A (the "Proxy") in violation of Section 14(a) and 20(a) of the 1934 Act. The Proxy, which recommends that Rite Aid shareholders vote in favor of the Proposed Transaction,

fails to disclose material information regarding the negotiation and approval of the deal and deprives the Company's shareholders of their right to cast an informed vote. For example, the Proxy fails to disclose the following material information, which renders statements made in the Proxy materially false and/or misleading: (a) the terms of Party D's indications of interest; (b) the nature of Citi's conflict of interest; (c) management's Financial Forecast; (d) management's Alternate Forecast; (e) discussions regarding financial benefits to the Board and Rite Aid management; (f) discussions regarding management's equity rollovers; and (g) material metrics and assumptions underlying Citi's valuation analysis. Without this material information, which would alter the total mix of information available to them, the Company's shareholders cannot make an informed decision on how to vote their shares or whether to seek appraisal.

13.    In sum, Defendants violated the federal securities laws, including Sections 14(a) and 20(a) of the 1934 Act, in connection with the recommendation of the Proposed Transaction. Defendants' actions threaten Rite Aid shareholders with irreparable harm for which money damages are not an adequate remedy. Thus, Plaintiff seeks injunctive relief to ensure that Defendants cure Defendants' violations of federal law before Rite Aid shareholders are forced to vote on the Proposed Transaction.

14.     Plaintiff and the other members of the Class (as defined below) have no adequate remedy at law.

## PARTIES

### *Plaintiff*

15.     Plaintiff is, and at all relevant times was, a shareholder of Rite Aid common stock.  Plaintiff holds 1,000 shares of Rite Aid common stock and has had continuous and uninterrupted ownership of those shares since prior to the time of the wrongdoing alleged herein.

### *Rite Aid*

16.     Defendant Rite Aid Corporation is a Delaware corporation with its corporate headquarters located at 30 Hunter Lane, Camp Hill, Pennsylvania, 17011. Rite Aid is a retail drugstore chain that sells prescription drugs and a range of other merchandise referred to as "front-end products."  The Company's stock is publicly traded on the New York Stock Exchange under the ticker symbol "RAD."

### *The Individual Defendants*

17.     Defendant John T. Standley is, and at all relevant times was, Chairman of the Board and CEO of Rite Aid.  Defendant Standley also previously served as the Company's President (September 2008 until June 2013), Chief Operating Officer (September 2008 until June 2010), and Senior Executive Vice President and Chief Financial Officer (September 2000 to June 2002).

18.     Defendant David R. Jessick ("Jessick") is, and at all relevant times was, a director of Rite Aid.  Defendant Jessick also previously served as a consultant to Rite Aid's CEO and senior financial staff (July 2002 until February 2005) and Senior Executive Vice President, Chief Administrative Officer of Rite Aid (December 1999 to July 2002).

19.     Defendant Joseph B. Anderson, Jr. is, and at all relevant times was, a director of Rite Aid.

20.     Defendant Bruce G. Bodaken is, and at all relevant times was, a director of Rite Aid.

21.     Defendant Kevin E. Lofton is, and at all relevant times was, a director of Rite Aid.

22.     Defendant Myrtle S. Potter is, and at all relevant times was, a director of Rite Aid.

23.     Defendant Michael N. Regan is, and at all relevant times was, a director of Rite Aid.

24.     Defendant Frank A. Savage is, and at all relevant times was, a director of Rite Aid.

25.     Defendant Marcy Syms is, and at all relevant times was, a director of Rite Aid.

26.     The Defendants identified in ¶¶17-25, above, are at times collectively referred to herein as the "Board" or the "Individual Defendants."

***The Walgreens Defendants***

27.     Defendant Walgreens Boots Alliance, Inc. is a Delaware corporation with its corporate headquarters located at 108 Wilmot Road, Deerfield, Illinois 60015. Walgreens is a global pharmacy-led health and well-being enterprise that was created through the combination of Walgreens and Alliance Boots in December 2014.  The Company's stock is publicly traded on the NASDAQ Exchange under the ticker symbol "WBA."

28.     Defendant Victoria Merger Sub, Inc. is a Delaware corporation, a wholly-owned, direct subsidiary of Walgreens, and a vehicle through which Defendants seek to effectuate the Proposed Transaction.

29.     Defendants Walgreens and Victoria Merger Sub, Inc. are collectively referred to herein as "Walgreens."

## JURISDICTION AND VENUE

30.     This Court has subject matter jurisdiction over this action pursuant to 28 U.S.C. §1331 and Section 27 of the 1934 Act, 15 U.S.C. §78aa, because the claims asserted herein arise under Sections 14(a) and 20(a) of the 1934 Act, 15 U.S.C. §78n(a) and §78t(a).  Venue is proper in this District pursuant to Section 27 of the 1934 Act and 28 U.S.C. §1391(b).

