IN THE UNITED STATES DISTRICT COURT
FOR THE MIDDLE DISTRICT OF PENNSYLVANIA

| | | |
|---|---|---|
| JERRY HERING, Individually and on Behalf of All Others Similarly Situated, | ) ) ) | |
| Plaintiff, | ) ) | CIVIL ACTION |
| v. | ) ) | No. 15-CV-02440-JEJ |
| RITE AID CORPORATION, JOHN T. STANDLEY, DAVID R. JESSICK, JOSEPH B. ANDERSON, JR., BRUCE G. BODAKEN, KEVIN E. LOFTON, MYRTLE S. POTTER, MICHAEL N. REGAN, FRANK A. SAVAGE, MARCY SYMS, WALGREENS BOOTS ALLIANCE, INC., STEFANO PESSINA, and GEORGE R. FAIRWEATHER, | ) ) ) ) ) ) ) ) ) ) | (Hon. John E. Jones III) |
| Defendants. | | |

**THE WALGREENS DEFENDANTS'
MEMORANDUM OF LAW IN SUPPORT OF THEIR
<u>MOTION TO DISMISS PLAINTIFF'S AMENDED COMPLAINT</u>**

# **TABLE OF CONTENTS**

INTRODUCTION ................................................................................1

STATEMENT OF FACTS ....................................................................4

I.    The Parties. ...............................................................................4

II.   Relevant Facts About The Transaction. .......................................5

RELEVANT PROCEDURAL HISTORY ................................................7

STATEMENT OF QUESTIONS INVOLVED.........................................9

ARGUMENT ...................................................................................10

I.    Plaintiff Fails To Plead A Strong Inference Of Scienter..............11

      A.    Plaintiff Fails to Plead with Particularity that the Walgreens
            Defendants Possessed Intent or Motive to Deceive Rite Aid
            Stockholders. ......................................................................12

      B.    Plaintiff Fails to Plead with Particularity that the Walgreens
            Defendants Knew of any Alleged Falsity of Their Statements...........14

II.   Plaintiff Fails To Allege That The Walgreens Defendants Made False or
      Misleading Statements..................................................................17

      A.    The Walgreens Defendants Were Optimistic About the Transaction
            but Neither Guaranteed that the FTC Would Approve It, nor Denied
            that Obtaining Regulatory Approval Was an Obstacle to Closing It..18

            1.    The Walgreens Defendants' statements expressing optimism
                  about the transaction are not actionable....................................18

            2.    The Walgreens Defendants' other alleged misstatements
                  contain no false or misleading information, and include that
                  regulatory approval was still pending. .....................................25

      B.    Statements by Nonparties Are Not Actionable Because They Are Not
            False or Misleading. ...........................................................32

      C.    The Walgreens Defendants' Post-Class Period Statements Only
            Further Undercut Plaintiff's Claims...................................36

III.   The PSLRA's Safe Harbor Applies To The Walgreens Defendants'
       Forward-Looking Statements. .......................................................................37

IV.    Plaintiff Does Not State A Claim For Control Person Liability Under
       Section 20(a). ..............................................................................................38

CONCLUSION .......................................................................................................39

# TABLE OF AUTHORITIES

**Cases**                                                                    **Page(s)**

*In re Advanta Corp. Sec. Litig.*,
  180 F.3d 525 (3d Cir. 1999) ........................................................................*passim*

*Backman v. Polaroid Corp.*,
  910 F.2d 10 (1st Cir. 1990)...........................................................................35

*Blue Chip Stamps v. Manor Drug Stores*,
  421 U.S. 723 (1975)......................................................................................32

*In re Burlington Coat Factory Sec. Litig.*,
  114 F.3d 1410 (3d Cir. 1997) ...............................................................18, 35

*DiLeo v. Ernst & Young*,
  901 F.2d 624 (7th Cir. 1990) .......................................................................25

*In re Discovery Labs. Sec. Litig.*,
  No. 06-1820, 276 F. App'x 154 (3d Cir. 2008)[1] ..............................................14

*In re Discovery Labs. Sec. Litig.*,
  No. 06-1820, 2007 WL 789432 (E.D. Pa. Mar. 15, 2007) ....................14, 19, 25

*ECA, Local 134 IBEW Joint Pension Tr. of Chi. v.*
  *JP Morgan Chase Co.*,
  553 F.3d 187 (2d Cir. 2009) .........................................................................13

*Elam v. Neidorff*,
  544 F.3d 921 (8th Cir. 2008) .......................................................................17

*GSC Partners CDO Fund v. Washington*,
  368 F.3d 228 (3d Cir. 2004) ........................................................13, 14, 17, 39

*Institutional Inv'rs Grp. v. Avaya, Inc.*,
  564 F.3d 242 (3d Cir. 2009) .........................................................................11

*Janus Capital Grp., Inc. v. First Derivative Traders*,
  564 U.S. 135 (2011)................................................................................10, 39

---

[1] All unpublished cases cited herein are attached in the Appendix at Exhibit 14.

*Kaplan v. S.A.C. Capital Advisors, L.P.*,
    947 F. Supp. 2d 366 (S.D.N.Y. 2013) ...................................................5

*Key Equity Inv'rs, Inc. v. Sel-Leb Mktg. Inc.*,
    No. 06-1052, 246 F. App'x 780 (3d Cir. 2007)..................................11

*Martin v. GNC Holdings, Inc.*,
    No. 2:15-cv-01522, 2017 WL 3974002 (W.D. Pa. Sept. 8, 2017) ......5

*In re NAHC, Inc. Sec. Litig.*,
    306 F.3d 1314 (3d Cir. 2002) ............................................................39

*OFI Asset Mgmt. v. Cooper Tire & Rubber*,
    834 F.3d 481 (3d Cir. 2016) ..............................................................11

*In re Radian Sec. Litig.*,
    612 F. Supp. 2d 594 (E.D. Pa. 2009)..................................................39

*Tellabs, Inc. v. Makor Issues & Rights, Ltd.*,
    551 U.S. 308 (2007).....................................................................*passim*

*Walck v. Am. Stock Exch., Inc.*,
    687 F.2d 778 (3d Cir. 1982) ..............................................................32

*Williams v. Globus Med., Inc.*,
    869 F.3d 235 (3d Cir. 2017) ..............................................................10

*Winer Family Tr. v. Queen*,
    503 F.3d 319 (3d Cir. 2007) .............................................4, 5, 10, 32

## Statutes

15 U.S.C. § 77z-2.................................................................................38

15 U.S.C. § 78u-4.........................................................................10, 18

Defendants Walgreens Boots Alliance, Inc. ("Walgreens" or "WBA"), Stefano Pessina, and George R. Fairweather (together, the "Walgreens Defendants"), submit this Memorandum of Law in Support of their Motion to Dismiss the First Amended Direct Shareholder Class Action Complaint (the "Amended Complaint"),[2] and hereby join in and fully incorporate the Rite Aid Defendants' Motion to Dismiss the Amended Complaint and accompanying Memorandum of Law.

## INTRODUCTION

This briefing concerns Plaintiff's latest challenge to a transaction between Walgreens and Rite Aid. Plaintiff's original claims were mooted by the changed terms of the deal. Going back to the drawing board, Plaintiff has come up with brand-new legal theories. Plaintiff now asserts, on behalf of a putative class, that virtually every public statement made by Walgreens in connection with the transaction was knowingly false or misleading, and attacks certain Rite Aid statements as well. But these new claims are baseless, just like the prior ones.

Plaintiff is a Rite Aid stockholder. Plaintiff alleges that various statements misleadingly portrayed the likelihood that the transaction would obtain regulatory approval. Plaintiff does not allege that he is a Walgreens stockholder or that

---

[2] Unless defined herein, all terms have the meaning set forth in the Amended Complaint.

statements by the Walgreens Defendants induced him to buy Walgreens stock. Rather, his case against the Walgreens Defendants rests on the confused theory that their statements about the transaction – to *Walgreens* stockholders at meetings, at conferences, and on Walgreens earnings calls – were made with the intent to deceive or defraud *Rite Aid* stockholders into buying Rite Aid common stock at artificially inflated prices.

Plaintiff's claims do not meet the heightened pleading standards of the Private Securities Litigation Reform Act of 1995 (the "PSLRA"). The PSLRA was enacted by Congress "[a]s a check against abusive litigation by private parties." *Tellabs, Inc. v. Makor Issues & Rights, Ltd.*, 551 U.S. 308, 313 (2007). The PSLRA requires, among other things, that a complaint set forth well-pleaded facts sufficient to give rise to a "strong inference" that each defendant acted with scienter – i.e., an intent to defraud. A complaint must also identify "with particularity" the alleged false statements and the reasons why those statements are purportedly false and misleading. The Amended Complaint satisfies neither requirement.

