IN THE UNITED STATES DISTRICT COURT
FOR THE MIDDLE DISTRICT OF PENNSYLVANIA

|  |  |  |
|---|---|---|
| JERRY HERING, Individually and on Behalf of All Others Similarly Situated, | : : : | |
| Plaintiff, | : : : | CIVIL ACTION |
| v. | : : : | NO. 1:15-cv-02440-JEJ |
| RITE AID CORPORATION, *et al.*, | : : : | |
| Defendants. | : : : | |

## THE RITE AID DEFENDANTS' OPENING BRIEF IN SUPPORT OF THEIR MOTION TO DISMISS THE AMENDED COMPLAINT

Of the Delaware Bar
(admitted *pro hac vice*):

Robert S. Saunders
Jennifer C. Voss
Cliff C. Gardner
Jessica R. Kunz
SKADDEN, ARPS, SLATE,
   MEAGHER & FLOM LLP
One Rodney Square, P.O. Box 636
Wilmington, Delaware  19899-0636
(302) 651-3000
(302) 651-3001 (fax)

Brian P. Downey (PA 59891)
Simoné L. Delerme (PA 317120)
PEPPER HAMILTON LLP
Suite 200, 100 Market Street, Box 1181
Harrisburg, Pennsylvania  17108-1181
(717) 255-1155
(717) 238-0575 (fax)
downeyb@pepperlaw.com
delermes@pepperlaw.com

*Attorneys for Defendants Rite Aid Corporation, John T. Standley, David R. Jessick, Joseph B. Anderson, Jr., Bruce G. Bodaken, Kevin E. Lofton, Myrtle S. Potter, Michael N. Regan, Frank A. Savage and Marcy Syms*

DATED:  February 16, 2018

## TABLE OF CONTENTS

TABLE OF AUTHORITIES ...................................................................... iii

INTRODUCTION ................................................................................... 1

STATEMENT OF FACTS ........................................................................ 7

    A.    Rite Aid And Walgreens Announce The Merger .................................. 8

    B.    Rite Aid And Walgreens Seek Regulatory Approval. ........................ 10

    C.    Rite Aid Issues The Definitive Proxy Statement. ............................... 11

    D.    Efforts To Obtain Regulatory Approval. ........................................... 14

    E.    Rite Aid And Walgreens Announce An Amendment To The Original Merger Agreement. ............................................................. 17

    F.    Rite Aid And Walgreens Continue To Provide Updates On The FTC Review Until Terminating The Proposed Transaction. .............. 19

PROCEDURAL HISTORY ..................................................................... 20

    A.    Prior Litigation. ............................................................................... 20

    B.    The Amended Complaint. ................................................................. 20

QUESTIONS PRESENTED ..................................................................... 22

ARGUMENT ......................................................................................... 23

I.     THE STANDARD OF REVIEW. .................................................... 23

II.    PLAINTIFF FAILS TO PLEAD ANY MATERIAL MISSTATEMENT OR OMISSION. ........................................... 24

    A.    The Rite Aid Defendants Cannot Be Liable For Any Statements That They Did Not Make. ................................................................. 25

    B.    Plaintiff Fails To Plead Any Actionable Opinion. ............................. 26

    C.    The Challenged Opinions Are Forward Looking Statements Protected By The PSLRA Safe Harbor. ........................................... 32

III.    PLAINTIFF FAILS TO ALLEGE SCIENTER. ...........................................35

    A.    Plaintiff's Allegations Of Scienter Are Not Plausible, Let Alone Cogent.....................................................................................................36

    B.    Plaintiff's Allegations Of Motive And Opportunity Are Insufficient............................................................................................39

    C.    Plaintiff Relies Improperly On The Group Pleading Doctrine. ..........39

IV.    PLAINTIFF FAILS TO ALLEGE LOSS CAUSATION. ............................40

V.    PLAINTIFF FAILS TO ALLEGE A SECTION 20(a) CLAIM...................42

CONCLUSION ....................................................................................................42

# TABLE OF AUTHORITIES

**Cases**                                                                 **Page(s)**

*In re Advanta Corp. Sec. Litig*,
  180 F.3d 525 (3d Cir. 1999) ...................................................................31, 36

*In re Alpharma, Inc. Sec. Litig.*,
  372 F.3d 137 (3d Cir. 2004), *abrogated on other grounds by*
  *Tellabs, Inc. v. Makor Issues and Rights, Ltd.*, 551 U.S. 300 (2007) ...........39

*In re Amarin Corp. PLC Securities Litigation*,
  689 F. App'x 124 (3d Cir. 2017) ..........................................................30, 31

*Bauer v. Eagle Pharm., Inc.*,
  C.A. No. 16-3091(JLL), 2017 WL 2213147 (D.N.J. May 19, 2017) ...........33

*Bonomo v. Nova Fin. Holdings, Inc.*,
  C.A. No. 11-4762, 2012 WL 2196305 (E.D. Pa. June 15, 2012)..................35

*Burges v. BancorpSouth, Inc.*,
  No. 3-14-1564, 2015 WL 4198795 (M.D. Tenn. July 10, 2015) ..................33

*In re Burlington Coat Factory Sec. Litig.*,
  114 F.3d 1410, 1426 (3d Cir. 1997) ............................................................19

*City of Edinburgh Council v. Pfizer, Inc.*,
  754 F.3d 159 (3d Cir. 2014) ...............................................................*passim*

*Davidoff v. Farina*,
  No. 04 Civ. 7617(NRB), 2005 WL 2030501 (S.D.N.Y. Aug. 22, 2005)......38

*In re Digital Island Sec. Litig.*,
  357 F.3d 322 (3d Cir. 2004) ........................................................................36

*In re Discovery Labs. Sec. Litig.*,
  No. 06-1820, 2007 WL 789432 (E.D. Pa. Mar. 15, 2007),
  *aff'd*, 276 F. App'x 154 (3d Cir. 2008) ........................................................28

*Dura Pharm., Inc. v. Broudo*,
    544 U.S. 336 (2005)....................................................................7, 40

*GSC Partners CDO Fund v. Washington*,
    368 F.3d 228 (3d Cir. 2004) .......................................6, 24, 34, 39

*Herzog v. GT Interactive Software Corp.*,
    No. 98 Civ. 0085(DNE), 1999 WL 1072500 (S.D.N.Y. Nov. 29, 1999)......39

*Janus Capital Grp., Inc. v. First Derivative Traders*,
    564 U.S. 135 (2011).....................................................................25

*Jaroslawicz v. M&T Bank Corp.*,
    Civ. No. 15-897-RGA, 2017 WL 4856864 (D. Del. Oct. 27, 2017).......29, 35

*Kaplan v. S.A.C. Capital Advisors, L.P.*,
    947 F. Supp. 2d 366 (S.D.N.Y. 2013) .........................................26

*Martin v. GNC Hldgs., Inc.*,
    C.A. No. 2:15-cv-01522, 2017 WL 3974002 (W.D. Pa. Sept. 8, 2017) .......41

*Miller v. Champion Enters., Inc.*,
    346 F.3d 660 (6th Cir. 2003) .........................................................32

*In re NAHC, Inc. Sec. Litig.*,
    No. CIV. A. 00-4020, 2001 WL 1241007 (E.D. Pa. Oct. 17, 2001),
    *aff'd*, 306 F.3d 1314 (3d Cir. 2002).........................................28, 36

*In re NAHC, Inc. Sec. Litig.*,
    306 F.3d 1314 (3d Cir. 2002) .......................................................27

*Nat'l Junior Baseball League v. Pharmanet Dev. Grp. Inc.*,
    720 F. Supp. 2d 517 (D.N.J. 2010) .............................................41

*OFI Asset Mgmt. v. Cooper Tire & Rubber*,
    834 F.3d 481 (3d Cir. 2016) .......................................6, 23, 24, 32

*Omnicare, Inc. v. Laborers Dist. Council Constr. Indus. Pension Fund*,
    135 S. Ct. 1318 (2015)...................................................5, 26, 29, 30

*Rahman v. Kid Brands, Inc.*,
    736 F.3d 237 (3d Cir. 2013) ........................................................................36

*Rescue Mission of El Paso, Inc. v. K-Sea Transp. Partners, L.P.*,
    No. 12-CV-00509(WHW), 2013 WL 3087078 (D.N.J. June 14, 2013) .......40

*In re Rite Aid Corp. Stockholders Litig.*,
    C.A. No. 11663-CB (Del. Ch. Jan. 5, 2016) (TRANSCRIPT) ...............2, 20, 37

*In re Rockefeller Ctr. Prop. Sec. Litig.*,
    311 F.3d 198 (3d Cir. 2002) ....................................................................4, 23

*Se. Pa. Transp. Auth. v. Orrstown Fin. Servs., Inc.,*
    No. 1:12-CV-00993, 2015 WL 3833849 (M.D. Pa. June 22, 2015) .........7, 31

*Tellabs, Inc. v. Makor Issues & Rights, Ltd.*,
    551 U.S. 300 (2007)..........................................................................6, 24, 36

*Tongue v. Sanofi*,
    816 F.3d 199 (2d Cir. 2016) ......................................................................31

*In re Trulia, Inc. Stockholder Litig.*,
    129 A.3d 884 (Del. Ch. 2016) .......................................................................2

*Winer Family Tr. v. Queen*,
    503 F.3d 319 (3d Cir. 2007) ................................................................*passim*

## AUTHORITIES

8 *Del. C.* § 141(e) ..................................................................................................30

15 U.S.C. § 78t.......................................................................................................42

15 U.S.C. § 78u-4(b)........................................................................................26, 36

15 U.S.C. § 78u-5(c) ..............................................................................................32

15 U.S.C. § 78u-5(i)................................................................................................33

Fed. R. Civ. P. 9(b) ................................................................................................23

## INTRODUCTION

Plaintiff is a purported stockholder of Rite Aid Corporation ("Rite Aid"). He has been on the hunt for a claim since late 2015, when Rite Aid announced a proposed multi-billion dollar merger transaction with Walgreens Boots Alliance ("Walgreens") that would have entitled Rite Aid stockholders to a cash payment of $9.00 per share, representing a stunning 48% premium over Rite Aid's closing price the day before the announcement. While approximately 96% of all Rite Aid shares represented in person or by proxy at the special meeting voted to approve the merger transaction, the stockholder plaintiff's bar reflexively pounced and filed suit in three jurisdictions.