31.     This Court has personal jurisdiction over each Defendant named herein because each Defendant is an individual, corporation, or partnership that has sufficient minimum contacts with this District so as to render the exercise of jurisdiction by this Court permissible under traditional notions of fair play and substantial justice.

## SUBSTANTIVE ALLEGATIONS

*The Proposed Transaction*

32.     Rite Aid is a retail drugstore chain that sells prescription drugs and a range of "front-end products." Walgreens is a global pharmacy-led health and well-being enterprise that was created through the combination of Walgreens and Alliance Boots in December 2014.

33.     On October 27, 2015, Rite Aid and Walgreens jointly announced that they had entered into a Merger Agreement, pursuant to which, Walgreens will purchase Rite Aid for $9.00 per share in cash.

34.     The Proposed Transaction is the product of a hopelessly flawed process designed to ensure the sale of the Company to the buyer willing to pay significant merger-related bonuses to the Board and Company management.

*Defendants Retain a Conflicted Financial Advisor*
*and Run a Deficient Sales Process*

35.     According to the Proxy, Rite Aid was engaged in discussions regarding a potential stock-for-stock merger of equals with Party D since early 2014. However, the Board's financial advisor, Citi, suffered from a conflict of interest arising from its

"existing and previous relationship" with Party D that prevented Citi from providing the Board with objective advice regarding a potential transaction with Party D.

36.     Sometime in January 2015, Rite Aid management contacted Walgreens to request a meeting to discuss a potential business combination.  The parties met on January 12, 2015, and Walgreens immediately began demanding that Rite Aid negotiate exclusively with Walgreens as a condition to continuing discussions.

37.     On May 8, 2015, Walgreens made a preliminary indication of interest, proposing to purchase Rite Aid for $9.00 per share.  Rite Aid management expressed disappointment with Walgreens' initial proposal and sought a higher purchase price. In response, Walgreens reiterated its request for a 60-day period in which Rite Aid would be required to negotiate exclusively with Walgreens.

38.     On July 15, 2015, Party D made a preliminary indication of interest to Rite Aid.  The Proxy does not disclose the terms of Party D's proposal, including whether it offered more value to the Company's shareholders than Walgreens' May 8 indication of interest.

39.     During a meeting on August 2, 2015, the Board reviewed the status of discussions with Walgreens and Party D.  At the meeting, Citi reiterated its conflict of interest arising out of its "existing and previous roles on matters involving Party D." But at the same time, the Proxy states that Citi also indicated that its relationship with Party D had changed since January 2015.  Despite Citi's clear conflict of interest, the

Proxy states that Board did not believe that there was a need to retain a second financial advisor.  The Proxy fails to disclose the nature of Citi's "existing and previous roles on matters involving Party D" and the nature of the change in Citi's relationship with Party D as of January 2015, as well as the basis for the Board's belief that Citi's changed relationship with Party D somehow cured its conflict of interest.

40.     On August 3, 2015, Walgreens submitted a revised preliminary indication of interest and reiterated its demand that Rite Aid negotiate exclusively with Walgreens for 60 days.  The Board declined to commit to exclusive negotiations.  A few days later, on August 8, 2015, Walgreens indicated that it would not continue discussions with Rite Aid unless, in lieu of an exclusivity agreement, the Company entered into a Notification Agreement requiring Rite Aid to advise Walgreens of any alternative acquisition and other alternative transaction proposals or discussions that the Company engaged in, initiated, or received.

41.     On August 10, 2015, Party D submitted a revised preliminary indication of interest.  The Proxy does not disclose the terms of Party D's revised indication of interest, including whether it offered more value to Rite Aid's public shareholders than Walgreens' then-current proposal.

42.     The following day, on August 11, 2015, Walgreens submitted a counterproposal to purchase Rite Aid for $10.00 per share.

43.     Despite Party D's continued interest in the Company, the Board ceded to Walgreens' demands and entered into the Notification Agreement on August 18, 2015.   From that point forward, however, Defendants treated the Notification Agreement as a *de facto* exclusivity agreement, and the Board negotiated exclusively with Walgreens.

44.     Indeed, the same day that it executed the Notification Agreement, the Board terminated discussions with Party D.  The following day, the Board refused to provide non-public information regarding Rite Aid to "Party I," which had previously expressed interest in the Company and requested that the parties enter into a confidentiality agreement to explore a potential business combination transaction.

45.     Had the Board continued to simultaneously negotiate with both Walgreens and Party D (and, potentially, with Party I), it could have leveraged competing proposals for the Company, thereby increasing the value ultimately offered to the Company's shareholders.  Instead, Rite Aid was left with a single suitor – Walgreens – which began to exploit Rite Aid's weakened bargaining position for its own benefit.

46.     Just one month after Defendants terminated discussions with Party D, on September 21, 2015, negotiations with Walgreens reached an impasse, although the Proxy fails to disclose the specific key terms that caused the impasse.  Now left with no interested suitors, the Board attempted to run back to Party D, but by that time,

Party D had already undertaken an alternative direction and was not interested in re-engaging in negotiations with Rite Aid.