***First***, Plaintiff makes no attempt to show that the Walgreens Defendants fraudulently intended to induce Rite Aid stockholders to buy Rite Aid stock at artificially inflated prices. To the contrary, the Amended Complaint repeatedly claims that Walgreens tried to acquire Rite Aid at an unfavorably *low* price. Nor

has Plaintiff alleged any plausible motive the Walgreens Defendants could have had to mislead Rite Aid stockholders about the likelihood that the transaction would receive regulatory approval, a variable that the Walgreens Defendants could neither control nor conceal.  The best Plaintiff can come up with is that the Walgreens Defendants supposedly misled Rite Aid investors in an effort to protect CEO Stefano Pessina's "strong deal-making reputation."  This does not pass muster under the PSLRA.

*Second*, and more fundamentally, in attempting to plead the requisite false or misleading statements or omissions by the Walgreens Defendants, Plaintiff grossly mischaracterizes the statements he purports to quote.  Plaintiff alleges that the Walgreens Defendants denied that the regulatory approval process posed any risk to the Rite Aid transaction and stated with certainty that approval was forthcoming.  But Plaintiff's characterizations are belied by the statements themselves – particularly the portions of the statements that Plaintiff misleadingly omits.

Plaintiff's scienter arguments are wholly implausible, and his allegations that the Walgreens Defendants made false or misleading statements are contradicted by the statements themselves.  Plaintiff comes nowhere close to meeting the exacting pleading burdens imposed on those who would accuse a corporate officer of knowingly and intentionally deceiving stockholders.  The

Amended Complaint fails to satisfy the standards of the PSLRA, and must be dismissed.

## STATEMENT OF FACTS

## I.   __The Parties.__

Walgreens is a global, pharmacy-led health and wellbeing enterprise.  (Am. Compl. ("AC") ¶ 36.)  During the putative class period, Defendant Stefano Pessina served as Walgreens's CEO and Executive Vice Chairman, and Defendant George R. Fairweather served as Walgreens's CFO and Executive Vice President.  (*Id.* ¶¶ 37-38.)  Rite Aid is a retail drugstore chain that sells prescription drugs and a range of other merchandise.  (*Id.* ¶ 25.)  During the putative class period, Defendant John T. Standley served as Rite Aid's CEO and Chairman of the Board, and Defendants David R. Jessick, Joseph B. Anderson, Jr., Bruce G. Bodaken, Kevin E. Lofton, Myrtle S. Potter, Michael N. Regan, Frank A. Savage, and Marcy Syms served as Rite Aid's directors.  (*Id.* ¶¶ 26-34.)  Plaintiff Hering was allegedly a Rite Aid stockholder and purchased Rite Aid common stock during the putative class period.  (*Id.* ¶ 24.)[3]

---

[3] The putative class period is October 27, 2015 through June 28, 2017.  (AC ¶ 1.) Notably, Schedule A to the Amended Complaint shows that Plaintiff did not acquire any Rite Aid stock after August 16, 2016, indicating that Plaintiff lacks standing as lead plaintiff to pursue allegedly fraudulent conduct after that purchase date.  *Winer Family Tr. v. Queen*, 503 F.3d 319, 325-26 (3d Cir. 2007).  For this reason, and the fact that the Amended Complaint's claims are fundamentally

## II.   **Relevant Facts About The Transaction.**

On October 27, 2015, Walgreens and Rite Aid announced a transaction whereby Walgreens would purchase Rite Aid for $9 per share and commit to divest up to 1,000 stores to comply with regulatory requirements.  (*Id.* ¶¶ 49, 57.)  In November 2015, Walgreens and Rite Aid filed notifications required under antitrust law (Rite Aid 2017 Proxy at 59)[4]; the next month, the Federal Trade Commission (FTC) issued requests for additional information from both parties (AC ¶¶ 79-80).  Rite Aid, Walgreens, and their counsel began cooperating with the FTC and worked to resolve its questions over the ensuing months.  (*Id.* ¶ 80.)  In February 2016, Rite Aid stockholders voted in favor of the transaction.  (*Id.* ¶ 49.)

Starting in April 2016, the FTC began identifying geographic areas of interest respecting Walgreens's and Rite Aid's overlapping operations, which both parties' counsel and economists addressed in 20 advocacy papers and various economic analyses.  (Rite Aid 2017 Proxy at 60; AC ¶¶ 83, 85.)  That fall, Walgreens initiated a process to divest stores, granting 18 potential purchasers

---

different from those asserted in the original complaint, the Walgreens Defendants maintain that Plaintiff is required to again undertake the PSLRA notice and lead plaintiff appointment process.  *See Kaplan v. S.A.C. Capital Advisors, L.P.*, 947 F. Supp. 2d 366, 367 (S.D.N.Y. 2013).

[4] When ruling on a motion to dismiss, the Court may take judicial notice of documents incorporated into the Amended Complaint "such as SEC filings, press releases and earnings call transcripts."  *Martin v. GNC Holdings, Inc.*, 2017 WL 3974002, at *1 n.2 (W.D. Pa. Sept. 8, 2017) (citing *Winer*, 503 F.3d at 327).

access to a virtual data site containing extensive due diligence information.  (Rite

Aid 2017 Proxy at 62.)  Walgreens and Rite Aid then agreed to extend the

transaction's closing date from October 27, 2016, to January 27, 2017, "in order to

provide additional time to obtain FTC approval and close the transaction."  (AC

¶ 88; Rite Aid 2017 Proxy at 64.)  Throughout the process, Walgreens reiterated to

its investors that the transaction was subject to regulatory risk.  (*E.g.*, WBA July 6,

2016 Earnings Tr. at 15, *infra* p. 27.)

In January 2017, Walgreens, Rite Aid, and their counsel and advisors met to

discuss the regulatory review process, and how to structure a proposed divestiture

agreement with a third party to address the FTC's concerns.  (Rite Aid 2017 Proxy

at 67.)  The parties then agreed to amend the terms of the transaction, increasing

the number of stores Walgreens was required to divest and reducing the

consideration.  (AC ¶ 19.)  They extended the closing date to July 31, 2017, "in

order allow the parties additional time to obtain regulatory approval."  (Rite Aid

Jan. 30, 2017 Press Release at 1.)

Walgreens and Rite Aid ultimately entered into an agreement, announced on

June 29, 2017, whereby Walgreens would acquire stores and related assets from

Rite Aid, and Rite Aid would continue to operate as an independent company.

(AC ¶ 61.)  The FTC approved an amended and restated asset purchase agreement

in September 2017.  (*Id.*)

6

## RELEVANT PROCEDURAL HISTORY

Plaintiff Hering's original complaint was filed in December 2015, after Walgreens and Rite Aid initially announced the transaction.  That complaint alleged that Rite Aid's preliminary proxy statement, which recommended that Rite Aid stockholders vote in favor of the transaction, was false and misleading in violation of Section 14(a) of the Securities Exchange Act of 1934, among other things.  (Dkt. 1.)  This Court denied Plaintiff's subsequent motion to enjoin the stockholder vote, "find[ing] nothing even remotely defective in the Proxy despite Plaintiff's attempt to torture both its language and logic."  (Dkt. 42 at 13.)

Following Mr. Hering's appointment, along with two others, as lead plaintiff under the PSLRA (Dkt. 52), plaintiffs received an extension to file an amended complaint pending the consummation of the transaction (Dkt. 57).  On June 29, 2017, Walgreens and Rite Aid announced that the transaction had taken the form of an asset purchase agreement.  In August, the Court lifted the stay and ordered plaintiffs to file a motion for leave to amend their complaint, "given that the original claims in this matter are now moot."  (Dkt. 72 at 1.)  The Court granted Plaintiff Hering's motion for leave to amend (Dkt. 82), and Plaintiff filed the Amended Complaint on December 11, 2017 (Dkt. 83).

Two years elapsed between Plaintiff's original complaint and the Amended Complaint, during which time Plaintiff's original claims under Section 14(a)

morphed into allegations under Section 10(b) of the Exchange Act.  Neither the passage of time nor the evolving theory can rescue Plaintiff's case – these latest claims fail and should be dismissed.