Here, Plaintiff Hering's initial effort to enjoin the transaction – which turned on alleged omissions in the December 2015 proxy statement concerning financial forecasts and discussions regarding the directors' and officers' interests in the transaction – crumbled in January 2016, when the Court ruled: "We can find nothing even remotely defective in the Proxy despite Plaintiff's attempt to torture both its language and logic. We are certain that the Proxy amply details all facts that a reasonable shareholder would need to know in evaluating this proposed merger." (Doc. 42 at 13).

Eight other lawsuits filed in the Delaware Court of Chancery upon the announcement of the proposed transaction were similarly swiftly dispatched, with

efforts to enjoin the merger transaction denied.  *See In re Rite Aid Corp. Stockholders Litig.*, C.A. No. 11663-CB, Tr. at 90 (Del. Ch. Jan. 5, 2016) (TRANSCRIPT).  As specifically noted by this Court, Chancellor Bouchard ruled that "the plaintiffs had failed to plead a colorable claim that the proposed merger was self-interested or the result of an unreasonable process." (Doc. 42 at 3).[1]

The Delaware plaintiffs prudently dismissed their claims, avoiding judicial waste.  Similarly, another plaintiff who filed in Pennsylvania state court never served and never prosecuted his claim.[2]  But, here, Plaintiff Hering pursued another strategy.  Having failed to enjoin the deal, in April 2016, Plaintiff Hering moved to stay the action pending consummation of the transaction.

More than a year later, in June 2017, Rite Aid and Walgreens elected to terminate the merger transaction because the Federal Trade Commission (the "FTC") had not provided antitrust approval (a necessary condition to consummating the merger).  Rite Aid received a $325 million termination fee from Walgreens.

---

[1]  Chancellor Bouchard is the author of the seminal *Trulia* opinion (Doc. 38-1), which stemmed the tide of merger-related lawsuits in Delaware (and in many jurisdictions outside of Delaware).  In that opinion, Chancellor Bouchard pointed specifically to the Rite Aid litigation when explaining that Delaware must "**screen out frivolous cases**."  *In re Trulia, Inc. Stockholder Litig.*, 129 A.3d 884, 892 & n.19 (Del. Ch. 2016) (emphasis added).

[2]  *See Wilson v. Rite Aid Corp.*, No. 2015-06109 (Pa. C.C.P. Cumberland Cty.).

Now, Plaintiff Hering has resurfaced.[3]  Still avoiding the Delaware Court of Chancery and, tellingly, making no effort to allege any state law breach of duty claim against the Rite Aid Defendants in Delaware (Rite Aid's state of incorporation and the venue in which all such claims must be litigated pursuant to the company's forum selection bylaw), Plaintiff Hering eschews his original disclosure claims and tries to assert "securities fraud" against the Rite Aid Defendants.  His unfounded "fraud" theory is based solely on the unbelievable and ill-pled notion that he was intentionally misled about the risk attendant to FTC approval of the merger transaction.  But from the very moment that the transaction was first announced in 2015, Rite Aid and its board of directors warned investors that the merger was contingent on approval by the FTC, that approval could take longer than expected and that approval might never come.  Plaintiff Hering cannot and does not allege otherwise.

Nevertheless, Plaintiff Hering is pursuing a fraud claim against the Rite Aid Defendants that hinges on the extraordinary.  Namely, convincing this Court to divorce itself from clear cut U.S. Supreme Court and Third Circuit precedent and to find that statements made in public filings in 2015, conveying subjective beliefs about the likelihood that the proposed transaction would receive regulatory

---

[3]  Former co-lead plaintiffs, Mr. and Ms. Hussey, have abandoned their status as lead plaintiffs and removed themselves from the lawsuit.

approval – which were coupled with explicit warnings that such regulatory approvals might not occur – somehow constitute misstatements, made with scienter, and, moreover, that the allegations satisfy the heightened pleading requirements under the Private Securities Litigation Reform Act of 1995 (the "PSLRA") and Rule 9 of the Federal Rules of Civil Procedure.

Ironically, the same Plaintiff who now complains that he was misled into believing that FTC approval was effectively in the bag, told the Court in April 2016 that the case should be stayed because "**[t]he Proposed Acquisition is currently under antitrust review by the [FTC]**," acknowledging that such approval might not be forthcoming, which means the deal would not be consummated.  (Doc. 56) (emphasis added) (plaintiff noting an intent to amend the Operative Complaint "within thirty days of consummation of the Proposed Acquisition **if and when** the Proposed Acquisition closes") (emphasis added).

Plaintiff's Amended Complaint "is precisely the sort of speculative fraud by hindsight that the [PSLRA] was intended to eliminate." *In re Rockefeller Ctr. Prop. Sec. Litig.*, 311 F.3d 198, 225 (3d Cir. 2002).  Plaintiff Hering simply juxtaposes the Rite Aid Defendants' 2015 subjective opinions against the 2017 results (*i.e.*, termination of the transaction because of a failure to obtain regulatory approval), and expects fraud to be inferred.

*  *  *

4

The Amended Complaint's purported Section 10(b), Rule 10b-5 and Section 20(a) claims against the Rite Aid Defendants must be dismissed based on several independent grounds:

**First**, as a threshold matter, the Rite Aid Defendants' 2015 statements of opinion are not actionable under the securities laws.  The U.S. Supreme Court and the Third Circuit have made it unequivocally clear that it is not enough to allege merely that a statement of opinion turned out to be wrong, which is exactly what is pled here.  *See Omnicare, Inc. v. Laborers Dist. Council Constr. Indus. Pension Fund*, 135 S. Ct. 1318, 1327 (2015); *City of Edinburgh Council v. Pfizer, Inc.*, 754 F.3d 159, 170 (3d Cir. 2014).

Indeed, merely reciting the purported "fraudulent" statements puts a lie to Plaintiff's allegations.  For example, it was not a violation of the securities laws to say in 2015:  "'**[w]e can't speculate on the decisions of any regulatory agency**, but both Rite Aid and Walgreens have had extensive consultation with anti-trust counsel, and based upon the market profiles of both companies, and the amount of pharmacy counters in the U.S., **we do not believe** the combination should cause regulatory concern.'"  (Am. Compl. ¶ 66 (emphasis altered); *see also, e.g.*, ¶¶ 5, 19, 65, 69, 80).

Plainly, this subjective statement of belief, just like the few other challenged statements attributable to the Rite Aid Defendants, is not actionable under the

securities laws.  Plaintiff Hering's effort to dress them up as "fraud" begs credulity. The Amended Complaint should be dismissed on this ground alone.

**Second**, the Rite Aid Defendants' 2015 statements about regulatory approval were forward-looking and therefore protected under the "safe harbor" provisions of the PSLRA.  In short, the challenged opinions are accompanied by meaningful cautionary statements of the sort routinely held to be sufficient to grant safe harbor protection.  And Plaintiff fails to show that any statement was made with actual knowledge of falsehood.  *See OFI Asset Mgmt. v. Cooper Tire & Rubber*, 834 F.3d 481, 491 (3d Cir. 2016).

**Third**, Plaintiff fails entirely to meet the exacting standards required to plead scienter for a securities fraud claim.  To start, Plaintiff's allegations of "motive" to commit fraud are nonsensical and self-contradicting.  *See Tellabs, Inc. v. Makor Issues & Rights, Ltd.*, 551 U.S. 300, 314 (2007); *GSC Partners CDO Fund v. Washington*, 368 F.3d 228, 237-38 (3d Cir. 2004).  Additionally, Plaintiff does not allege anything at all about the actual individuals he accuses of fraud; beyond their names, titles and compensation.  This kind of "group pleading" is impermissible and cannot establish scienter under the PSLRA.  *See Winer Family Tr. v. Queen*, 503 F.3d 319, 337 (3d Cir. 2007).

**Fourth**, Plaintiff does not (and cannot) plead the required element of loss causation because there were no omitted facts in 2015 that were later revealed to

the market.  Merely alleging that Rite Aid's stock price dropped once it became

apparent in 2017 that the FTC would not timely approve the merger is insufficient

to plead that any revelation of fraud caused Rite Aid's stock price to drop.  *See*

*Dura Pharm., Inc. v. Broudo*, 544 U.S. 336, 342 (2005).