47.     On October 15, 2015, with Rite Aid in a weakened bargaining position, Walgreens returned to the negotiating table from a position of strength and began demanding beneficial deal terms for itself.  First, Walgreens *lowered* its proposed purchase price, which purportedly supported the Board's decision to terminate discussions with Party D, from $10.00 to $9.00 per share.  Walgreens then demanded that it be permitted to engage in transactions with other entities during the regulatory review process of the deal and that Rite Aid's ability to borrow under its existing credit facilities be limited.  Walgreens also refused to agree to all but minimal commitments to assist in obtaining regulatory approval of the deal, which will certainly face regulatory scrutiny.  The Board agreed to these exploitative deal terms during discussions held between October 19 and October 21, 2015.

48.     On October 27, 2015, Rite Aid and Walgreens executed the Merger Agreement and issued a joint press release announcing the Proposed Transaction.

**The Board Failed to Maximize Shareholder Value**

49.     Rather than attempt to leverage the competing interests of Walgreens, Party D, and Party I to increase shareholder value, the Board hamstrung itself by prematurely entering into the Notification Agreement and treating it as a *de facto* exclusivity agreement.  The Board's decision ultimately allowed Walgreens to lowball

the Company's shareholders with a $9.00 per share merger consideration, which the Board previously rejected on or about May 8, 2015.

50.     The Merger Consideration significantly undervalues Rite Aid and is merely an attempt by Walgreens to acquire the Company during a temporary decline in the Company's stock price.  Indeed, the Company's stock price was exhibiting an upward trajectory, eventually trading at *$9.32* on August 5, 2015, just *three months* before Defendants announced the Proposed Transaction.

51.     Defendants timed the Proposed Transaction to take advantage of a temporary dip in the Company's stock price in order to mask the inadequacy of the Merger Consideration.  But the Company was poised for continued growth and its stock price would have rebounded to once again surpass the $9.00 per share offered by the Merger Consideration.

52.     To be sure, on June 18, 2105, Rite Aid issued a press release announcing the Company's first quarter 2016 financial results wherein Defendant Standley, the Company's CEO and Chairman of the Board, stated, "Our first-quarter results reflect the *continued progress we're making in positioning Rite Aid for growth, including increases in same-store sales, same-store prescription count and Adjusted EBITDA*."

53.    The Company's stock price, which temporarily dipped just before Defendants' announcement of the Proposed Transaction, does not reflect the Company's true value or growth potential.

***The Board Placed Its Own Interests***
***Ahead of the Company's Shareholders***

54.    While the Board negotiated a deal that fails to maximize shareholder value, it extracted lucrative terms for its members and Rite Aid senior management. Upon completion of the merger, the Company's senior officers and directors will be permitted to rollover most of their options and all of their restricted stock and performance units into Walgreens shares, and their outstanding restricted stock units will automatically vest and be cashed out.

55.    As demonstrated in the following table, these benefits amount to payouts that range from just ***over $120,000.00 to $2.8 million*** for directors, and ***from $440,000.00 to $25 million*** for officers, with Defendant Standley, the Company's CEO and Chairman of the Board, receiving the largest share:

| | Rollover Options | | Rollover Stock Awards[1] | | | | | | |
| | Shares (#) | Value ($) | Restricted Stock (#) | Value of Restricted Stock ($) | Performance Stock Units (#) | Value of Performance Units ($) | RSUs (#) | Value of RSUs ($) | Total Value ($) |
|---|---|---|---|---|---|---|---|---|---|
| *Directors* | | | | | | | | | |
| Mr. Anderson, Jr. | — | — | — | — | — | — | 299,746 | 2,697,714 | 2,697,714 |
| Mr. Bodaken | — | — | 17,167 | 154,503 | — | — | 31,250 | 281,250 | 435,753 |
| Mr. Jessick | — | — | 17,167 | 154,503 | — | — | 299,746 | 2,697,714 | 2,852,217 |
| Mr. Lofton | — | — | 17,167 | 154,503 | — | — | 11,048 | 99,432 | 253,935 |
| Ms. Potter | — | — | 17,167 | 154,503 | — | — | 8,953 | 80,577 | 235,080 |
| Mr. Regan | — | — | — | — | — | — | 299,746 | 2,697,714 | 2,697,714 |
| Mr. Savage | — | — | — | — | — | — | 13,825 | 124,425 | 124,425 |
| Ms. Syms | — | — | — | — | — | — | 299,746 | 2,697,714 | 2,697,714 |
| *Named Executive Officers* | | | | | | | | | |
| Mr. Standley[2] | 1,891,150 | 6,728,728 | 397,299 | 3,575,691 | 1,665,074 | 14,985,666 | — | — | 25,290,085 |
| Mr. Martindale | 895,900 | 3,009,648 | 361,099 | 3,249,891 | 1,097,256 | 9,875,304 | — | — | 16,134,843 |
| Mr. Vitrano | 776,250 | 3,017,648 | 157,933 | 1,421,397 | 188,300 | 1,694,700 | — | — | 6,133,745 |
| Mr. Karst | 312,250 | 450,583 | 293,794 | 2,644,146 | 149,700 | 1,347,300 | — | — | 4,442,029 |
| Mr. Robert K. Thompson | 282,600 | 1,064,288 | 97,499 | 877,491 | 67,200 | 604,800 | — | — | 2,546,579 |
| Mr. Strassler | 263,025 | 1,040,936 | 50,632 | 455,688 | 63,900 | 575,100 | — | — | 2,071,724 |
| *Other Executive Officers* | | | | | | | | | |
| Mr. Abelman | 42,175 | 45,296 | 66,432 | 597,888 | 20,100 | 180,900 | — | — | 824,084 |
| Ms. Castle | 119,500 | 128,480 | 76,722 | 690,498 | 56,900 | 512,100 | — | — | 1,331,078 |
| Mr. Donley | 136,925 | 642,296 | 22,499 | 202,491 | 25,800 | 232,200 | — | — | 1,076,987 |
| Mr. Everett | 66,800 | 21,376 | 19,400 | 174,600 | 27,200 | 244,800 | — | — | 440,776 |
| Ms. Konrad | 31,750 | 120,232 | 56,066 | 504,594 | 7,400 | 66,600 | — | — | 691,426 |
| Mr. Montini, Jr. | 243,375 | 971,048 | 46,666 | 419,994 | 58,400 | 525,600 | — | — | 1,916,642 |
| Mr. Robert I. Thompson | 265,700 | 1,058,368 | 51,033 | 459,297 | 64,000 | 576,000 | — | — | 2,093,665 |

56.     The fact that Rite Aid management negotiated a rollover of their lucrative Rite Aid equity awards into Walgreens stock is telling.  These Company insiders who negotiated and approved the deal clearly believe that the Proposed Transaction benefits Walgreens shareholders more than Rite Aid's, otherwise they would have simply cashed out their Rite Aid shares.

57.     The Board also secured lucrative "Golden Parachute" payments for senior management, which are triggered by a change-in-control, such as the Proposed Transaction:

| Officer | Cash ($)[1] | Equity ($)[2],[3] | Pension/NQDC ($)[4] | Perquisites / Benefits ($)[5] | Tax Reimbursement ($)[6] | Total ($)[7] |
|---|---|---|---|---|---|---|
| Mr. Standley | 8,418,630 | 18,830,286 | 835,917 | 27,664 | 0 | 28,112,497 |
| Mr. Martindale | 5,391,370 | 12,444,960 | 628,906 | 18,928 | — | 18,484,164 |
| Mr. Vitrano | 1,997,603 | 3,286,440 | | 27,092 | — | 5,311,135 |
| Mr. Karst | 4,207,021 | 3,042,185 | 209,967 | 19,916 | — | 7,479,089 |
| Mr. Robert K. Thompson | — | 1,318,716 | 363,161 | — | — | 1,681,877 |
| Mr. Strassler | 659,425 | 1,071,672 | — | 2,028 | — | 1,733,125 |

58.    The Proxy fails to disclose any discussions between Rite Aid management, the Board, and/or Walgreens underlying these substantial benefits that will be paid to Company insiders.

***The Board Failed to Obtain Adequate Deal Protection Terms***

59.    To serve their own interests, the Board agreed to a merger that is highly unlikely to be approved by regulators as currently constituted, and the Board failed to protect Rite Aid shareholders from the regulatory risk presented by the Proposed Transaction.  Specifically, the Board failed to secure a "hell or high water" provision in the Merger Agreement, which would have required Walgreens to take all necessary actions to obtain regulatory approval of the deal, including making any necessary divestures.  Instead, Walgreens agreed only to use its "reasonable best efforts to do all things reasonably necessary, proper or advisable" to consummate the merger, including divesting up to only 1,000 stores.  Experts agree that regulators will require the divesture of ***3,000*** stores.

*The Board Agreed to Preclusive Lockup Provisions*
*Designed to Discouraged Other Potential Bidders*

60.     The Board ensured that no topping bidder would emerge to offer a better deal to the Company's shareholders by agreeing to a number of preclusive Lockup Provisions in the Merger Agreement designed to make Rite Aid a financially unattractive acquisition candidate.  Specifically, the Board locked up the sale of the Company to Walgreens by agreeing to: (a) a strict no-solicitation provision that prevents the Company or its employees from soliciting other potential acquirers or even in continuing discussions and negotiations with potential acquirers; (b) rapid information rights that require Rite Aid to share highly sensitive information about potential bidders with Walgreens and requires the Company to notify Walgreens orally and in writing within 24 hours after receipt of an acquisition proposal or inquiry; (c) a provision that provides Walgreens with the opportunity to match any competing proposal in the event one is made; (d) a provision that prohibits the Board from withdrawing or modifying its recommendation of the Proposed Transaction except in narrowly prescribed circumstances; and (e) a provision that requires the Company to pay a termination fee of $325 million, in addition to out-of-pocket expenses of up to $45 million in order to enter into a transaction with a superior bidder.  These provisions, taken collectively, substantially and improperly limit the Board's ability to act with respect to investigating and pursuing superior proposals and alternatives.