## STATEMENT OF QUESTIONS INVOLVED

1.  Whether Plaintiff's claim under Section 10(b) of the Exchange Act and SEC Rule 10b-5 promulgated thereunder should be dismissed for failure to satisfy Federal Rule of Civil Procedure 9(b)'s and the PSLRA's requirements:

    a.  That Plaintiff plead a "strong inference" that the Walgreens Defendants acted with scienter – i.e., an intent to deceive – given that Plaintiff fails to allege a plausible motive for fraud or any specific facts demonstrating that the Walgreens Defendants sought to induce Rite Aid shareholders to buy Rite Aid stock at artificially inflated prices.

    b.  That Plaintiff plead with particularity that the Walgreens Defendants made false statements, as well as the reason or reasons why each statement was false or misleading, given that Plaintiff fails to allege facts demonstrating that the Walgreens Defendants guaranteed that a pending transaction with Rite Aid would receive regulatory approval.

2.  Whether Plaintiff's claim under Section 20(a) of the Exchange Act should be dismissed for failure to plead an underlying claim under Section 10(b) of the Exchange Act and Rule 10b-5 promulgated thereunder.

## ARGUMENT

To state a claim under Section 10(b) of the Exchange Act and Rule 10b-5, "[p]laintiffs must . . . allege defendants made a misstatement or an omission of material fact with scienter in connection with the purchase or the sale of a security upon which plaintiffs reasonably relied and plaintiff[s'] reliance was the proximate cause of their injury." *Winer*, 503 F.3d at 326. Plaintiff's claims are subject to the PSLRA, which imposes "heightened pleading requirements above the normal Rule 12(b)(6) standard." *Williams v. Globus Med., Inc.*, 869 F.3d 235, 240 (3d Cir. 2017); *see also* 15 U.S.C. § 78u-4(b).

The securities laws only proscribe the "making" of a false statement by a person who also possesses the necessary intent to defraud with respect to that statement. *See Janus Capital Grp., Inc. v. First Derivative Traders*, 564 U.S. 135, 142 (2011). Thus, to state a claim, Plaintiff must both identify a false statement and establish that the person who made that statement possessed the requisite state of mind, i.e., scienter, when the statement was made. *See* 15 U.S.C. § 78u-4(b)(2)(A).

The Amended Complaint fails to meet its pleading burden with respect to both scienter and falsity. Each of those failures provides independent grounds for dismissal.

10

I.    **Plaintiff Fails To Plead A Strong Inference Of Scienter.**

Scienter is "a 'knowing or reckless' mental state 'embracing intent to deceive, manipulate, or defraud.'" *OFI Asset Mgmt. v. Cooper Tire & Rubber*, 834 F.3d 481, 490 (3d Cir. 2016) (quoting *Institutional Inv'rs Grp. v. Avaya, Inc.*, 564 F.3d 242, 252 (3d Cir. 2009)).  The heightened pleading standards under the PSLRA require plaintiffs to "state with particularity facts giving rise to a *strong inference* that the defendant acted with [scienter]." *Tellabs*, 551 U.S. at 314 (emphasis added).  This strong inference "must be more than merely plausible or reasonable – it must be cogent and at least as compelling as any opposing inference of nonfraudulent intent." *Id.*  Relevant considerations include showing "that defendants had both motive and opportunity to commit fraud," or "strong circumstantial evidence of conscious misbehavior or recklessness." *Key Equity Inv'rs, Inc. v. Sel-Leb Mktg. Inc.*, 246 F. App'x 780, 784-85 (3d Cir. 2007) (citation omitted).

Plaintiff comes nowhere near meeting this exacting standard:  his claims of fraudulent intent are contradicted by other allegations in the Amended Complaint, and his claims of motive are implausible.  Plaintiff also fails to plead particularized facts establishing the requisite mental state.

### A. Plaintiff Fails to Plead with Particularity that the Walgreens Defendants Possessed Intent or Motive to Deceive Rite Aid Stockholders.

The Amended Complaint does not even suggest, much less establish, why the Walgreens Defendants, via statements to *Walgreens* stockholders, would want to deceive *Rite Aid* stockholders into buying Rite Aid stock at artificially inflated prices. (*E.g.*, AC ¶ 143 ("Plaintiff and the Class would not have purchased Rite Aid common stock during the Class Period at the prices they paid, or at all, if they had been aware that the market prices had been artificially and falsely inflated by Defendants' misleading statements.").) In fact, the Amended Complaint itself consistently argues the *opposite*, claiming that Walgreens's actual interest was in acquiring Rite Aid "at a bargain," and that it continued to "cut down" the consideration throughout the merger process to achieve that goal. (*Id.* ¶¶ 3, 56; *id.* ¶ 48 ("With Rite Aid now in a weakened bargaining position, Walgreens began demanding beneficial deal terms for itself from a position of strength. First, Walgreens lowered its proposed purchase price . . . .").)[5]

Plaintiff's allegation that Walgreens deliberately sought to inflate Rite Aid's stock price, while simultaneously seeking to acquire Rite Aid at a depressed price, is nonsensical. These mutually exclusive allegations are fatal to Plaintiff's ability

---

[5] The Amended Complaint also alleges that the Walgreens Defendants refused to agree to an extension of the closing date or to bear the antitrust risks of the transaction "without a decrease in deal price." (AC ¶ 68(c); *id.* ¶¶ 54, 70(a).)

to plead a strong inference that the Walgreens Defendants knowingly acted fraudulently to *inflate* Rite Aid's stock price.  Plainly any inference of knowing wrongdoing in this case is not strong, let alone "cogent and at least as compelling as any opposing inference of nonfraudulent intent." *Tellabs*, 551 U.S. at 314.

The Amended Complaint also fails to plead with particularity that the Walgreens Defendants had any "motive and opportunity" to deceive Rite Aid stockholders.  (AC ¶ 111.)  All Plaintiff offers is that the Walgreens Defendants (a) "misled investors to gain [Rite Aid] shareholder approval of the deal," and (b) "continued to mislead investors in order to rebut criticism of the deal's viability, which threatened to tarnish Pessina's strong deal-making reputation." (*Id.* ¶ 112; *id.* ¶ 10.)[6]  Plaintiff's generic and unsupported assertions about the Walgreens Defendants' interests are a far cry from the level of particularity demanded under the PSLRA:  "In every corporate transaction, the corporation and its officers have a desire to complete the transaction . . . .  Such allegations alone cannot give rise to a 'strong inference' of fraudulent intent." *GSC Partners CDO Fund v. Washington*, 368 F.3d 228, 237 (3d Cir. 2004).  Relatedly, "a generalized desire to achieve a lucrative acquisition . . . can be attributed to virtually every company" and so fails to support a strong inference of scienter. *ECA, Local 134*

---

[6] Plaintiff does not even attempt to address the fact that the Walgreens Defendants' statements were made to stockholders of Walgreens, not Rite Aid.

*IBEW Joint Pension Tr. of Chi. v. JP Morgan Chase Co.*, 553 F.3d 187, 201 (2d

Cir. 2009) (citation omitted).  Plaintiff fails to plead motive or intent to defraud.

### B. Plaintiff Fails to Plead with Particularity that the Walgreens Defendants Knew of any Alleged Falsity of Their Statements.

Plaintiff's assertions that the Walgreens Defendants "knew that their public

statements were materially false and misleading" also fall short.  (AC ¶ 113.)  "Of

course, it is not enough for plaintiffs to merely allege that defendants 'knew' their

statements were fraudulent or that defendants 'must have known' their statements

were false.  Plaintiffs must plead allegations of scienter with particularity."  *GSC*,

368 F.3d at 239 (citations omitted).  Plaintiff has not done this.

Plaintiff first alleges knowledge of falsity based on Defendants Pessina's

and Fairweather's personal involvement in the Rite Aid transaction. (AC ¶¶ 116,

118-19.)  But Plaintiff has not alleged any facts "*known to defendants at the time of*

*the statements*, whose disclosure would have made the statement clearer or more

correct."  *In re Discovery Labs. Sec. Litig.*, 2007 WL 789432, at *2 (E.D. Pa.