**Fifth**, Plaintiff cannot state a Section 20(a) claim because he states no

underlying Section 10(b) or Rule 10b-5 claim.

Accordingly, for the reasons set forth herein, the Amended Complaint

should be dismissed with prejudice.

## STATEMENT OF FACTS[4]

Rite Aid is the "No. 3" pharmacy chain in the United States, operating 4,561

stores in 31 states and the District of Columbia, as of October 24, 2015.

(Am. Compl. ¶ 25; Ex. A, Rite Aid Corp., Definitive Proxy Statement (Schedule

14A) at 1 (Dec. 21, 2015); Ex. B, "Walgreens Faces U.S. Antitrust Concerns

Over Rite Aid Fix," *Bloomberg*, January 20, 2017, https://www.bloomberg.com/ne

---

[4] The facts set forth herein are derived from the First Amended Direct Shareholder Class Action Complaint For Violations Of The Securities Exchange Act Of 1934 (the "Amended Complaint" or "Am. Compl."), filed December 11, 2017, as well as "'documents incorporated into the complaint by reference, and matters of which a court may take judicial notice,'" which the Court may consider in resolving this motion. *Se. Pa. Transp. Auth. v. Orrstown Fin. Servs., Inc.*, No. 1:12-CV-00993, 2015 WL 3833849, at *3 (M.D. Pa. June 22, 2015) (quoting *Tellabs*, 551 U.S. at 322).  The lettered exhibits attached hereto and cited as "Ex. _" are documents that the Court may consider in resolving this motion.

ws/articles/2017-01-20/walgreens-said-to-face-u-s-antitrust-concerns-over-rite-aid-fix).  Rite Aid's board of directors is comprised of defendants John T. Standley, David R. Jessick, Joseph B. Anderson, Jr., Bruce G. Bodaken, Kevin E. Lofton, Myrtle S. Potter, Michael N. Regan, Frank A. Savage and Marcy Syms (the "Board," and together with Rite Aid, the "Rite Aid Defendants").  (Am. Compl. ¶¶ 26-35).

Walgreens is the "No. 2" pharmacy chain in the United States, employing more than 370,000 people with over 13,100 stores in 11 countries.  (Am. Compl. ¶ 36; Ex. A at 1; Ex. B).  Defendants Stefano Pessina ("Pessina") and George R. Fairweather ("Fairweather") are, respectively, the CEO and CFO of Walgreens. (Am. Compl. ¶¶ 6, 12).

### A.    Rite Aid And Walgreens Announce The Merger.

On October 28, 2015, Rite Aid and Walgreens filed a Form 8-K with the Securities and Exchange Commission (the "SEC") containing a joint press release (the "Transaction Announcement") announcing that they had entered into the Agreement and Plan of Merger, dated October 27, 2015 (the "Original Merger Agreement"), "under which Walgreens [] will acquire all outstanding shares of Rite Aid … for $9.00 per share in cash, for a total enterprise value of approximately $17.2 billion" (the "Merger").  (Ex. C, Rite Aid Corp., Form 8-K (Current Report) at Ex. 99.1 (Oct. 28, 2015); Am. Compl. ¶ 49).

The Transaction Announcement made clear that the Merger was subject to numerous "closing conditions," including "the expiration or termination of applicable waiting periods under the Hart-Scott-Rodino Antitrust Improvements Act of 1976." (the "HSR Act").  (Ex. C at Ex. 99.1; Am. Compl. ¶ 64).  It provided specific examples of risks that may cause the announced Merger to fail, including:

> risks related to the satisfaction of the conditions to closing the acquisition **in the anticipated timeframe or at all**, including risks related to the **failure to obtain necessary regulatory** … **approval**[] and **the possibility that the acquisition does not close** … [and] the risk of litigation and/or **regulatory actions** related to the proposed acquisition ….

(Ex. C at Ex. 99.1 (emphasis added)).

The next day, on October 29, 2015, Rite Aid filed a Form 8-K with the SEC containing three documents that it had distributed to its own employees, providing information about the proposed transaction, including (i) a script (the "Script"), (ii) a set of talking points (the "Talking Points") and (iii) a frequently asked questions document (the "FAQs").  (*See* Ex. D, Rite Aid Corp., Form 8-K (Current Report) Exs. 99.1, 99.2 and 99.3 (Oct. 28, 2015); Am. Compl. ¶¶ 65-66).

These documents expressed the belief that the Merger "deliver[s] value to our shareholders," and that it "not only enhances [Rite Aid's] position and long-term growth outlook, it also gives our team the opportunity to be part of the first global, pharmacy-led health and wellbeing enterprise."  (Ex. D at Ex. 99.1 at 2; *accord id.* at Ex. 99.2 at 2, Ex. 99.3 at 1; *see* Am. Compl. ¶ 65).  The documents

also reminded that "[i]t's important to keep in mind that this news is just the first step in a lengthy process," because "[t]he transaction is subject to Rite Aid shareholder and regulatory approvals and other customary closing conditions." (Ex. D at Ex. 99.1 at 2; *accord id.* at Ex. 99.2 at 3-4, Ex. 99.3 at 1).   The documents explained that, although "[w]e can't speculate on the decisions of any regulatory agency," based on "extensive consultation with anti-trust counsel," "the market profiles of both companies" and "the amount of pharmacy counters in the U.S.," Rite Aid and Walgreens "do not believe the combination should cause regulatory concern."  (Ex. D at Ex. 99.3 at 1-2; *accord id.* at Ex. 99.1 at 2, Ex. 99.2 at 3-4; *see* Am. Compl. ¶ 5).

These documents also warned of the risk that "regulatory approvals[] may not be satisfied or waived, on a timely basis or otherwise," and that "a governmental entity may prohibit, delay or refuse to grant approval for the consummation of the transaction."  (Ex. D at Ex. 99.1 at 4, Ex. 99.2 at 6, Ex. 99.3 at 4).  They additionally stated that "[t]here can be no assurance that the merger will be completed," and "[r]eaders are cautioned not to place undue reliance on any of these forward-looking statements."  (*Id.*).

**B.    Rite Aid And Walgreens Seek Regulatory Approval.**

On November 10, 2015, Rite Aid and Walgreens filed their notification and report forms with the U.S. Department of Justice and the FTC, commencing the

regulatory review process. (*See* Ex. A at 10, 83). About a month later, on December 14, 2015, Rite Aid and Walgreens filed a Form 8-K with the SEC, containing a joint press release (the "Second Request Announcement"), stating that "as expected, the two companies have each received a request for additional information (the 'second request') from the [FTC] in connection with the [proposed transaction]…. This second request is a standard part of the regulatory process in connection with the FTC's review." (Ex. E, Rite Aid Corp., Form 8-K (Current Report) at Ex. 99.1 (Dec. 14, 2015); Am. Compl. ¶ 80). Rite Aid's antitrust counsel advised at the time that the second request "is a standard part of the regulatory process in connection with the FTC's review." (Ex. F, Rite Aid Corp., Schedule 14A (Preliminary Proxy Statement) at 59 (Mar. 3, 2017)).

Again, the Second Request Announcement cautioned readers not to rely on forward-looking statements because actual results are subject to, among other risks, the risk that "regulatory approvals[] may not be satisfied or waived, on a timely basis or otherwise," and that "a governmental entity may prohibit, delay or refuse to grant approval for the consummation of the transaction." (Ex. E at 3).

### C.    Rite Aid Issues The Definitive Proxy Statement.

On December 21, 2015, Rite Aid filed a 120-page definitive proxy statement with the SEC (the "2015 Proxy Statement"), and subsequently mailed copies to stockholders. (*See generally* Ex. A; *see also* Am. Compl. ¶ 69). Over the course

of 18 single-spaced pages, the 2015 Proxy Statement set forth the background of the Merger, including negotiations between Rite Aid and Walgreens concerning the price to be delivered to stockholders, the terms of the merger agreement and "actions [Walgreens] would have to agree to undertake in order to obtain antitrust approvals." (Ex. A at 47; *see also id.* at 33-51).

The 2015 Proxy Statement set forth several perceived benefits that the Board considered when approving and recommending the Merger, including: (i) "the fact that the $9.00 all-cash per share merger consideration will provide certainty of value and liquidity to Rite Aid stockholders," and (ii) the Board's "belief" that the proposed transaction "would be completed successfully," based on their "knowledge of [Walgreens'] financial condition" and "the level of commitment by [Walgreens] to obtaining applicable consents and approvals under antitrust and similar laws." (*Id.* at 51-53). Importantly, the 2015 Proxy Statement also set forth numerous negative factors that the Board considered, including:

- "The fact that the completion of the merger would require expiration or termination of the applicable waiting periods under the HSR Act and the amount of time that might be required to obtain such expiration or termination, and the **risk that other regulatory agencies may not approve the merger**."

- "The fact that, while Rite Aid expects the merger to be consummated if the proposal to adopt the merger agreement is approved by Rite Aid's stockholders, **there can be no assurance that all conditions to the parties' obligations to consummate the merger will be satisfied**."

- "The risk that the merger could be delayed **or not completed** …."

- "The fact that [Walgreens] is not required to accept divestiture and other remedies imposed by governmental authorities (i) that would result in the divestiture of more than 1,000 [Walgreens] and Rite Aid stores or (ii) other than (a) certain specified remedies or (b) remedies that would not result in an impact exceeding $100 million in the aggregate as a result of such remedies."