*Defendants Issued a Materially False and Misleading*
*Proxy in Support of the Proposed Transaction*

61.     In an attempt to secure shareholder approval of the Proposed Transaction,
Rite Aid filed – following review, editing, and approval by the Board and Walgreens –
a materially false and misleading Proxy with the SEC on November 23, 2015.  While
the Proxy recommends that shareholders vote in favor of the Proposed Transaction,
Defendants omitted material information that renders the Proxy materially false and/or
misleading, in direct contravention of Sections 14(a) and 20(a) of the 1934 Act.

62.     Due to their joint efforts in preparing, editing, reviewing, approving,
and/or disseminating the Proxy, Defendants knew that the Proxy failed to disclose
such material information, which rendered other statements made in the Proxy false
and/or misleading.

63.     ***The terms of Party D's indications of interest.***  The Proxy states that
Party D submitted at least two indications of interest – one on July 15, 2015 and one
on August 10, 2015.  Proxy at 39, 42.  The Proxy, however, fails to disclose the terms
of Party D's indications of interest, including the proposed purchase price and whether
it presented more value to Rite Aid shareholders than Walgreens' offer at the time,
including Walgreens' May 8 indication of interest to acquire the Company for $9.00
per share.  Defendants' omission of the terms of Party D's indications of interest
renders the Proxy's discussion of the sales process for the Company materially false
and/or misleading as Rite Aid shareholders are unable to determine whether the Board

adequately shopped the Company and, therefore, cannot make an informed voting decision regarding the Proposed Transaction.  This information is material as it would alter the total mix of information available to investors and is information that a reasonable investor would consider important in determining how to vote his or her shares.

64.   ***The Nature of Citi's Conflict of Interest.***   The Proxy states that the Board's financial advisor, Citi, "informed the Board of Directors as to the nature of Citi's existing and previous relationship with Party D."   Proxy at 33.   The Proxy further states that "Citi again discussed with the Board of Directors the nature of its relationship with Party D, including its existing and previous roles on matters involving Party D, and in light of Citi's changed relationship with Party D since January 2015, the Board of Directors did not believe there was a need to retain a second financial advisor at this time."   *Id.* at 40.   The Proxy, however, fails to disclose: (a) "the nature of Citi's existing and previous relationship with Party D"; (b) the nature of Citi's "existing and previous roles on matters involving Party D"; (c) the nature of the change in Citi's "relationship with Party D since January 2015"; (d) the basis for the Board's belief that "there was [not] a need to retain a second financial advisor at this time"; and (e) the amount and structure of Citi's potential fee in a buy-side transaction with Party D.  Defendants' omission of this material information renders the Proxy's discussion of Citi's conflicts of interest materially false and/or

misleading as Rite Aid shareholders are unable to ascertain the full extent of Citi's

conflicts and determine whether those conflicts tainted the sales process and/or Citi's

evaluation of the fairness of the Merger Consideration and, therefore, cannot make an

informed voting decision regarding the Proposed Transaction.  This information is

material as it would alter the total mix of information available to investors and is

information that a reasonable investor would consider important in determining how

to vote his or her shares.

65.   ***Management's Financial Forecast.***  The Proxy discloses a "Financial

Forecast" prepared by Rite Aid management and provided to Citi, which Citi relied on

in performing its financial analyses that purportedly support the "fairness" of the

Merger Consideration.  Proxy at 61-63.  The Proxy, however, discloses only portions

of management's forecast and omits material line items, including: (a) store count; (b)

same store growth rate; (c) depreciation and amortization; (d) LIFO adjustments; (e)

charges or credits for facility closing and impairment; (f) inventory write-downs; (g)

debt retirements; (h) revenue deferrals related customer loyalty program; (i) taxes (or

tax rate); (j) capital expenditures; (k) changes in net working capital; and (l) stock-

based compensation expense.  These line items are essential to understand how Rite

Aid is achieving growth and what that growth will cost.  Defendants' omission of

these line items renders the Proxy's partial disclosure of management's Forecasts, and

Citi's valuation analyses based on those Forecasts, materially false and/or misleading

because Rite Aid shareholders are unable to determine whether Citi's valuation analyses are reliable and whether the Merger Consideration they are being offered is truly fair and, therefore, cannot make an informed voting decision regarding the Proposed Transaction.  This information is material as it would alter the total mix of information available to investors and is information that a reasonable investor would consider important in determining how to vote his or her shares.