Mar. 15, 2007), *aff'd*, 276 F. App'x 154 (3d Cir. 2008) (citation omitted) (finding

that company's statement that its production line was FDA-compliant was not

false, despite subsequent FDA finding of noncompliance).  Plaintiff baselessly

claims that "each Defendant was fully informed of . . . the FTC's determination

that it was unlikely to approve the Original Merger or the Revised Merger."  (AC

¶ 120; *id.* ¶¶ 85, 101(b).)  The facts alleged show only that, as is standard for

14

complex transactions of this kind, the FTC made additional requests for information and identified areas of geographic interest, and that Walgreens and Rite Aid revised the terms of the transaction in response. *See supra* pp. 5-6.[7]

Plaintiff next points to the fact that the Walgreens Defendants held themselves out as knowledgeable about the transaction as proof of scienter. (AC ¶ 121.) But despite Plaintiff's misleading allegations (*id.* ¶¶ 123-25), neither Mr. Pessina nor Mr. Fairweather ever claimed to *know* that the FTC would grant approval. To the contrary, Mr. Pessina told Walgreens investors only that he was optimistic about the success and value of the proposed transaction, and Mr. Fairweather said merely that Walgreens had always been clear about its expectations regarding the deal. *See infra* pp. 18-25.[8]

---

[7] Plaintiff also alleges knowledge based on Defendants Pessina's and Fairweather's roles as Walgreens executives. (AC ¶ 116.) But it is insufficient to assert "blanket statements that defendants must have been aware of [whether the FTC would grant regulatory approval] by virtue of their positions within the company." *In re Advanta Corp. Sec. Litig.*, 180 F.3d 525, 539 (3d Cir. 1999), *abrogated on other grounds by Tellabs*, 551 U.S. 308. Plaintiff's argument presumes that Defendants Pessina's and Fairweather's roles at Walgreens somehow conferred knowledge about the FTC's internal decisionmaking process – an unreasonable position and one which the Walgreens Defendants disavowed when speaking to Walgreens investors.

[8] Plaintiff baselessly alleges, as further evidence of knowledge, that the Walgreens Defendants "insisted that any criticism of the deal's viability was flat wrong." (AC ¶ 121.) The Walgreens Defendants never made any such statement; as Plaintiff eventually concedes; they only claimed to "have a different opinion" about the regulatory approval process based on their experience with the FTC: "And we

Lastly, Plaintiff focuses on the "temporal proximity" between the Walgreens Defendants' representations, on the one hand, and the supposed "revelation of their falsity" via a *Bloomberg* article and opinions exchanged "privately" among Rite Aid's counsel, on the other.  (AC ¶¶ 126-27.)  As an initial matter, Plaintiff wildly mischaracterizes statements made by Defendants Pessina and Fairweather to suggest that they promised "that the deal would be approved by the FTC as structured based on purported insider knowledge and conversations with regulators."  (*Id.* ¶ 127.)  In reality, the Walgreens Defendants limited their comments to Walgreens's evolving expectations about the deal and kept investors informed of the additional demands coming from the FTC.  *Bloomberg*'s speculation about the FTC's antitrust concerns, and opinions exchanged "privately" among Rite Aid's counsel,[9] do nothing to establish the falsity of the Walgreens Defendants' statements.

Moreover, Plaintiff makes no effort to explain why temporal proximity of differing statements is evidence of falsity or scienter – particularly when the statements at issue were made by different groups of people – as opposed to

---

continue to be very positive in spite of the opinion of certain people who apparently are not particularly well informed."  (*Id.* ¶ 123.)

[9] Further, it is unreasonable to impute knowledge to the *Walgreens* Defendants based on comments *Rite Aid's* counsel shared with *Rite Aid's* board.  (Rite Aid 2017 Proxy at 66.)

merely reflecting the evolution of the underlying circumstances.  Even assuming

that subsequent statements by others were inconsistent with the Walgreens

Defendants' prior statements, that does not make the Walgreens Defendants'

statements false; temporal proximity alone does not support a strong inference of

scienter.  *See Elam v. Neidorff*, 544 F.3d 921, 930 (8th Cir. 2008).  Plaintiff's

proposed inference is not nearly as compelling as the nonculpable explanation:

The Walgreens Defendants' statements were truthful when made and were revised

as they became aware that circumstances changed.  *Tellabs*, 551 U.S. at 323 ("The

[compelling inference] inquiry is inherently comparative . . . .").

 For these reasons, Plaintiff's scienter claim fails.[10]

## II.   Plaintiff Fails To Allege That The Walgreens Defendants Made False or Misleading Statements.

 The Amended Complaint further fails to allege adequately that any of the

Walgreens Defendants' statements were false or misleading.  In addition to "the

who, what, when, where and how" required under Rule 9(b), *Advanta*, 180 F.3d at

---

[10] Plaintiff cursorily alleges that the Walgreens Defendants "were reckless in statements that were likely to mislead investors."  (AC ¶ 111.)  In the Third Circuit, recklessness "involv[es] not merely simple, or even inexcusable negligence, but an *extreme departure* from the standards of ordinary care, and which presents a danger of misleading buyers or sellers that is either known to the defendant or is so obvious that the actor must have been aware of it."  *GSC*, 368 F.3d at 239 (emphasis added) (quoting *Advanta*, 180 F.3d at 535).  Other than claiming that the Walgreens Defendants "recklessly disregarded" adverse facts, Plaintiff fails to develop any argument on this point, let alone plead an extreme departure from the standards of ordinary care.  (AC ¶¶ 68, 70.)

534, under the PSLRA, Plaintiff must "specify each statement alleged to have been misleading [and] the reason or reasons why the statement is misleading," *id.* (quoting 15 U.S.C. § 78u-4(b)(1)).

Unable to clear that high hurdle, Plaintiff resorts to gross mischaracterization of the statements he purports to quote and the omission of key language, repeatedly distorting their meaning. But even then, he cannot outrun reality – in the very quotes alleged by Plaintiff to be false, the Walgreens Defendants plainly stated that the success of the transaction was not guaranteed. Plaintiff has not demonstrated the falsity of any of the identified statements, providing independent grounds for dismissal of the Amended Complaint.

> **A.     The Walgreens Defendants Were Optimistic About the Transaction but Neither Guaranteed that the FTC Would Approve It, nor Denied that Obtaining Regulatory Approval Was an Obstacle to Closing It.**

> > 1.     <u>The Walgreens Defendants' statements expressing optimism about the transaction are not actionable.</u>

Optimism is not actionable under Section 10(b). *See Advanta*, 180 F.3d at 538 (company's expressions of "confidence in Advanta's prospects for future growth" were "vague and general statements of optimism" and thus immaterial); *In re Burlington Coat Factory Sec. Litig.*, 114 F.3d 1410, 1427 (3d Cir. 1997) (allegations that officer's "vague expressions of hope" about continued growth "could dupe the market have been almost uniformly rejected by the courts");

*Discovery Labs.*, 2007 WL 789432, at *5 (finding that company's optimistic statements that it could "timely resolve[]" noncompliance issues identified by FDA were not false or misleading, even though resolution actually took years).  "The mere fact that defendants' statements turned out to be overly optimistic does not make them fraudulent. . . .  In order to make out a securities fraud claim, plaintiffs must allege that defendants *knew* they were being overly optimistic," which Plaintiff has not done here.  *Discovery Labs.*, 2007 WL 789432, at *5; *see supra* pp. 14-17.  Instead, Plaintiff twists and mischaracterizes numerous statements by Mr. Pessina and Mr. Fairweather, repeatedly putting words in their mouths and claiming that they offered guarantees that they never actually provided.

The Walgreens Defendants expressed their optimism, anticipations, and expectations – *not* certainties – about the transaction.  During an October 2016 Walgreens earnings call, a Walgreens investor asked, "So, what gives you confidence in an early 2017 close?"  (AC ¶ 89.)  Far from providing any guarantee, Mr. Pessina merely expressed general optimism in response, stating that "we are confident, as confident as we were before about this deal."  (*Id.*)[11]  Mr. Pessina added, "Yes, probably more stores, a little more stores here and there, but at the end of the day – *as far as I can see today, as far as we can see today*, we are absolutely confident that we can create, that we can do the deal and we can create

---

[11] All emphasis in this Section II added or altered unless otherwise noted.

the value." (*Id.*)[12]  Thus, contrary to Plaintiff's mischaracterizations, Mr. Pessina never provided investors with assurance "that the deal would close under the terms of the Original Merger Agreement based on Walgreens' discussions with the FTC and Walgreens' own internal analyses." (*Id.* ¶¶ 12, 89.)

With respect to Mr. Pessina's remarks during an April 2017 earnings call with Walgreens investors regarding the revised transaction, Plaintiff misleadingly truncates separate statements when purporting to quote them (presumably to make them appear more definitive than they actually were).  Plaintiff says: "Pessina added: 'I am still optimistic that we will bring this deal to a successful conclusion' and that '[w]e believe that we can [certify compliance] in the coming weeks[.]'" (*Id.* ¶ 100; *id.* ¶ 20.)

Here is what Mr. Pessina *actually* said:

Turning to Rite Aid.  I am still optimistic that we will bring this deal to a successful conclusion.  ***But there is no doubt that the process of getting clearance for the transaction is taking longer than we expected.  We are constantly and currently collaborating with FTC*** . . . to get the necessary approvals and close the transaction.