(*Id.* at 54-55) (emphasis added).

The 2015 Proxy Statement stated that although "[w]e are working toward completing the merger as quickly as possible and currently expect to complete the merger in the second half of the calendar year 2016," "the exact timing … cannot be predicted because [it] is subject to conditions, including … receipt of regulatory approvals."  (*Id.* at 24).  The 2015 Proxy Statement again warned investors about "'forward-looking statements' that do not directly or exclusively relate to historical facts" because actual results may vary and are subject to several risks, including (1) "the inability to consummate the merger" due to the failure to receive "required regulatory approvals"; (2) "risks related to obtaining the requisite consents to the merger," including "under the HSR Act and other applicable antitrust laws"; and (3) "the risk that the merger may not be consummated in a timely manner, if at all." (*Id.* at 25).

In total, **in at least eight separate places**, the 2015 Proxy Statement warned investors that the Merger was contingent on regulatory approval, that regulatory

13

approval was not guaranteed, and that the Merger might not close, even if stockholders approved it.  (*See, e.g.*, Ex. A at 10, 12, 24, 25, 53, 55, 83, 105).

On February 4, 2016, aware of the regulatory risk that the Merger faced, 96% of all the Rite Aid shares represented in person or by proxy at the special meeting voted to approve the Merger.  (*See* Ex. G, Rite Aid Corp., Form 8-K (Current Report) at Ex. 99.1 (Feb. 4, 2016)).

### D.   Efforts To Obtain Regulatory Approval.

Under the terms of the Original Merger Agreement, Walgreens was obligated to take the lead on any negotiations with the FTC or with potential divestiture buyers in connection with the regulatory approval process.  (*See* Ex. A at 98-99).  The Original Merger Agreement also provided that Walgreens "may determine in its sole discretion the retail stores [of either Rite Aid or Walgreens] to be sold" or otherwise divested in order to obtain regulatory approval.  (*Id.* at 99).

"Throughout 2016, [antitrust counsel] discussed with the FTC Staff, either telephonically or in person, the merits of the transaction, the proposed synergies and potential remedies, including the potential divestiture of retail stores."  (Ex. F at 59).  Antitrust counsel regularly updated the Rite Aid Defendants on the progress of the FTC approval process.  (*Id.* at 59-74).

In April 2016, the FTC staff "began identifying geographic areas of interest" with respect to the proposed Merger.  (*Id.* at 60).  In response, "more than twenty

14

(20) advocacy papers" and "various econometric analyses" were prepared by antitrust counsel and "[e]conomists retained by Rite Aid and [Walgreens]" and were submitted to the FTC.  (*Id.*).  "Over the course of the next several months," Walgreens and antitrust counsel "worked to establish a divestiture process that they believed would potentially satisfy the FTC Staff's questions about the transaction." (*Id.*).  While Walgreens took the lead in the divestiture process, the Rite Aid Defendants were advised by antitrust counsel "that the FTC Staff's questions were of the type and nature expected under the circumstances" and that "the development of a divestiture framework and the presentation of such framework to the FTC is a typical event in an FTC review process." (*Id.* at 61).

On September 22, 2016, Walgreens informed Rite Aid that 18 "potential purchasers" were given "due diligence information about a package of divestiture assets being offered." (*Id.* at 62).  Each potential purchaser was given the chance to bid on the divestiture assets, and was evaluated based on its ability to purchase all of the assets and its likelihood to "be deemed an acceptable purchaser of the divestiture assets by the FTC." (*Id.*).

On October 20, 2016, Rite Aid and Walgreens announced revised expectations concerning the timing of closing and, "in accordance with the [Original Merger Agreement], [the companies] jointly agreed to extend the 'End Date' (as defined in the [Original] Merger Agreement) to January 27, 2017."

(Ex. H, Rite Aid Corp., Form 8-K (Current Report) at 2 (Oct. 20, 2016); Am. Compl. ¶ 88).   They stated that "[t]he companies now expect the transaction will close in early calendar 2017."   (Ex. H at 99.1).   The press release again warned of the many risks and uncertainties relating to the Merger, including those concerning (1) "the outcome of discussions with the [FTC] … in connection with the pending acquisition of Rite Aid by Walgreens," (2) "the number of stores divested in connection with such pending acquisition," and (3) "the ability to satisfy the closing conditions and consummate the pending acquisition of Rite Aid … on a timely basis or at all."   (*Id.*).

On December 20, 2016, Rite Aid and Walgreens announced "that they [had] entered into an agreement to sell 865 Rite Aid stores … to Fred's ...  subject to [FTC] approval, the approval and completion of the [proposed transaction], and other customary closing conditions."   (Ex. I, Rite Aid Corp., Form 8-K (Current Report) at Ex. 99.1 (Dec. 20, 2016); Am. Compl. ¶ 96).   The press release advised that the proposed divestiture to Fred's "is being entered into to respond to concerns identified by the FTC in its review of the proposed [transaction]" and that while Walgreens "is actively engaged in discussions with the FTC," the proposed transaction is still expected to close "in early calendar 2017."   (Ex. I at Ex. 99.1).   The press release again warned "that a governmental entity may prohibit, delay or refuse to grant approval for the consummation of the transactions."   (*Id.*).

On January 6, 2017, Rite Aid's antitrust counsel updated the Board "on the FTC approval process, including the FTC's subpoena to interview members of Fred's management, the FTC's request for substantial documents related to the divestiture, and the increasing likelihood that the merger would not be consummated by the January 27, 2017 end date." (*Id.*).   Rite Aid's antitrust counsel advised that "at that point, the FTC continued to review the transaction, and, in the judgment of [antitrust counsel], the FTC would not recommend approval of the divestiture transaction by the end date." (*Id.*; *see* Am. Compl. ¶ 101).

### E.   Rite Aid And Walgreens Announce An Amendment To The Original Merger Agreement.

On January 30, 2017, Rite Aid and Walgreens announced an amendment to the Original Merger Agreement, under which Walgreens, among other things, "agreed, to the extent necessary, to obtain the required regulatory approvals, to sell [or] divest … up to an aggregate of 1,200 retail stores" and certain additional related assets, including certain of Rite Aid's intellectual property rights, and to extend the end date to July 31, 2017.  (Ex. J, Rite Aid Corp., Form 8-K (Current Report) at 2 (Jan. 30, 2017); Am. Compl. ¶¶ 18, 99, 103, 130).  The parties also agreed to reduce the price for each share of Rite Aid common stock to a maximum of $7.00 per share and a minimum of $6.50 per share, depending on the number of

stores divested.   (Ex. J at 2).[5]   Investors were reminded that the proposed transaction remained "subject to various closing conditions," including "expiration or earlier termination of the waiting period under the [HSR] Act," and investors were again warned that "certain regulatory approvals[] may not be satisfied or waived, on a timely basis or otherwise" and "a governmental entity may prohibit, delay or refuse to grant approval."   (*Id.* at 2-3).

On March 3, 2017, Rite Aid filed a preliminary proxy statement with the SEC to inform stockholders about the proposed merger amendment in advance of a second stockholder vote.   (*See generally* Ex. F).   It provided investors with additional background concerning the ongoing negotiations between Rite Aid and Walgreens and their efforts to work with the FTC toward consummation of the proposed transaction.   (Ex. F at 59-74; Am. Compl. ¶ 22).   It also repeatedly cautioned investors about forward-looking statements and reiterated the risks that continued to be associated with the Merger, stating "we cannot assure you that the[] regulatory clearances and approvals will be timely obtained or obtained at all." (Ex. F at 13, 109; *see id.* at 31-32).

---

[5]   Before recommending the amendment, the Board considered, among other factors, "Rite Aid's financial results and prospects"; Rite Aid's "difficulty improving reimbursement rates and lowering costs to improve operating margins"; and Walgreens' agreement to "increase the number of stores that [it] is required to divest" and to "sell [or] transfer … the Rite Aid Brand Rights." (Ex. F at 75-78).

**F.      Rite Aid And Walgreens Continue To Provide Updates On The FTC Review Until Terminating The Proposed Transaction.**

On May 8, 2017, Rite Aid and Walgreens "announc[ed] that [they] certified substantial compliance with the Request for Additional Information from the [FTC]," and awaited a response from the FTC regarding approval of the transaction.  (Ex. K, Rite Aid Corp., Form 8-K (Current Report) at Ex. 99.1 (May 8, 2017)).[6]  The press release warned investors of "the risk that the transactions may not close due to one or more closing conditions to the transactions not being satisfied or waived, such as certain regulatory approvals not being obtained, on a timely basis or otherwise."  (*Id.*).

On June 28, 2017, having not received clearance from the FTC, Rite Aid and Walgreens announced that they were terminating the merger agreement, and that Walgreens "will pay to Rite Aid a termination fee in the amount of $325,000,000." (Ex. L, Rite Aid Corp., Form 8-K (Current Report) at 3 (June 28, 2017)).

---

[6]   Exhibit K is not necessary for the resolution of this motion.  But the Court may, nevertheless, take judicial notice of it because it is an undisputedly authentic public document, on which Plaintiff's claims are based.  *See In re Burlington Coat Factory Sec. Litig.*, 114 F.3d 1410, 1426 (3d Cir. 1997).