66.     ***Management's Alternate Forecast.***  The Proxy states that "at Party D's request, Rite Aid provided Party D with an ***alternative forecast that reflected higher growth assumptions*** in fiscal year 2017 and beyond."  Proxy at 61.  The Proxy further states that "Rite Aid believed it was more appropriate to use and rely upon the Forecast."  Proxy at 61.  The Proxy, however, fails to disclose the complete Alternate Forecast, as well as the basis for Defendants' belief that "it was more appropriate to use and rely upon the Forecast."  Defendants' omission of the complete Alternate Forecast and the basis for their belief that it "it was more appropriate to use and rely upon the Forecast" renders the Proxy's discussion of the Alternate Forecast, Management's Forecast, and Citi's valuation analyses materially false and/or misleading as Rite Aid shareholders cannot determine whether Defendants sandbagged the Forecast underlying Citi's financial analyses in order to justify a lower Merger Consideration and, therefore, cannot make an informed voting decision regarding the Proposed Transaction.  This information is material as it would alter the

total mix of information available to investors and is information that a reasonable investor would consider important in determining how to vote his or her shares.

67.   ***Discussions regarding employee benefits.***   In connection with the Proposed Transaction, Rite Aid shareholders will also be asked to vote to approve payments to Rite Aid management in connection with the Proposed Transaction. Proxy at 108.  The Proxy states that "[t]he Board of Directors held a special telephonic meeting on October 17, 2015 . . . .  A discussion then followed regarding . . . a number of employee benefit matters including, among others, Rite Aid's adoption of a retention and severance program following the announcement of a business combination transaction."  Proxy at 47.  The Proxy further states that "[t]he Board of Directors held a special telephonic meeting on October 25, 2015 . . . . Representatives of Skadden, the Board of Directors' independent consultant on compensation matters and the compensation committee of the Board of Directors . . . then reviewed with the Board of Directors certain proposed compensation arrangements, including entering into, amending and authorizing such compensation arrangements for certain executives."  *Id.* at 48-49.  The Proxy fails to disclose the discussions underlying the employment matters discussed at these two Board meetings, which resulted in significant financial benefits to the Board and Rite Aid management.  Defendants' omission of these discussions, particularly where Rite Aid shareholders are being asked to approve payments to Company management, renders the Proxy's discussion

of the sales process and the financial benefits to be paid to Company insiders

materially false and/or misleading as Rite Aid shareholders cannot determine whether

the Board acted loyally or whether it placed its interests ahead of the Company's

shareholders and, therefore, cannot make an informed voting decision regarding the

Proposed Transaction.  This information is material as it would alter the total mix of

information available to investors and is information that a reasonable investor would

consider important in determining how to vote his or her shares.

68.  ***Discussions regarding management's equity rollovers.***  The Proxy

includes a discussion of the "Interests of the Directors and Executive Officers of Rite

Aid in the Merger," which among other things, provides that the Company's senior

officers and directors will be permitted to rollover most of their options and all of their

restricted stock and performance units into Walgreens shares.  Proxy at 63-66.  The

Proxy fails to disclose, however, any discussions between Rite Aid management, the

Board, and/or Walgreens underlying these substantial benefits, which amount to as

much as ***$25 million***.  Defendants' omission of such discussions renders the Proxy's

disclosure of the equity rollovers and interests of Rite Aid management and the Board

materially false and/or misleading as Rite Aid shareholders are unable to evaluate the

true nature of those interests and whether they presented a conflict of interest that

tainted the sales process and, therefore, cannot make an informed voting decision

regarding the Proposed Transaction.  This information is material as it would alter the

total mix of information available to investors and is information that a reasonable investor would consider important in determining how to vote his or her shares.

69.     ***Citi's Valuation Analysis.*** The Proxy discloses some of the valuation analyses performed by Citi that purportedly support the fairness of the Merger Consideration.   Proxy at 55-61.   However, Defendants omitted from the Proxy material information regarding the assumptions and metrics underlying those analyses, which renders the Proxy's discussion of the fairness of the Merger Consideration materially false and/or misleading because Rite Aid shareholders cannot determine whether Citi's analyses are reliable and, therefore, cannot make an informed voting decision regarding the Proposed Transaction.   This information is material as it would alter the total mix of information available to investors and is information that a reasonable investor would consider important in determining how to vote his or her shares.   For example, the Proxy omits the following material information regarding Citi's fairness opinion:

(a)     With respect to Citi's *Selected Public Companies Analysis*, Proxy at 58, the Proxy fails disclose whether Citi performed a benchmarking analysis for Rite Aid in relation to the selected companies.   A selected companies analysis is a relative exercise meaning that "comparable" companies are analyzed and compared to determine what valuation multiples to assign to a target company.   Benchmarking Rite

Aid's past and expected financial performance versus its peers is essential context in understanding the multiples applied by Citi as part of its analysis;