***At the same time, we are working to be in a position to certify compliance.  We believe that we can achieve this in the coming weeks and are still***

---

[12] The *Bloomberg* article on which Plaintiff relies claims, "In October, Walgreens said it was 'confident' it would close the deal early this year . . . ."  (AC ¶¶ 17, 102, 127.)  Like Plaintiff, *Bloomberg* fails to capture that Mr. Pessina did not express confidence as to whether the FTC would ultimately grant the regulatory approval requisite to closing within a specified timeline.  Rather, Mr. Pessina acknowledged "a delay in the execution of the deal." (*Id.* ¶ 89.)

> ***working toward our revised time table to obtain a clearance by the end of
> July.***  The changes to the deal that we agreed in January demonstrate our
> absolute commitment to ensure all transactions meet our demanding
> financial and strategic requirements while allowing us the ability to address
> any reasonable demand that may be made of us in obtaining regulatory
> approval.

(WBA Apr. 5, 2017 Earnings Tr. (Ex. 1) at 7.)[13]  At no point in the above

statement does Mr. Pessina "reassur[e] investors that the Revised Merger would be

more likely to satisfy regulators," as Plaintiff baselessly claims.  (AC ¶¶ 20, 100.)

In fact, Mr. Pessina's last sentence anticipates *more* demands from the FTC and

represents only *Walgreens's* commitment to obtaining approval.[14]

At the Morgan Stanley Consumer Conference in November 2015, Mr.

Fairweather told Walgreens investors, "We're ***anticipating*** that store divestitures

---

[13] Plaintiff alleges that Mr. Pessina also "touted Walgreens' announcement of a
$1 billion share repurchase program" on this same call.  (AC ¶¶ 20, 100.)  It is
unclear, and Plaintiff makes no attempt to explain, what is false or misleading
about this statement or how it is relevant to his claims.

[14] In response to an analyst's question during this call about "where exactly aren't
you and the FTC seeing eye to eye" and whether "there need[s] to be more
commissioners added in order to gain approval," the Amended Complaint
concedes that Mr. Pessina expressed his own opinion: "Well, as I said, I am still
positive on this deal.  I believe that we have a strong argument for – to defend this
deal."  (AC ¶ 100; Ex. 1 at 8.)  The Amended Complaint then omits Mr. Pessina's
next sentences, which highlight Walgreens's inability to shape the FTC's
decisionmaking process:  "***I cannot comment on the organization of the FTC.  It
will be up to them to decide whether they have enough people or not to judge on
the quality of this deal***. . . .  We are collaborating very well with the FTC.  And . . .
we are preparing our facts to be ready to certify compliance, if we will decide to do
so."  (Ex. 1 at 8.)

will be less than 500, although our contract provides for up to 1,000, but we don't *anticipate* that will be the case."  (AC ¶ 67.)  Plaintiff omits that Mr. Fairweather then reminded Walgreens investors, "But *clearly we will have to work with the relevant authorities* as we go through this."  (Morgan Stanley Nov. 17, 2015 Tr. (Ex. 2) at 3.)

Similarly, at Walgreens's January 2016 annual stockholders meeting, Mr. Pessina told Walgreens stockholders, "So far, this process is proceeding as we had anticipated and we continue to expect the transaction to complete at some point in the second half of this calendar year."  (AC ¶¶ 7, 82.)  Plaintiff omits that Mr. Pessina added, "We are currently *going through the regulatory process* together to work for these transactions."  (WBA Jan. 27, 2016 S'holders Meeting Tr. (Ex. 3) at 8.)

Plaintiff also misleadingly claims that, at the Credit Suisse Healthcare Conference in November 2016, Mr. Pessina "rejected any notion that the [transaction] had encountered regulatory turbulence based on his insider knowledge."  (AC ¶ 90; *id.* ¶ 13.)  But as the Amended Complaint itself shows, far from rejecting anything, Mr. Pessina expressed his own opinion that "*I don't believe that there is any technical reason* why this deal should not go through.  Of course, *everything is possible politically*.  But, until now, we have seen a careful, diligent, but absolutely not hostile attitude of the FTC.  And we are collaborating."

22

(*Id.* ¶ 90.)[15]  Contrary to Plaintiff's aspersions, Mr. Pessina did not claim insider

knowledge, he plainly acknowledged and discussed that the regulatory process

remained ongoing, and he noted that any outcome was possible.

Similarly, Mr. Fairweather never claimed to be "'very clear' that the deal

would pass regulatory review within the divestiture cap" as Plaintiff alleges.  (*Id.*

¶ 94; *id.* ¶ 15.)  Instead, Mr. Fairweather told Walgreens investors at the Jefferies

Healthcare Conference in November 2016 that Walgreens was clear about its *own*

expectations, but at the same time, he stated that the regulatory approval process

already had exceeded the timetable for which Walgreens had hoped – making plain

to investors that Walgreens had little ability to control or predict the outcome of

the FTC's review:

---

[15] Limiting his comments to "what we know," Mr. Pessina told Walgreens investors that "we have a ***different opinion*** than certain journalists who are writing things we don't recognize or people we – or about people we have never heard of." (AC ¶¶ 13, 90, 123.)  He based this opinion on the "careful, diligent, but absolutely not hostile attitude of the FTC" toward Walgreens:  "And I believe that so far, so good.  And we continue to be very positive in spite of the opinion of certain people who apparently are not particularly well informed."  (*Id.* ¶ 90.)

When asked what synergies Walgreens's initial earnings per share guidance incorporated, Mr. Pessina explained, "No, there is very little about synergies" but, "***if we would be able to conclude this deal***, let's say, at the very beginning of the year" (Credit Suisse Nov. 8, 2016 Tr. (Ex. 4) at 5), then "[t]he synergies will come in quite in line with what we have announced to the market in the following two years, particularly our fiscal 2018 and 2019" (AC ¶ 91).  Mr. Pessina's comment about focusing on Rite Aid and integration was in response to a question about other merger opportunities; it is unclear what is alleged to be false or misleading about this statement or how it is relevant to Plaintiff's claims.  (*Id.*; Ex. 4 at 5.)

> We are very clear – from what we said in September, we expect the deal to complete.  We have been absolutely consistent on that from day one . . . . [W]e do expect the store divestitures to now be in the range of 500 to 1,000. We expect to be able to sign the divestiture agreements before the end of this calendar year and to be able to complete the transaction . . . early in the new year . . . .  [I]t is a few more divestitures than we had ***originally anticipated*** but within what we had in the contract, and it has just taken us a little bit longer than – ideally ***we would have hoped to work through with the FTC*** . . . .

(*Id.* ¶ 94.)  Mr. Fairweather also explained that, "fundamentally, the economics of the deal are the same," though "it's just perhaps taken a little bit longer than we had thought in the first place." (*Id.*; *id.* ¶ 125.)

Plaintiff also alleges that Walgreens's September 2016 press release misled the market into thinking that the transaction was "close to closing." (*Id.* ¶¶ 11, 87.) But (and as the Amended Complaint partly concedes), the release actually stated that Walgreens and Rite Aid "***remain actively engaged with the [FTC]*** regarding its review of the pending acquisition.  As a result of the progress of these discussions with the FTC staff, Walgreens Boots Alliance is ***exploring potential divestiture remedies to address certain issues*** raised in those discussions." (WBA Sept. 8, 2016 Press Release (Ex. 5) at 1; AC ¶¶ 11, 87.)  Walgreens said it "***continues to believe***" that the transaction would close "in the second half of calendar 2016." (Ex. 5 at 1.)  And far from "downplay[ing]" the divestiture issue (AC ¶ 11), Walgreens said it "now expects that the ***most likely*** outcome will be that the parties will be required to divest ***more than the 500 stores*** previously

communicated, but still continues to expect that fewer than 1,000 stores will be required to be divested" (Ex. 5 at 1).[16]

These statements, providing optimism, anticipations, and beliefs that evolved over time with changing circumstances, are not actionable.

> ## 2. The Walgreens Defendants' other alleged misstatements contain no false or misleading information, and include that regulatory approval was still pending.

The Walgreens Defendants' expressions of optimism were coupled with clear statements that regulatory approval of the Rite Aid transaction remained pending, and there were never any guarantees that the transaction would receive regulatory approval. Plaintiff's mischaracterizations and allegations to the contrary do not undermine any of the statements.

Plaintiff refers to a statement by Mr. Pessina during a January 2016 earnings call with Walgreens investors "reiterat[ing] that this transaction is progressing as we expected and planned" (AC ¶¶ 6, 81), but the Amended Complaint fails to include that Mr. Pessina also said, "The transaction remains subject to approval by

---

[16] Even if the Walgreens Defendants "may have attempted to put a positive spin" to investors on an unfavorable development, "that is not, by itself, enough to form the basis for liability." *Discovery Labs.*, 2007 WL 789432, at *3 ("It is not the role of the courts to split hairs over *how* positively corporate executives are allowed to describe a negative event. It is sufficient that the markets were aware that [there] was a serious setback . . . ."); *Advanta*, 180 F.3d at 538 (no Rule 10b-5 liability merely because "the firm bathes itself in a favorable light" but later "discloses that things are less rosy" (quoting *DiLeo v. Ernst & Young*, 901 F.2d 624, 627 (7th Cir. 1990))).