## PROCEDURAL HISTORY

### A.   Prior Litigation.

Ten lawsuits were filed in the Delaware Court of Chancery, in Pennsylvania state court and in this Court.   Eight suits were filed before the Chancellor of the Delaware Court of Chancery, who quickly identified their utter lack of merit.   On January 5, 2016, the Chancellor denied a motion for expedited proceedings, "conclud[ing] that plaintiffs have not stated a colorable claim as to the disclosure issues" in the 2015 Proxy Statement.   *In re Rite Aid Corp. Stockholders Litig.*, Consol. C.A. No. 11663-CB, Tr. at 90 (Del. Ch. Jan. 5, 2016) (TRANSCRIPT). Shortly thereafter, on March 11, 2016, all eight cases were dismissed.

On December 18, 2015, Plaintiff Jerry Hering filed suit here, dressing up the same allegations rejected by the Chancellor as a federal securities claim under Section 14(a) of the Exchange Act of 1934 (the "1934 Act").   (Doc. 1).   On January 14, 2016, Plaintiff moved to enjoin the stockholder vote on the Merger. (Doc. 12).   On January 28, 2016, the Court denied Plaintiff's request for injunctive relief.

### B.   The Amended Complaint.

On December 11, 2017, Plaintiff filed the Amended Complaint.   (Doc. 83). The Amended Complaint asserts Section 10(b), Rule 10b-5 and Section 20(a) claims against Rite Aid, its Board, Walgreens, and Messrs. Pessina and Fairweather.   (Am. Compl. ¶ 1).   With respect to the Rite Aid Defendants, Plaintiff

challenges subjective statements of belief about regulatory approval contained in four documents filed with the SEC in 2015.[7]  Those statements are:

- "[T]he transaction is **expected** to close in the second half of calendar 2016."  (Am. Compl. ¶¶ 64-66).

- "**We can't speculate on the decisions of any regulatory agency**, but both Rite Aid and Walgreens have had extensive consultation with anti-trust counsel, and based upon the market profiles of both companies, and the amount of pharmacy counters in the U.S., **we do not believe** the combination should cause regulatory concern."  (*Id.* ¶¶ 5, 65-66).

- "In evaluating the merger agreement and the transactions contemplated thereby … the Board of Directors considered a variety of factors …, including … [t]he fact that the $9.00 all-cash per share merger consideration will provide certainty of value and liquidity to Rite Aid stockholders, enabling them to realize value that had been created at Rite Aid in recent years, while eliminating long-term business and execution risk.  … [and] **[t]he Board of Directors' belief that the merger and related transactions with [Walgreens] would be completed successfully**, based on, among other things…the commitment to sell up to 1,000 stores of Rite Aid or [Walgreens] and take certain other limited actions, in each case, in order to avoid or vacate any order that would prevent or materially delay the merger."  (*Id.* ¶¶ 5, 19, 69).

- The Rite Aid Defendants believed the second request was a "**standard** part of the regulatory process in connection with the FTC's review."  (*Id.* ¶ 80).

---

[7]   (1) the Transaction Announcement, filed with the SEC on October 28, 2015 (Ex. C); (2) the Script, the Talking Points, and the FAQs, filed with the SEC on October 29, 2015 (Ex. D); (3) the Second Request Announcement, filed with the SEC on December 14, 2015 (Ex. E); and (4) the 2015 Proxy Statement, filed with the SEC on December 21, 2015 (Ex. A).  Plaintiff does not allege that two referenced press releases, dated October 20 and December 20, 2016, contained any purportedly misleading statements.  (*See* Am. Compl. ¶¶ 88, 96).

# QUESTIONS PRESENTED

1.      Whether Plaintiff has stated a claim for violation of the 1934 Act where Plaintiff alleges that subjective statements of belief about the timing and likelihood of regulatory approval of a merger were false and misleading when made because over a year later the merger did not receive regulatory approval.

*Suggested answer*:  No.

2.      Whether Plaintiff has stated a claim for violation of the 1934 Act where Plaintiff does not plead contemporaneous facts with sufficient specificity to raise a strong inference that the challenged statements were made with an intent to deceive investors.

*Suggested answer*:  No.

3.      Whether Plaintiff has stated a claim for violation of the 1934 Act where Plaintiff does not plead that a corrective disclosure was made containing facts that were previously omitted and that revealed that a fraud had occurred.

*Suggested answer*:  No.

4.      Whether Plaintiff has stated a claim for violation of Section 20(a) of the 1934 Act where Plaintiff has failed to state any primary violation of the 1934 Act.

*Suggested answer*:  No.

**ARGUMENT**

## I.   THE STANDARD OF REVIEW.

To state a claim for securities fraud under Section 10(b), a plaintiff must plead with particularized facts: "(1) a material misrepresentation in connection with the purchase or sale of a security; (2) scienter, *i.e.*, a wrongful state of mind in the party making the representation; (3) reliance by the plaintiff; (4) economic loss; and (5) loss causation, *i.e.*, a causal connection between the material misrepresentation and the loss." *OFI Asset Mgmt.*, 834 F.3d at 493-94 (internal quotation marks and citation omitted).

Every allegation of fraud is subject to Federal Rule of Civil Procedure 9(b), which requires that a plaintiff "must state with particularity the circumstances constituting fraud or mistake." Fed. R. Civ. P. 9(b).  Securities fraud complaints are additionally subject to the "[e]xacting pleading requirements" of the PSLRA. *See Pfizer*, 754 F.3d at 168.  The PSLRA imposes "another layer of factual particularity" to that required under Rule 9(b), requiring that a plaintiff "'specify each statement alleged to have been misleading, the reason or reasons why the statement is misleading, and, if an allegation regarding the statement or omission is made on information and belief, the complaint shall state with particularity all facts on which that belief is formed.'" *In re Rockefeller*, 311 F.3d at 217 (quoting 15 U.S.C. § 78u-4(b)(1)).

Separately, as to allegations of scienter, the PSLRA requires that, with respect to each purported act or omission, a plaintiff must "'state with particularity facts giving rise to a strong inference that the defendant acted with the required state of mind.'" *Tellabs*, 551 U.S. at 314 (quoting 15 U.S.C. § 78u-4(b)(2)).  Under the PSLRA, "[o]nly a complaint that provides sufficiently particularized factual pleading and gives rise to a strong inference of scienter can survive a motion to dismiss."  *OFI Asset Mgmt.*, 834 F.3d at 490.  The particularity requirement is "'rigorously applied'" and "dismissal is mandatory" when a securities fraud complaint fails to comply with the PSLRA's pleading requirements.  *GSC Partners*, 368 F.3d at 236-37 (quoting *In re Burlington*, 114 F.3d at 1417).

The Amended Complaint is exactly the sort of "frivolous, lawyer-driven litigation" that the PSLRA was designed to eliminate.  *See Winer*, 503 F.3d at 326. It fails entirely to state a claim that the Rite Aid Defendants made material misstatements, did so purposefully, and thereby caused investor losses.

## II.   PLAINTIFF FAILS TO PLEAD ANY MATERIAL MISSTATEMENT OR OMISSION.

Plaintiff fails to state a claim against the Rite Aid Defendants for violation of Section 10(b) because he fails to plead that the Rite Aid Defendants made any material misstatement or omission.  The statements Plaintiff challenges in the Amended Complaint (A) were not made by the Rite Aid Defendants, (B) are

nonactionable opinions, or (C) are protected by the PSLRA safe harbor. Accordingly, the Amended Complaint must be dismissed.

### A. The Rite Aid Defendants Cannot Be Liable For Any Statements That They Did Not Make.

The Amended Complaint challenges numerous statements made exclusively by individuals and entities other than the Rite Aid Defendants, such as statements by Defendants Pessina and Fairweather, or other Walgreens employees, on Walgreens earnings calls, in Walgreens press releases or public filings, or at various conferences. (*See, e.g.*, Am. Compl. ¶¶ 6-9, 11-16, 20, 26, 61, 67, 81-82, 84, 86-95). Indeed, <u>none</u> of the purportedly false and misleading statements made after the 2015 Proxy Statement were made by the Rite Aid Defendants. (*Id.* ¶¶ 79-100). The "maker" of a statement is "the person or entity with ultimate authority over the statement, including its content and whether and how to communicate it." *Janus Capital Grp., Inc. v. First Derivative Traders*, 564 U.S. 135, 142 (2011). Only the maker of a statement can face Section 10(b) liability. *Id.* For this reason, the Rite Aid Defendants can face no liability for, and do not address, statements made by the Walgreens Defendants. Those statements are not actionable for the reasons stated in the Walgreens Defendants' Memorandum of Law In Support of

Their Motion to Dismiss Plaintiff's Amended Complaint, which the Rite Aid

Defendants hereby join in and incorporate.[8]

### B.   Plaintiff Fails To Plead Any Actionable Opinion.

"[A] sincere statement of pure opinion" remains truthful "regardless of

whether an investor can ultimately prove the belief wrong." *Omnicare*, 135 S. Ct.

at 1327. Thus, opinions are not actionable under the securities laws unless "they

are not honestly believed and lack a reasonable basis." *Pfizer*, 754 F.3d at 170

(citation omitted). *See also Omnicare*, 135 S. Ct. at 1327.