(b)     With respect to Citi's *Selected Precedent Transactions Analysis*, Proxy at 58-59, the Proxy fails to disclose the individual LTM EBITDA multiples for each of the selected transactions analyzed by Citi in its analysis.  Because a selected precedent transactions analysis reviews multiples paid over time in "comparable" transactions, knowing what these multiples are is material in understanding the selections made by Citi as precedent transactions may be more like the Proposed Transaction than others, and the market for similar pharmacy chains may have shifted over time as the industry consolidated (*e.g.*, the multiples increased); and

(c)     With respect to the *Discounted Cash Flow Analysis*, Proxy at 59, the Proxy fails to disclose the implied perpetuity growth rate range resulting from the analysis.  Citi used what is known as the terminal multiple method to calculate Rite Aid's terminal value in its analysis (*i.e.* the value of Rite Aid at the end of the forecast period).  The more accepted method to calculate terminal value is to select and apply perpetuity growth rates of cash flow because a company's long-term growth prospects will ultimately trend toward growth in their industry or the overall economy.  However, when terminal multiples are used, as was the case here, the perpetuity growth rates "implied" by the selected multiples are calculated as a "sanity check" and

must be disclosed to provide important context and highlight whether Citi's analysis suffered from conceptual or other flaws.

## CLASS ACTION ALLEGATIONS

70.     Plaintiff brings this action individually and as a class action on behalf of the public holders of Rite Aid common stock who are being and will be harmed by Defendants' actions described herein (the "Class").  Excluded from the Class are Defendants herein and any person, firm, trust, corporation, or other entity related to or affiliated with any Defendants.

71.     This action is properly maintainable as a class action under Rule 23 of the Federal Rules of Civil Procedure.

72.     ***Numerosity.*** The Class is so numerous that joinder of all members is impracticable.  According to Rite Aid's most recent Form 10-Q filing with the SEC, there were over ***1 billion*** shares of Rite Aid common stock as of November 19, 2015.

73.     ***Commonality.***  There are questions of law and fact that are common to the Class and that predominate over questions affecting any individual Class member. The common questions include, but are not limited to, the following:

(a)     whether Defendants violated Sections 14(a) and 20(a) of the 1934 Act and SEC Rule 14a-9 by preparing, reviewing, and disseminating a false and misleading Proxy;

(b)     whether the Individual Defendants engaged in self-dealing in connection with the Proposed Transaction; and

(c)     whether Plaintiff and the members of the Class would be irreparably harmed were the transactions complained of herein consummated.

74.     ***Typicality.***   Plaintiff's claims are typical of the claims of the other members of the Class and Plaintiff does not have any interests adverse to the Class.

75.     ***Adequacy of Representation.***   Plaintiff is an adequate representative of the Class, has retained competent counsel experienced in litigation of this nature, and will fairly and adequately protect the interests of the Class.

76.     The prosecution of separate actions by individual members of the Class would create a risk of inconsistent or varying adjudications with respect to individual members of the Class which would establish incompatible standards of conduct for the parties opposing the Class.

77.     Plaintiff anticipates that there will be no difficulty in the management of this litigation. A class action is superior to other available methods for the fair and efficient adjudication of this controversy.

78.     Defendants have acted on grounds generally applicable to the Class with respect to the matters complained of herein, thereby making appropriate the relief sought herein with respect to the Class as a whole.

## CAUSES OF ACTION

### COUNT I
**Claim for Violations of Section 14(a) of the 1934 Act and SEC Rule 14a-9**
**(Against All Defendants)**

79.     Plaintiff incorporates by reference and realleges each and every allegation above, as though fully set forth herein.

80.     The Company and its Board disseminated the false and materially misleading Proxy, which failed to disclose material facts necessary in order to make the statements made, in light of the circumstances under which they were made, not misleading.   As detailed above, the Proxy fails to disclose material information regarding: (a) the terms of Party D's indications of interest; (b) the nature of Citi's conflict of interest; (c) management's Financial Forecast; (d) management's Alternate Forecast; (e) discussions regarding financial benefits to the Board and Rite Aid management; (f) discussions regarding management's equity rollovers; and (g) material metrics and assumptions underlying Citi's valuation analysis.

81.     Rite Aid prepared, reviewed, and/or disseminated the Proxy following review, editing, and approval by the Board and Walgreens.  Defendants therefore, knew that the Proxy failed to disclose the aforementioned material information, which rendered other statements made in the Proxy false and/or misleading.

82.     The omissions and false and misleading statements in the Proxy were material in that a reasonable shareholder would consider them important in deciding

how to vote on the Proposed Transaction.  In addition, a reasonable investor would have viewed full and accurate disclosures as significantly altering the "total mix" of information made available in the Proxy and other information reasonably available to investors.

83.     By reason of the foregoing, Defendants violated §14(a) of the 1934 Act and SEC Rule 14a-9(a) promulgated thereunder.