Rite Aid's shareholders, *regulatory clearances*, and other customary closing

conditions. . . .   We are continuing to *work closely with the regulators*" (WBA Jan.

7, 2016 Earnings Tr. (Ex. 6) at 6).[17]

Plaintiff's selective quotations from Mr. Pessina's answers during an April

2016 earnings call with Walgreens stockholders are likewise misleading.  An

analyst asked, "Has anything changed in the competitive landscape since you

announced the deal that could impact the potential divestitures?"  (WBA Apr. 5,

2016 Earnings Tr. (Ex. 7) at 11.)  Mr. Pessina answered:

> No.  Nothing has changed, *except the fact we are collaborating*, and as the
> time is passing, probably the solution will be closer, because . . . we knew
> from the very beginning that this would have been a very long process . . . .
> *[W]e hope that, sooner or later, we will have an indication on where we
> are, but of course, we cannot put a day or even a month for this indication*

---

[17] Mr. Pessina also told Walgreens investors,  "As I have said before, we're
working with the relevant [targets] in order to speed up the process if possible of
course," (AC ¶ 81), and further stated that "we have received a second request
from the FTC for additional information.  This is a standard part of the regulatory
process in connection with the FTC's review" (Ex. 6 at 6).  Without any support or
explanation, Plaintiff implies that receiving a second request is not standard.  (*E.g.*,
AC ¶ 101(e).)  But a complex transaction between two large players in the same
industry is precisely the type of transaction that could raise antitrust issues
warranting a closer look.

Plaintiff also claims that, in an effort "[t]o drive the point home" (it is
unclear what point), Mr. Pessina told Walgreens investors that a recently appointed
integration team was "well underway on preliminary planning work."  (*Id.* ¶ 81; *id.*
¶ 6.)  Plaintiff does not explain what is false or misleading about this factual
statement; in any case, no reasonable investor would assume that regulatory
approval was immediately forthcoming merely because two parties to a merger had
assembled an integration team.

>*because it depends very much on how deeply the FTC wants to analyze all*
>*of the documents that we have given*.  But it's nothing atypical, exactly
>online with what we were expecting.

(*Id.*)[18]

Plaintiff uses this same ploy with Mr. Pessina's comments on a July 2016

earnings call with Walgreens investors.  Right after Mr. Pessina said, "Our

proposed acquisition of Rite Aid is progressing as planned" (AC ¶¶ 9, 86), Plaintiff

fails to include that Mr. Pessina added, "As you know, *we are in the process of*

*seeking a regulatory approval*.  In part, our integration team is continuing its work

on preliminary planning" (WBA July 6, 2016 Earnings Tr. (Ex. 8) at 3).  And after

he confirmed Walgreens's "initial estimate" for store divestitures and the deal's

timeline (AC ¶¶ 9, 86), Plaintiff also neglects to include that Mr. Pessina

continued, "But of course, *it doesn't depend on us*.  *The FTC will let us know*

when they are ready" (Ex. 8 at 15).  Plaintiff next omits that Mr. Pessina, in

response to questions about potential buyers of Rite Aid stores, responded, "We

cannot go – even because, at the end of the day, *we don't know exactly how many*

*stores and where*.  We have an idea, but *we don't know exactly*."  (*Id.* at 17.)

---

[18] On the same call, Mr. Pessina expressed optimism about the expected timeline of
the ongoing regulatory process:  "Of course, our agreement to acquire Rite Aid is
continuing as we expect, with the regulatory approval process progressing in line
with the timetable we had expected."  (AC ¶¶ 8, 84.)

Further, the Amended Complaint implies that Mr. Fairweather offered unqualified assurances to Walgreens investors about divestitures during the October 2016 Walgreens earnings call.  (*See* AC ¶¶ 12, 88.)  In reality, Mr. Fairweather said, "As announced on September 8, we remain ***actively engaged with the FTC*** on its review.  ***Today***, we still expect that the ***most likely*** outcome will be that the parties will be required to divest between 500 and 1,000 stores.  We ***believe*** that we will be able to execute agreements to divest these stores to potential buyers ***pending FTC approval***, by the end of calendar year 2016.  I now expect to close the acquisition in early calendar 2017."  (WBA Oct. 20, 2016 Earnings Tr. (Ex. 9) at 5.)

As on other calls, Mr. Pessina reminded Walgreens investors that the FTC was taking a close look at the transaction:  "[O]f course they were inquiring.  They were detailed.  They were asking a lot of questions.  Sometimes they were taking time to respond, but at the end of the day, I ***believe*** we have had a good collaboration – we're having a good collaboration.  ***We try to respond to all of their needs.  This takes time.***  But at the end, we are still confident."  (AC ¶ 89.)[19]

---

[19] Mr. Pessina added, "Of course, ***if we close the deal*** relatively late in our fiscal year, the synergies will be smaller.  But we will find all of them next year."  (AC ¶ 89.)  Again, there is nothing false or misleading about this expression of optimism.

On December 20, 2016, a Rite Aid press release announced that Walgreens and Rite Aid had entered into a divestiture agreement with a third party, "subject to [FTC] approval," with some commentary from Mr. Pessina.  (Rite Aid Dec. 20, 2016 Press Release at 1.)  Without any basis in the text, Plaintiff claims, "The market understood Pessina's comments to indicate that the extended timeframe and announced divestitures meant the Original Merger was close to receiving the necessary regulatory approvals."  (AC ¶ 96.)  But as the Amended Complaint shows, Mr. Pessina actually reminded investors that this was one step in an ongoing process:  "With this agreement, *we are moving ahead* with important work *necessary to obtain approval* of our acquisition of Rite Aid."  (*Id.*)

Plaintiff again attempts to twist the Walgreens Defendants' statements from an earnings call on January 5, 2017.  As set forth in the Amended Complaint, Mr. Fairweather informed Walgreens investors, "[W]e are *actively engaged in discussions with the FTC*, and are still *working towards* a close of the acquisition in the early part of this calendar year, having announced [a divestiture] agreement on December 20, 2016."  (*Id.* ¶ 97; *id.* ¶¶ 16, 127.)  Contrary to Plaintiff's claims, the Walgreens Defendants clearly did not "conceal[] from investors" the FTC's anti-competition concerns, to which the divestiture agreement with a third-party buyer was a direct response.  (*Id.* ¶ 16; Rite Aid Dec. 20, 2016 Press Release at 1 ("The agreement is being entered into to respond to concerns identified by the

FTC . . . .").)[20]  Plaintiff also omits that, on that call, after Mr. Pessina reaffirmed

Walgreens's progress respecting the "conditional [divestiture] agreement," he

reminded Walgreens investors, "***We still have to complete our work with the FTC,***

***and as we have seen, these things can take some time***, as the FTC are scrupulous

in ensuring that they consider everything properly and fully."  (WBA Jan. 5, 2017

Earnings Tr. (Ex. 10) at 5.)  Still, Mr. Pessina "remain[ed] as convinced as ever ***of***

***the strategic benefits*** of the proposed Rite Aid transaction."  (AC ¶¶ 98, 127.)

Plaintiff next repeatedly misattributes Mr. Pessina's expression of

commitment during this earnings call, claiming that he was expressing

commitment "that the Original Merger would be approved as structured."  (*Id.*

¶ 17; *id.* ¶¶ 102, 124, 127.)  He said nothing of the sort.  The full statement,

including portions omitted in the Amended Complaint, disproves Plaintiff's

misleading interpretation.  Here is what Mr. Pessina told Walgreens investors:

> We are clearly making progress, and while I would always like to move
> faster and do more, ***we must be measured and ensure we work at a pace***
> ***with which we are confident we can deliver for our customers and our***

---

[20] Plaintiff has also not pleaded any facts disproving that Mr. Fairweather's "good
progress" report reflected his understanding at the time.  (AC ¶ 97.)  As discussed,
*supra* n.9, Plaintiff's allegations regarding *Rite Aid's* counsel's opinion about the
regulatory approval process shared during a *Rite Aid* board meeting on January 6,
2017, say nothing about *Walgreens's* position as presented during an earnings call
with its investors the day before.  (*Id.* ¶¶ 16, 101(b), 127; Rite Aid 2017 Proxy at
66.)  In any case, entering into the divestiture agreement was in fact progress
toward addressing the FTC's concerns.  (Rite Aid Dec. 20, 2016 Press Release at
1.)