**First**, according to Plaintiff, the Rite Aid Defendants could not have

honestly believed their opinions about regulatory approval because they **knew** that

the Merger "**was unlikely to** garner regulatory approval because of the significant

---

[8]   Plaintiff purports to represent a class comprised of all purchasers of Rite Aid common stock between October 27, 2015 and June 28, 2017. (Am. Compl. ¶ 1). The "initial inquiry" is "whether the lead plaintiff individually has standing," and "the lead plaintiff [must] establish its own standing based on a **purchase or sale** of stock, and not merely the decision to retain stock." *Winer*, 503 F.3d at 325-26 (emphasis added) (citation omitted) (holding that Section 10(b) plaintiff cannot assert a class or individual claim based on statements made after the date of its last purchase or sale). Here, Plaintiff's last transaction in Rite Aid stock allegedly occurred on August 16, 2016. (*See* Doc. 83 at 75 (Schedule A to Certificate of Named Plaintiff)). Therefore, Plaintiff cannot represent the purported class. For this and other reasons, Plaintiff also must undertake again the PSLRA lead plaintiff and lead counsel process, including giving notice to other Rite Aid stockholders of the Amended Complaint and affording them the opportunity to petition for lead status under 15 U.S.C. § 78u-4. *See, e.g.*, *Kaplan v. S.A.C. Capital Advisors, L.P.*, 947 F. Supp. 2d 366, 367 (S.D.N.Y. 2013).

market overlap between Rite Aid and Walgreens stores" and that "Walgreens **would need to** divest substantially more stores than the 1,000-store cap provided for in the [Merger] in order to obtain FTC approval." (Am. Compl. ¶¶ 68(a)-(b) (emphasis added); *see also* ¶ 70). Plaintiff's position, which is not supported by any well-pled fact, is nonsensical.

Plaintiff's allegations, and the documents incorporated by reference, demonstrate that the Rite Aid Defendants could not possibly have known the future result of the FTC's review in 2015, when the challenged statements were made. To be actionable, a "statement or omission must have been misleading at the time it was made; liability cannot be imposed on the basis of subsequent events." *In re NAHC, Inc. Sec. Litig.*, 306 F.3d 1314, 1330 (3d Cir. 2002) (citation omitted). *See Winer*, 503 F.3d at 332 (dismissing "impermissible attempt to prove fraud by hindsight" because complaint relied on allegedly contradictory statements made "weeks after [defendant's] challenged statements").

Rite Aid and Walgreens did not even file their notification and report forms with the U.S. Department of Justice and the FTC seeking regulatory approval until November 10, 2015 – nearly **two weeks after** the Transaction Announcement, Script, Talking Points, and the FAQs were filed with the SEC on October 28 and 29, 2015. It was not until April 2016, more than **four months after** the last

challenged statement was made in December 2015, that "the FTC staff began identifying geographic areas of interest." (Ex. F at 60).

Further, **more than a year after** all of the challenged statements were made, Rite Aid's antitrust counsel advised on January 6, 2017, that the FTC was unlikely to approve Walgreens' divestiture plans before the Merger drop dead date. (*See id.*) *See also In re Discovery Labs. Sec. Litig.*, No. 06-1820, 2007 WL 789432, at *6 (E.D. Pa. Mar. 15, 2007) (admonishing plaintiff's attempt to plead "fraud by hindsight" by alleging "a statement made in April of 2006 to prove the falsehood of a statement made in March, 2005"), *aff'd*, 276 F. App'x 154 (3d Cir. 2008). Therefore, in 2015, the Rite Aid Defendants could not have foreseen the result of the FTC's review in 2017.

Even more ridiculous is Plaintiff's assertion that the Rite Aid Defendants knew in 2015 that in January 2017 "Walgreens would not be willing to bear the antitrust risks or even maintain its commitment to divest up to 1,000 stores, as represented, without a decrease in deal price." (Am. Compl. ¶¶ 68(c)-(d); *see also* ¶¶ 65, 70(a)-(b)). Plaintiff offers no basis to believe that the Rite Aid Defendants knew, more than a year earlier, what Walgreens, an arm's-length counterparty, would ultimately "not be willing" to do. *See In re NAHC, Inc. Sec. Litig.*, No. CIV. A. 00-4020, 2001 WL 1241007, at *11 (E.D. Pa. Oct. 17, 2001) (explaining "'[c]orporate officials need not be clairvoyant'") (citation omitted), *aff'd*, 306 F.3d

1314 (3d Cir. 2002). Plaintiff's allegations again are contradicted by the few actual facts in the Amended Complaint, including that Walgreens indicated a desire to reduce the merger consideration on January 24, 2017, **more than a year** after the challenged statements were made, and the contractual terms of the Original Merger Agreement are completely consistent with the Rite Aid Defendants' statements. (Am. Compl. ¶¶ 54, 67).[9]

**Second**, Plaintiff pleads no particularized facts challenging the basis of the Rite Aid Defendants' stated opinions related to potential regulatory approval. *Omnicare*, 135 S. Ct. at 1332; *Pfizer*, 754 F.3d at 170. *See also Jaroslawicz v. M&T Bank Corp.*, Civ. No. 15-897-RGA, 2017 WL 4856864, at *6 (D. Del. Oct. 27, 2017) (dismissing complaint for failing to plead "particular facts about what Defendants did or did not do in forming the compliance opinion"). To the contrary, Plaintiff concedes that the Rite Aid Defendants repeatedly disclosed the bases for their stated opinions, which included "'extensive consultation with anti-trust counsel'"; "'the market profiles of both companies'"; "'the amount of pharmacy counters in the U.S.'"; and consultation "'with Rite Aid's management and legal and financial advisors.'" (Am. Compl. ¶¶ 65-66 (quoting Ex. D at Ex. 99.1 at 2, Ex. 99.3 at 1-2); *see id.* ¶ 122). For this additional reason, Plaintiff fails to state an

---

[9] These facts also contradict Plaintiff's assertion that the Rite Aid Defendants knew, in 2015, that "the risk of failing to gain antitrust approval would be largely borne by Rite Aid stockholders." (*See* Am. Compl. ¶ 75).

omission that could make the challenged opinions actionable because "an issuer need only divulge an opinion's basis" to avoid exposure.[10] *Omnicare*, 135 S. Ct. at 1332.

**Third**, Plaintiff cannot plead that subjective statements of opinion are misleading merely by suggesting the existence of facts "cutting the other way." *See Omnicare*, 135 S. Ct. at 1329. Rather, an opinion need only "fairly align[]" with the facts known to the speaker at the time because "[r]easonable investors understand that opinions sometimes rest on a weighing of competing facts; indeed, the presence of such facts is one reason why an issuer may frame a statement as an opinion, thus conveying uncertainty." *Id.* Thus, competing facts, even if well-pled, do not make an opinion actionable.

For example, in *In re Amarin Corp. PLC Securities Litigation*, the Third Circuit analyzed whether defendants made a misleading statement in disclosing their belief that an expensive and time-consuming "outcomes study" would not be required for approval by the Food and Drug Administration (the "FDA"). 689 F. App'x 124, 126-27 (3d Cir. 2017). In *Amarin*, the plaintiff alleged that defendants' statements of belief were misleading because of the purported

---

[10] Similarly, statements that the FTC's second request was "standard" (Am. Compl. ¶ 80), are not pled to be false and misleading because Plaintiff fails to allege any facts contradicting the contemporaneous advice of antitrust counsel that the second request "is a standard part of the regulatory process." (Ex. F at 59). *See also* 8 *Del. C.* § 141(e) (authorizing directors to rely on expert advice).

omission that "the FDA had indicated approval would be 'a review issue,' and that an outcomes trial … '[was] *almost certainly* going to be required by the FDA.'" *Id.* at 127 (second alteration and emphasis in original).   The Third Circuit considered the documents that the plaintiff relied upon and found that the plaintiff mischaracterized the FDA's position because "the FDA's use of the phrase 'review issue' meant only that 'it [was] possible, although not guaranteed'" that an outcomes study would be required.   *Id.* at 129-31.   Contrary to the plaintiff's position that an outcomes study "*almost certainly*" would be required, the Third Circuit found that, during the time the challenged opinions were made, the FDA had "never explicitly or even implicitly indicated that a long-term outcome trial would be required to be completed for approval." *Id.* at 130.   The Third Circuit explained that "just because the Defendants were aware of [an] issue and optimistic that it would be decided in their favor does not necessarily mean their omissions are actionable." *Id.* at 132 (citation omitted).   *See also Tongue v. Sanofi*, 816 F.3d 199, 212 (2d Cir. 2016).[11]

---

[11] *Cf. In re Advanta Corp. Sec. Litig*, 180 F.3d 525, 538 (3d Cir. 1999) (holding that "vague and general statements of optimism" are not actionable); *accord Orrstown*, 2015 WL 3833849, at *19, *22, *36, *38-39 (dismissing claims under section 10(b) of the 1934 Act and under sections 11 and 12(a)(2) of the Securities Act of 1933 because the challenged opinions were not "determinate or verifiable").

Here, Plaintiff does not allege that in 2015, the FTC had provided the Rite Aid Defendants with any information about its position on the merger.  Therefore, like in *Amarin*, Plaintiff fails to allege any omitted facts that the Rite Aid Defendants knew at the time that did not fairly align with their subjective statements of belief.  This failure is dispositive of the case against the Rite Aid Defendants.