84.     Plaintiff and the Class have no adequate remedy at law. Only through the exercise of this Court's equitable powers can Plaintiff and the other Class members be fully protected from irreparable injury that they will surely face absent Court intervention.

## COUNT II
### Claim for Violations of Section 20(a) of the 1934 Act
### (Against the Individual Defendants and Walgreens)

85.     Plaintiff incorporates by reference and realleges the allegations in ¶¶1-78, above, as though fully set forth herein.

86.     The Individual Defendants and Walgreens acted as controlling persons of Rite Aid within the meaning of Section 20(a) of the 1934 Act as alleged herein. By virtue of their positions as officers and/or directors of the Company, participation in and/or awareness of the Company's operations, and/or intimate knowledge of the false and misleading statements contained in the Proxy, they had the power to influence and control, and did influence and control, directly or indirectly, the decision-making of

the Company, including the content and dissemination of the false and misleading statements in the Proxy.

87.     Each of the Individual Defendants and Walgreens were provided with or had unlimited access to copies of the Proxy and the other statements alleged by Plaintiffs to be misleading prior to and/or shortly after these statements were issued, and had the ability to prevent the issuance of the statements or cause the statements to be corrected.

88.     In particular, each of the Individual Defendants had direct and supervisory involvement in the day-to-day operations of the Company and, therefore, each is presumed to have had the power to control or influence the particular transactions giving rise to the 1934 Act violations alleged herein, and exercised the same. The Proxy contained the unanimous recommendation of each of the Board members to approve the Proposed Transaction.  They were, thus, directly involved in the making of the Proxy.

89.     In addition, as the Proxy sets forth at length, and as described herein, the Board members were each involved in reviewing and approving the Proposed Transaction. The Proxy purports to describe the various issues and information that they reviewed and considered, descriptions of which had input from the Board.

90.     As set forth above, the Individual Defendants and Walgreens had the ability to exercise control over, and did control, a person or persons who have each

violated Section 14(a) of the 1934 Act and SEC Rule 14a-9 promulgated thereunder, by their acts and omissions in connection with the false and materially misleading Proxy.

91.     By virtue of these facts, the Individual Defendants and Walgreens have violated Section 20(a) of the 1934 Act and are liable to Plaintiff and the other members of the Class.

92.     Plaintiff and the Class have no adequate remedy at law. Only through the exercise of this Court's equitable powers can Plaintiff and the other members of the Class be fully protected from irreparable injury that they will surely face absent Court intervention.

## PRAYER FOR RELIEF

WHEREFORE, Plaintiff demands judgment and preliminary and permanent relief, including injunctive relief, in favor of Plaintiff and the Class, and against Defendants as follows:

A.     Declaring that this action is properly maintainable as a class action pursuant to Rule 23 of the Federal Rules of Civil Procedure, and certifying Plaintiff as Class representative and Plaintiff's counsel as Class counsel;

B.     Declaring that the Proxy distributed to Rite Aid shareholders was materially false and misleading, in violation of Rule 14a-9 and Section 14(a) of the 1934 Act;

C.      Enjoining Defendants from holding the shareholder vote on the Proposed

Transaction unless and until the Individual Defendants disclose all material

information to the Company's shareholders;

D.      Awarding Plaintiff and the Class compensatory and/or rescissory

damages against Defendants;

E.      Awarding Plaintiff and the Class pre-judgment and post-judgment

interest, as well as reasonable attorneys' fees, expert witness fees and other costs;

F.      Awarding extraordinary, equitable and/or injunctive relief as permitted

by law, equity and the federal statutory provisions sued hereunder, and any

appropriate state law remedies; and

G.      Awarding such other relief as this Court may deem just and proper.

## DEMAND FOR JURY TRIAL

Pursuant to Rule 38(b) of the Federal Rules of Civil Procedure, Plaintiff and the

Class demand a trial by jury.

DATED:  December 18, 2015          KAUFMAN, COREN & RESS, P.C.
                                   BENJAMIN M. MATHER, ESQUIRE
                                   (Pa. ID No. 89959)


                                   _____
                                         *s/ Benjamin M. Mather*
                                   BENJAMIN M. MATHER

                                   Two Commerce Square, Suite 3900
                                   2001 Market Street
                                   Philadelphia, PA 19103
                                   Telephone:  215/735-8700
                                   bmather@kcr-law.com

ROBBINS GELLER RUDMAN
  & DOWD LLP
STUART A. DAVIDSON
MARK J. DEARMAN
CHRISTOPHER MARTINS
120 East Palmetto Park Road, Suite 500
Boca Raton, FL 33432
Telephone:  561/750-3000
Facsimile:   561/750-3364

ROBBINS GELLER RUDMAN
  & DOWD LLP
RANDALL J. BARON
DAVID T. WISSBROECKER
655 West Broadway, Suite 1900
San Diego, CA  92101-3301
Telephone:  619/231-1058
619/231-7423 (fax)

*Attorneys for Plaintiff and the Proposed
Class*