> ***shareholders, on all the plans and strategies we have discussed with you.***
> ***Our confidence is only strengthened by our recent performance.***  Holiday
> shopping started later than usual . . . .  That said, we have once again seen
> what appears to be a solid holiday trading period in our main retail markets.

(Ex. 10 at 6; *see also id.* ("Overall we remain confident ***in the outlook for the***

***Company*** . . . .").)  Mr. Pessina's reference to "all" Walgreens's plans and

strategies, and his subsequent comments about Walgreens's strong sales

performance, show that his remarks were not directed to whether the FTC would

approve the Rite Aid transaction – nor could any investor reasonably have

interpreted them that way.[21]

Mr. Pessina also addressed what could happen if the FTC did not grant

approval, contrary to Plaintiff's assertion that he refused to consider the possibility.

(AC ¶ 98.)  Mr. Pessina told Walgreens investors, "[W]e would have to sit down

and decide what to do . . . .  We would have to see what our counterparty, Rite Aid

wants to do, and see whether there are solutions or not . . . .  ***I and the multiple***

***people here are thinking the ways of difference*** and are analyzing many other

things."  (Ex. 10 at 17.)[22]

---

[21] Regardless, Mr. Pessina's generalized expressions of confidence are not
actionable statements under Section 10(b).  *See supra* pp. 18-19.

[22] Mr. Pessina also explained why, "today," Walgreens was not expecting to rely
on a Plan B:  "We are working hard to have this deal approved, ***and for the time***
***being***, we don't want even to think of the fact that this could not be approved after
so many months, when we have given a lot of information, and we have had a very
good relationship with the people of the FTC.  And they have continued to ask

Once Plaintiff's mischaracterizations are put aside and the statements in question are seen in their full context, including portions Plaintiff omitted, it is clear that the Walgreens Defendants consistently expressed their optimism, anticipations, and beliefs – but never certainties – about the Rite Aid transaction, and they never guaranteed results or denied that regulatory approval was a risk factor.  Plaintiff's mischaracterizations and selective citations of the statements do not suffice under the PSLRA.[23]

### B.   Statements by Nonparties Are Not Actionable Because They Are Not False or Misleading.

Plaintiff also attacks statements made by other Walgreens executives, who are not named as defendants.  Like the Walgreens Defendants, the nondefendants

---

information, and we have continued to give information.  And in reality, we ***believe*** that we have spen[t] so much time asking and analyzing so many documents, is because they want to understand the substance of this transaction, which is fine.  So we are not thinking of a Plan B ***today***."  (Ex. 10 at 17.)

[23] In any case, Plaintiff does not have standing to pursue his 10(b) claims against the Walgreens Defendants based on any alleged misstatements made after August 16, 2016, the last date of any purchase or sale of Rite Aid securities (*see* Compl., Sch. A), pursuant to long-standing Supreme Court precedent.  *See Blue Chip Stamps v. Manor Drug Stores*, 421 U.S. 723, 737-38 (1975); *Winer*, 503 F.3d at 325-26; *Walck v. Am. Stock Exch., Inc.*, 687 F.2d 778, 790 (3d Cir. 1982) (plaintiff "cannot predicate [securities fraud] liability on . . . activities of [the defendants], no matter how fraudulent or deceptive they may have been, that induced [plaintiff] to 'retain' . . . stock"; rather, Section 10(b) "authorize[s] liability only for conduct occurring 'in connection with the purchase or sale of any security'" (citing *Blue Chip Stamps*, 421 U.S. 723)).  As such, Plaintiff lacks standing to assert a claim with respect to the alleged misstatements postdating August 16, 2016.  (*E.g.*, AC ¶¶ 87-98, 100.)

shared their optimism and predictions with Walgreens investors about the Rite Aid transaction, but they never guaranteed FTC approval and they repeatedly reiterated the lack of certainty.  (*Cf.* AC ¶¶ 68, 101 (alleging that nondefendants "failed to disclose . . . adverse facts").)  The cited statements made by nondefendants were not false or misleading, and so they are not actionable.

For example, when Alex Gourlay (now Walgreens's Co-Chief Operating Officer) said at the November 2015 Credit Suisse conference that "we *believe*" the number of required divestitures would "*probably*" be around 500 stores (*id.* ¶ 67), he then cautioned Walgreens investors (which Plaintiff omits):  "*We don't really know*, but we *believe* that's probably the right number.  The expected timing is second half of next year.  *We don't know, to be honest*, but we think it'll be the second half of 2016" (Credit Suisse Nov. 10, 2015 Tr. (Ex. 11) at 7).

Plaintiff alleges that Mr. Gourlay "rebutted any notion that the Original Merger had generated any regulatory concern" at the Morgan Stanley conference in November 2016.  (*Id.* ¶¶ 14, 92.)  However, as the subsequently quoted transcript shows, Mr. Gourlay told Walgreens investors, "No, *the process continues*, the process has never stopped.  It's a process that clearly has taken longer than we had anticipated."  (*Id.* ¶ 92.)  "*And the process continues* and we've given an update saying that we expect to give more information on the deal

in the early part of next year and we stick by that." (*Id.*)[24]  Mr. Gourlay said that

Walgreens's management "***believe[d]*** we will get it done," but he never "rebutted"

the notion that there were FTC approval risks associated with the transaction – to

the contrary, he made clear that the regulatory approval process remained ongoing.

(*Id.*)

Plaintiff next repeatedly manipulates a term used by Walgreens's Senior

Vice President, Gerald Gradwell, at the November 2016 Jefferies conference.

Mr. Gradwell told investors that Walgreens had "enough clarity on what we have

to do in terms of remedies with the FTC to be – ***to have opened the data room for***

***sale of pharmacies to potential buyers***." (*Id.* ¶ 95.)  Incredibly, based on this

statement, Plaintiff alleges that Mr. Gradwell claimed to have "'clarity' on the

issue" of whether "the deal would pass regulatory review within the divestiture

cap" (*id.* ¶¶ 94-95), as well as "'clarity' on the issue" of what would "satisfy

antitrust regulators" (*id.* ¶ 125), and that the Walgreens Defendants claimed to

have "'clarity' . . . that the deal would be approved" (*id.* ¶ 101(c)).  Plaintiff has

invented this out of whole cloth.

_____

[24] Mr. Gourlay also reiterated Walgreens's confidence about the strategic benefit of
the deal:  "We remain, as we did from day one, confident ***about [doing] strategic***
***deal*** for us.  The Rite Aid board clearly believes it's a good deal for them and we
***believe*** we will get it done."  (AC ¶ 92 (alteration in original); *id.* ¶ 93 ("[W]e
***believe even more in the Rite Aid deal*** from that [strategic] point of view than we
believe probably two years ago we've understood the market and these network
change have happened.").)

Plaintiff also omits that Mr. Gradwell added at the Jefferies conference, "So from our point of view, the process has never stopped, which is quite key, because if there was a blocking rationale the case team would stop working at the FTC. ***You can never guarantee anything.  It still has to go through the commissioners of the FTC*** but we are slightly further behind where we thought we would be just because the level of detail, but things are progressing well."  (Jefferies Nov. 17, 2016 Tr. (Ex. 12) at 9.)  He reminded investors that while Walgreens had identified potential buyers, "We have been in ***ongoing discussions with the FTC***."  (AC ¶ 95.)

Plaintiff attempts to attribute these nondefendants' statements to Mr. Pessina by cursorily arguing that he, as Walgreens's CEO, "had the authority and ability to correct any false or misleading statements made about the company's business" but failed to do so.  (*E.g.*, *id.* ¶ 93.)[25]  But a duty to correct arises "if a disclosure is in fact *misleading when made*, and the speaker thereafter learns of this."  *Burlington*, 114 F.3d at 1431 (quoting *Backman v. Polaroid Corp.*, 910 F.2d 10, 16-17 (1st Cir. 1990)).  The nondefendants never concealed that regulatory approval was an impediment to closing the transaction.  Plaintiff has not pleaded with adequate

---

[25] Mr. Pessina was not present at the Credit Suisse conference (AC ¶ 67 (Gourlay statement)), Morgan Stanley conference (*id.* ¶¶ 92-93 (Gourlay statement)), or Jefferies conference (*id.* ¶ 95 (Gradwell statement)).

particularity that any of these statements was false or misleading, and thus he also fails adequately to allege a duty to correct any of the statements.