### C.   The Challenged Opinions Are Forward Looking Statements Protected By The PSLRA Safe Harbor.

The challenged opinions are not actionable for the additional reason that they are protected under the PSLRA's safe harbor for forward-looking statements.  The PSLRA provides a statutory safe harbor that protects any statement "[1] identified as a forward-looking statement, and [2] [] accompanied by meaningful cautionary statements identifying important factors that could cause actual results to differ materially."  15 U.S.C. § 78u-5(c).[12]  The challenged opinions meet the requirements for safe harbor protection.

---

[12] Any forward-looking statement is also "immunize[d]" by the PSLRA's safe harbor to the extent "'the plaintiff fails to prove the forward-looking statement … was made with actual knowledge … that the statement was false or misleading.'"  *OFI Asset Mgmt.*, 834 F.3d at 502 (ellipses in original) (quoting 15 U.S.C. § 78u-5(c)(1)(B)).  *See also Miller v. Champion Enters., Inc.*, 346 F.3d 660, 672 (6th Cir. 2003).  For the reasons stated above (*supra*, Part II(B)), the challenged opinions are protected by the safe harbor simply because Plaintiff fails to allege actual knowledge of falsity.

**First**, the opinions are "forward-looking" under the PSLRA.  The PSLRA sets forth enumerated categories of statements that qualify as "forward-looking."  *See* 15 U.S.C. § 78u-5(i)(1).  For example, statements "that the [issuer] expect[s] the mergers to close [at a specific future date] are forward-looking statements and are protected by the Safe Harbor provisions," along with statements "that the [issuer] expected to receive the appropriate regulatory approvals."  *Burges v. BancorpSouth, Inc.*, No. 3-14-1564, 2015 WL 4198795, at *3 (M.D. Tenn. July 10, 2015); *see also Bauer v. Eagle Pharm., Inc.*, C.A. No. 16-3091(JLL), 2017 WL 2213147, at *8-9 (D.N.J. May 19, 2017) (explaining "statements relating to anticipated FDA approval" are considered forward-looking under the PSLRA's definition because they are "'statement[s] of the plans and objectives of management for future operations, including plans or objectives relating to the products'") (quoting 15 U.S.C. § 78u-5(i)(1)(B)).  These types of statements are forward-looking because they "reflect anticipated and expected actions, not guarantees."  *Burges*, 2015 WL 4198795, at *3.  It is indisputable that the challenged opinions here are forward-looking statements.  (*See, e.g.*, Am. Compl. ¶ 64 ("[T]he transaction is **expected** to close in the second half of calendar 2016 …."); *id.* ¶ 65 ("[W]e do not **believe** the combination **should** cause regulatory concern."); *id.* ¶ 69 ("'The Board of Directors' **belief** that the merger and related transactions with [Walgreens] **would be** completed successfully ….'")).

33

**Second**, the challenged opinions are accompanied by meaningful cautionary statements directly related to regulatory risk.  To warrant safe harbor protection, an accompanying cautionary statement "should be 'directly related to the alleged misrepresentations,' but it does not have to 'actually accompany the alleged misrepresentation.'"  *GSC Partners*, 368 F.3d at 243 n.3 (citation omitted).  Here, each of the Script, Talking Points and FAQs cautioned investors that these documents contain forward-looking statements "relating to the proposed transaction . . ., including statements regarding the expected timing of the closing of the transaction [and] the ability of the parties to complete the transaction considering the various closing conditions."  (Ex. D at Ex. 99.1 at 4, Ex. 99.2 at 6, Ex. 99.3 at 4).  They warned investors that "[t]here can be no assurance that the merger will be completed," and each "cautioned not to place undue reliance on any of these forward-looking statements" because of the risks that "regulatory approvals[] may not be satisfied or waived, on a timely basis or otherwise" and that "a governmental entity may prohibit, delay or refuse to grant approval for the consummation of the transaction."  (*Id.*).

Similarly, the 2015 Proxy Statement warned about "'forward-looking statements' that do not directly relate to historical facts" because actual results may differ and are subject to specifically identified risks, including, among others: (1) "the inability to consummate the merger" due to the failure to receive "required

regulatory approvals"; (2) "risks related to obtaining the requisite consents to the merger," such as "under the HSR Act and other applicable antitrust laws"; and (3) "the risk that the merger may not be consummated in a timely manner, if at all." (Ex. A at 25).   Statements such as "[t]he transaction is subject to all required regulatory approvals" and "**[t]here is no guarantee that we will be successful in completing the acquisition**," are sufficient to "qualify for protection under the PSLRA safe harbor provision" because they are "cautionary statements about the prospective and conditional nature of the proposed acquisitions." *Bonomo v. Nova Fin. Holdings, Inc.*, C.A. No. 11-4762, 2012 WL 2196305, at *8 (E.D. Pa. June 15, 2012).   *See also M&T Bank*, 2017 WL 4856864, at *7 (holding opinion not actionable because "the Proxy warned not only that regulatory approvals may take longer than expected, but that they may never come at all").

As a result, the challenged opinions are protected under the PSLRA's statutory safe harbor for forward-looking statements.[13]

## III.   PLAINTIFF FAILS TO ALLEGE SCIENTER.

Dismissal also is warranted for the independent reason that Plaintiff's purported allegations of scienter fall woefully short of the exacting standard

---

[13]  The only challenged opinion that might not properly be considered forward looking is the Rite Aid Defendants' stated belief that the second request was a "standard part of the regulatory process in connection with the FTC's review" (Am. Compl. ¶ 80).  Plaintiff, nevertheless, fails to state a claim with respect to this statement for the other reasons discussed herein.

Congress demanded in the PSLRA. The PSLRA requires that "the complaint shall, with respect to each act or omission … state with particularity facts giving rise to a strong inference that the defendant acted with the required state of mind." 15 U.S.C. § 78u-4(b)(2). That required state of mind is an "intent to deceive, manipulate, or defraud." *Rahman v. Kid Brands, Inc.*, 736 F.3d 237, 242-43 (3d Cir. 2013) (internal quotations and citations omitted). But "allegations of intentional, conscious or reckless behavior must be supported by facts stated 'with particularity' that give rise to a 'strong inference' of scienter." *In re NAHC*, 2001 WL 1241007, at *19; *see also In re Advanta Corp. Sec. Litig.*, 180 F.3d 525, 539 (3d Cir. 1999) (allegation that "defendants acted 'knowingly'" is insufficient). Vague or unspecific allegations will not suffice. *In re Digital Island Sec. Litig.*, 357 F.3d 322, 328 (3d Cir. 2004).

## A.   Plaintiff's Allegations Of Scienter Are Not Plausible, Let Alone Cogent.

To plead the "strong inference" of scienter required by the PSLRA, well-pled facts must give rise to an inference of scienter that is more than merely plausible or reasonable – "it must be cogent and at least as compelling as any opposing inference of nonfraudulent intent." *Tellabs*, 551 U.S. at 309-10 (explaining "in determining whether the pleaded facts give rise to a 'strong' inference of scienter, the court must take into account plausible opposing

inferences"). Plaintiff's theory of scienter is not even plausible, let alone cogent or compelling.

According to Plaintiff, the Rite Aid Defendants "were motivated to push through the unfair mergers in order to secure lucrative benefits and compensation packages for the [] Board and other Rite Aid insiders … [and] agreed to an even worse deal for shareholders, with significantly reduced cash consideration, so that Rite Aid insiders could still reap their disproportional benefits." (Am. Compl. ¶ 112).

If the Rite Aid Defendants knew the Merger could not receive regulatory approval and would, therefore, never close, as Plaintiff alleges, then how would they ever secure "disproportionate personal benefits" that were entirely contingent on the Merger's closing? (Am. Compl. ¶ 69; *see id.* ¶¶ 4, 112) They, of course, could not. It is utterly implausible that the Rite Aid Defendants would fraudulently induce stockholder approval of a doomed Merger.[14]

For example, in *City of Edinburgh Council v. Pfizer*, plaintiffs alleged that pharmaceutical companies made affirmatively false statements of belief when they

---

[14] Plaintiff's shop-worn allegations are particularly inadequate here because the Chancellor of the Delaware Court of Chancery already determined that the benefits the Rite Aid Defendants stood to receive in the Merger did not constitute a conflict of interest, holding that "the directors' financial interests in maximizing the transaction appear to be aligned with the interests of all other stockholders." *In re Rite Aid Stockholders Litig.*, Consol. C.A. No. 11663-CB, Tr. at 80 (Del. Ch. Jan. 5, 2016) (TRANSCRIPT).

announced their decision to initiate a Phase 3 study based on "a scheduled Interim look at data from an ongoing Phase 2 study." 754 F.3d at 164. The Third Circuit rejected plaintiffs' contrived inference that defendants purportedly disbelieved this statement and made it intending to defraud investors, finding instead that "the initiation of Phase 3 cost millions of dollars and required FDA approval, rendering it **improbable** that defendants would have continued if they did not believe their interpretation of the interim results or if they thought the drug a complete failure." *Id.* (emphasis added) (citation omitted). *See also Davidoff v. Farina*, No. 04 Civ. 7617(NRB), 2005 WL 2030501, at *11 n.19 (S.D.N.Y. Aug. 22, 2005) (explaining "it would have made no economic sense for defendants to invest literally billions of dollars in a venture that they knew would fail").