### C.   The Walgreens Defendants' Post-Class Period Statements Only Further Undercut Plaintiff's Claims.

Plaintiff next turns to post-class period statements in an attempt to shore up his claim that the Walgreens Defendants made false or misleading statements during the putative class period.  Plaintiff cites a Walgreens earnings call on June 29, 2017, following Walgreens and Rite Aid's announcement that the transaction would take the form of an asset purchase agreement.  (AC ¶¶ 21, 61.) Plaintiff implies that Defendant Pessina was suddenly reticent about the transaction, and suggests that it was indicative of the falsity of his prior statements. (*Id.* ¶ 109 ("Defendants' response was noticeably different.").)  However, a review of Mr. Pessina's participation during this call only further weakens Plaintiff's argument.

Despite Plaintiff's implication to the contrary, Mr. Pessina spoke at length about the Rite Aid transaction during this call.  In his prepared remarks about the benefits of the revised transaction (which spanned half a page), Mr. Pessina said:

> [G]iven the changes in the market during the longer-than-expected Federal Trade Commission review process and the ***ongoing*** uncertainty about the potential outcome, we have decided, after detailed discussion with Rite Aid, not to continue to pursue the acquisition of the old company. . . .

> This transaction, though smaller than the original, is due to our ***original strategic aim and, I believe, simpler to deliver, both operationally and***

*financially.   Overall, I view this deal as being more attractive* than the transaction it replaces, recognizing that the adjustment and compromises that we have had to make since the original deal was announced in what continues to be a challenging market for pharmacy.

(WBA June 29, 2017 Earnings Tr. (Ex. 13) at 5; AC ¶¶ 21, 61.)  Later, after Mr.

Gradwell (a nondefendant) deferred to Marco Pagni (Walgreens's general counsel

and another nondefendant) when an analyst asked "could this still be a battle with

the FTC," Mr. Pessina added:

> So this has been a *thoughtful, let's say, deal, as Marco said, taking into account all the objections that we could imagine from the FTC*, this is just an asset deal, but also taking into account the – our needs and the needs of Rite Aid, because they have to come out from this deal as a stronger company.

(AC ¶ 109; Ex. 13 at 13.)[26]

In no way does Walgreens's counsel's participation during an earnings call

post-class period bolster Plaintiff's inadequate allegations that the Walgreens

Defendants made false or misleading statements during the putative class period.

## III.   The PSLRA's Safe Harbor Applies To The Walgreens Defendants' Forward-Looking Statements.

Many of the Walgreens Defendants' statements, or portions thereof, are

forward looking and relate to "plans and objectives of management for future

---

[26] Plaintiff's selective excerpt from nondefendant Mr. Pagni obscures that he too shared his expectation that the transaction would respond to regulatory requirements.  (Ex. 13 at 12 ("I can tell you that we have designed it in a way . . . to take account of all the feedback that we received during the last 22 months in a very detailed, very detailed, review process.").)

operations" and "future economic performance."  15 U.S.C. § 77z-2(i).  For

instance, the Walgreens Defendants shared projections about the value, including

synergies, expected to result from the Rite Aid transaction,[27] as well as the timing

and means by which the transaction would be accomplished.[28]  Even assuming any

such statements are false or misleading, the PSLRA's safe harbor against liability

applies because, among other reasons, Plaintiff has failed to plead that the

Walgreens Defendants possessed the requisite knowledge of falsity.[29]  *See supra*

pp. 14-17.  At most, the Walgreens Defendants' statements "indicate nothing more

than [Walgreens's] failure to follow through exactly as planned . . . , rather than

purposeful intent to fool the public."  *Advanta*, 180 F.3d at 536 (citation omitted).

## IV.   Plaintiff Does Not State A Claim For Control Person Liability Under Section 20(a).

Plaintiff alleges control person liability under Section 20(a) of the Exchange

Act against the Walgreens Defendants.  (AC ¶¶ 144-49.)  An independent violation

---

[27] (*See* AC ¶¶ 89, 91, 94, 98.)

[28] (*See id.* ¶¶ 67, 80-82, 86-88, 94, 97.)

[29] The safe harbor applies if Plaintiff fails to prove that the forward-looking statement, "if made by a natural person, was made with actual knowledge by that person that the statement was false or misleading," or, if made by a business entity, was "made by or with the approval of an executive officer of that entity, and . . . made or approved by such officer with actual knowledge by that officer that the statement was false or misleading."  15 U.S.C. § 77z-2(c).

of the securities laws, however, is "a necessary predicate for § 20(a) liability." *In re Radian Sec. Litig.*, 612 F. Supp. 2d 594, 622 (E.D. Pa. 2009).  Where, as here, Plaintiff has not sufficiently alleged an underlying violation of Section 10(b), Plaintiff's Section 20(a) claim must fail.  *Id.*

Plaintiff also unsuccessfully argues that the Walgreens Defendants had "ultimate authority" over Rite Aid's public filings and thus are liable for that entity's statements.  (AC ¶ 41.)  First, as more fully set forth in Rite Aid's motion to dismiss and accompanying brief, none of those statements were false, and so there was no underlying violation.  Second, Walgreens would not be liable either way – its ability to review and comment on Rite Aid's filings (*id.* ¶ 78) does not equate to "making" the statement under Rule 10b-5, as Walgreens did not possess the requisite control.  *Janus*, 564 U.S. at 142.

## CONCLUSION

The Walgreens Defendants respectfully submit that Plaintiff has reached the end of the pleading road.  He has attacked this transaction over the course of two years under multiple legal theories, each as baseless as the next.  He has failed to develop his allegations properly and completely, despite ample opportunity to do so.  The PSLRA "provide[s] a filter at the earliest stage (the pleading stage) to screen out lawsuits that have no factual basis.'"  *GSC*, 368 F.3d at 246 (quoting *In re NAHC, Inc. Sec. Litig.*, 306 F.3d 1314, 1332 (3d Cir. 2002)).  This case is what

the PSLRA was designed to address.  There is no reason to allow Plaintiff another

bite at the apple.  For the foregoing reasons, the Walgreens Defendants respectfully

request that this Court dismiss the Amended Complaint with prejudice.

Dated:  February 16, 2018

/s/ *Kristen R. Seeger*
Kristen R. Seeger
Nilofer I. Umar
SIDLEY AUSTIN LLP
One South Dearborn Street
Chicago, Illinois 60603
(312) 853-7000
(312) 853-7036 (Fax)
kseeger@sidley.com
numar@sidley.com

Thomas G. Collins
BUCHANAN INGERSOLL &
ROONEY PC
409 North Second Street, Suite 500
Harrisburg, Pennsylvania 17101
(717) 237-4843
(717) 233-0852 (Fax)
thomas.collins@bipc.com

## **CERTIFICATE OF COMPLIANCE**

I hereby certify that the Walgreens Defendants' Memorandum of Law in Support of their Motion to Dismiss Plaintiff's Amended Complaint complies with the Court's order entered on February 16, 2018 (Dkt. 97), in that the brief does not exceed 10,000 words.  The word count of the brief is 9,944 words (excluding the Table of Contents, Table of Authorities, required certificates, and signature block).

Dated:  February 16, 2018                   /s/ *Thomas G. Collins*
                                                            Thomas G. Collins

## <u>CERTIFICATE OF SERVICE</u>

I hereby certify that on February 16, 2018, the foregoing was electronically

filed with the Clerk of the Court and was also electronically served upon all

counsel of record.

Benjamin M. Mather
Deborah R. Gross
Howard J. Kaufman
Kaufman, Coren & Ress, P.C.
2001 Market Street, Suite 3900
Philadelphia, PA 19103

Christopher Gold
Mark J. Dearman
Stuart A. Davidson
Robbins, Geller, Rudman & Dowd, LLP
120 East Palmetto Park Road, Suite 500
Boca Raton, FL 33432

David T. Wissbroecker
Randall J. Baron
Robbins, Geller, Rudman & Dowd, LLP
655 West Broadway, Suite 1900
San Diego, CA 92101-3301

Brian P. Downey
Pepper Hamilton LLP
Suite 200, 100 Market Street
Harrisburg, PA 17108-1181

Reed R. Kathrein
Hagens Berman Sobol Shapiro LLP
715 Hearst Avenue, Suite 202
Berkeley, CA 94710

Karl P. Barth
Hagens Berman Sobol Shapiro LLP
1918 8th Avenue, Suite 3300
Seattle, WA 98101

Robert S. Saunders
Jennifer C. Voss
Cliff C. Gardner
Jessica R. Kunz
Skadden Arps Slate Meagher & Flom LLP
One Rodney Square
920 N. King Street, 7th Floor
Wilmington, DE 19801

/s/ *Thomas G. Collins*
Thomas G. Collins