Here, just like in *Pfizer*, Plaintiff suggests the contrived inference that the Board knew the Merger would fail to gain regulatory approval, but recommended it anyway, despite the cost to investors (including themselves) and despite the impossibility of receiving any "personal benefits." This contrived inference is far less compelling than the obvious, nonculpable inference that although the Rite Aid Defendants believed the Merger would receive timely regulatory approval, the approval process ultimately took longer, and was less successful, than the Rite Aid Defendants reasonably expected.

### B.   Plaintiff's Allegations Of Motive And Opportunity Are Insufficient

"Blanket assertions of motive and opportunity" based on purported "lucrative benefits and compensation packages" are routinely rejected as insufficient to establish a strong inference of an intent to commit fraud.  *See GSC Partners*, 368 F.3d at 237.  "In every corporate transaction, the corporation and its officers have a desire to complete the transaction, and officers will usually reap financial benefits from a successful transaction.  Such allegations alone cannot give rise to a 'strong inference' of fraudulent intent."  *Id.* (collecting cases); *Herzog v. GT Interactive Software Corp.*, No. 98 Civ. 0085(DNE), 1999 WL 1072500, at *9 (S.D.N.Y. Nov. 29, 1999) (holding that a defendant's "'desire to consummate [a] corporate transaction does not constitute a motive for securities fraud'") (citation omitted).

Nor is it sufficient to plead opportunity by alleging that individuals held "senior positions" at a company or "participat[ed] in the merger review process." *In re Alpharma, Inc. Sec. Litig.*, 372 F.3d 137, 149-50 (3d Cir. 2004), *abrogated on other grounds by Tellabs*, 551 U.S. at 308.  Thus, Plaintiff fails to plead that the Rite Aid Defendants had any cognizable motive to commit fraud.

### C.   Plaintiff Relies Improperly On The Group Pleading Doctrine.

Finally, Plaintiff attempts wrongly to rely upon "group pleading" to allege the Rite Aid Defendants' purported knowledge and intent to commit fraud:

> The Individual Defendants are liable for the false and misleading statements pleaded herein because, through their positions as senior executives and/or board members of Rite Aid and/or Walgreens, [they] possessed the power and ultimate authority to control the contents of these companies' quarterly reports, press releases, and presentations to securities analysts, money and portfolio managers, and institutional investors, *i.e.*, the market.

(Am. Compl. ¶ 41; *see id.* ¶¶ 65-66, 76-77, 114). In *Winer Family Trust v. Queen*, the Third Circuit eliminated the "group pleading doctrine" because the PSLRA "requires plaintiffs to specify the role of each defendant, demonstrating each defendant's involvement in misstatements and omissions." 503 F.3d at 335-36. Therefore, the Complaint must be dismissed. *See, e.g.*, *Rescue Mission of El Paso, Inc. v. K-Sea Transp. Partners, L.P.*, No. 12-CV-00509(WHW), 2013 WL 3087078, at *28 (D.N.J. June 14, 2013) (dismissing claims against directors who signed 10-K because "[p]laintiffs have failed to detail specific actions of the individual board members").

## IV. PLAINTIFF FAILS TO ALLEGE LOSS CAUSATION.

Loss causation is "a causal connection between the material misrepresentation and the loss." *Dura Pharm.*, 544 U.S. at 342. To plead loss causation, a plaintiff must allege "that the misstatement or omission concealed something from the market that, when disclosed, negatively affected the value of

the security." *Nat'l Junior Baseball League v. Pharmanet Dev. Grp. Inc.*, 720 F. Supp. 2d 517, 559 (D.N.J. 2010).[15]

None of the purported corrective disclosures revealed facts that the Rite Aid Defendants could have known and omitted **in 2015**.  For example, Plaintiff alleges that a *Bloomberg* article on January 20, 2017, revealed that "FTC regulators were unlikely to approve the deal."  (*See* Am. Compl. ¶¶ 17, 102, 127).  The article states that "**[i]t isn't clear** whether the staff has made a formal recommendation." (Ex. B (emphasis added)).  Plaintiff does not identify facts disclosed in the article that the Rite Aid Defendants knew and omitted in 2015; rather, Plaintiff recites the article's pessimistic opinion in 2017 about the ongoing regulatory review. Therefore, Plaintiff does not plead that the article revealed any fraud.  *See Martin v. GNC Hldgs., Inc.*, C.A. No. 2:15-cv-01522, 2017 WL 3974002, at *19 (W.D. Pa. Sept. 8, 2017) (explaining "comments by analysts" are "not a corrective disclosure which revealed any alleged fraud").

Similarly, Plaintiff does not allege that the announcements on January 30, 2017, and June 29, 2017, disclosed facts that the Rite Aid Defendants knew and omitted in 2015.  (*See* Am. Compl. ¶¶ 18, 21, 61, 99, 103-104, 127, 130).  Thus, Plaintiff does not plead that either announcement revealed any fraud.

---

[15]   Although a pleading of loss causation need only meet the notice pleading requirement of Federal Rule of Civil Procedure 8(a)(2), Plaintiff falls well short of this standard.

## V.    PLAINTIFF FAILS TO ALLEGE A SECTION 20(a) CLAIM.

Section 20(a) of the 1934 Act imposes liability on "[e]very person who, directly or indirectly, controls any person liable" for an independent violation of the 1934 Act.  15 U.S.C. § 78t.  For the reasons already explained, Plaintiff fails to state any primary violation of Section 10(b).  (*See supra* Parts II-IV).  Accordingly, because Plaintiff has "failed to adequately plead a predicate section 10(b) violation, [his] section 20(a) claim must be dismissed."  *Pfizer*, 754 F.3d at 177.

## CONCLUSION

For the reasons set forth above, the Amended Complaint should be dismissed with prejudice.  *See In re NAHC, Inc. Sec. Litig.*, 2001 WL 1241007, at *25-26 (dismissing initial pleading with prejudice, explaining PSLRA purpose is "to provide a filter at the earliest stage (the pleading stage) to screen out lawsuits that have no factual basis").

Respectfully submitted,

Of the Delaware Bar
(admitted *pro hac vice*):

Robert S. Saunders
Jennifer C. Voss
Cliff C. Gardner
Jessica R. Kunz
**SKADDEN, ARPS, SLATE,**
  **MEAGHER & FLOM LLP**
One Rodney Square, P.O. Box 636
Wilmington, Delaware  19899-0636
(302) 651-3000
(302) 651-3001 (fax)


DATED:  February 16, 2018

/s/ Simoné L. Delerme
Brian P. Downey (PA 59891)
Simoné L. Delerme (PA 317120)
**PEPPER HAMILTON LLP**
Suite 200, 100 Market Street, Box 1181
Harrisburg, Pennsylvania  17108-1181
(717) 255-1155
(717) 238-0575 (fax)
downeyb@pepperlaw.com
delermes@pepperlaw.com

*Attorneys for Defendants Rite Aid*
*Corporation, John T. Standley, David R.*
*Jessick, Joseph B. Anderson, Jr., Bruce*
*G. Bodaken, Kevin E. Lofton, Myrtle S.*
*Potter, Michael N. Regan, Frank A.*
*Savage and Marcy Syms*

## **CERTIFICATE OF COMPLIANCE**

I hereby certify that the Rite Aid Defendants' Opening Brief in Support of their Motion to Dismiss the Amended Complaint does not exceed 10,000 words, in compliance with the Court's order granting the Rite Aid Defendants' request to exceed the word count. (Doc. 89). The word count of the brief is 9,970 words (excluding the Table of Contents, Table of Authorities, and signature block).


DATED: February 16, 2018          */s/ Simoné L. Delerme*
                                  Simoné L. Delerme (PA 317120)

## CERTIFICATE OF SERVICE

I, Simoné L. Delerme, hereby certify that on February 16, 2018, a true and correct copy of the foregoing was filed through the Court's Electronic Case Filing (ECF) system and the following is registered to receive electronic notification of said filing through ECF:

> Benjamin M. Mather, Esq.
> Deborah R. Gross, Esq.
> Howard J. Kaufman, Esq.
> KAUFMAN, COREN & RESS, P.C.
> Two Commerce Square, Suite 3900
> 2001 Market Street
> Philadelphia, PA  19103

I also certify that a true and correct copy of the foregoing was served via First Class, U.S. Mail, postage prepaid, upon the following:

> Stuart A. Davidson, Esq.
> Mark J. Dearman, Esq.
> Christopher Chagas Gold, Esq.
> ROBBINS GELLER RUDMAN & DOWD, LLP
> 120 East Palmetto Park Road, Suite 500
> Boca Raton, FL 33432

> Randall J. Baron, Esq.
> David T. Wissbroecker, Esq.
> ROBBINS GELLER RUDMAN & DOWD, LLP
> 655 West Broadway, Suite 1900
> San Diego, CA  92101

> ***Attorneys for Plaintiff***

Reed R. Kathrein, Esq.
HAGENS BERMAN SOBOL SHAPIRO LLP
715 Hearst Avenue, Suite 202
Berkeley, CA 94710

Karl P. Barth, Esq.
HAGENS BERMAN SOBOL SHAPIRO LLP
1918 8th Avenue, Suite 3300
Seattle, WA 98101

***Additional Counsel for Plaintiff***

    _s/_    *Simoné L. Delerme*
Simoné L. Delerme