UNITED STATES DISTRICT COURT

MIDDLE DISTRICT OF PENNSYLVANIA

| | | |
|---|---|---|
| JERRY HERING, Individually and on Behalf of All Others Similarly Situated, | ) ) | Civ. Action No. 1:15-cv-02440-JEJ |
| | ) | |
| Plaintiff, | ) | <u>CLASS ACTION</u> |
| | ) | |
| vs. | ) ) | |
| | ) | |
| RITE AID CORPORATION, et al., | ) | |
| | ) | |
| Defendants. | ) | |
| | ) | |

**LEAD PLAINTIFF'S OMNIBUS MEMORANDUM OF LAW IN OPPOSITION TO DEFENDANTS' MOTIONS TO DISMISS THE AMENDED COMPLAINT**

# TABLE OF CONTENTS

**Page**

I.   FACTS ..................................................................................................3

    A.   Defendants Announce the Merger and Downplay Regulatory
        Risks .........................................................................................3

    B.   The FTC Informs Defendants of Significant Issues.............................4

    C.   Defendants Double Down ...................................................................5

    D.   The Truth Comes Out..........................................................................6

    E.   Defendants Terminate the Revised Merger.........................................7

II.   ARGUMENT........................................................................................8

    A.   Legal Standards ..................................................................................8

    B.   The Complaint States a §10(b) Claim.................................................8

        1.   Defendants' Misrepresentations and Omissions.......................9

            a.   Start of Class Period to 2015 Proxy .............................9

                (1)   Statements 1-9 Are Actionable Opinions.............10

                (2)   Statements 2, 4-5 Contain Statements of
                        Facts.....................................................................14

            b.   Statements between December 2015 and
                September 2016 .............................................................15

                  (1)   False Statements of Fact.......................................15

                  (2)   False Statements of Opinion .................................19

                  (3)   Omissions During this Period ...............................21

1424407_1

**Page**

c. Statements and Omissions From October 2016 to November 2016 ...........................................................23

(1) Statements of Fact or Embedded Facts ...............23

(2) False Statements of Opinion .................................25

(3) Omissions During This Period .............................29

d. Statements and Omissions From December 2016 to the End of the Class Period .........................................29

(1) False Statements of Fact or Embedded Facts.......29

(2) False Statements of Opinion .................................31

(3) Omissions During This Period .............................32

2. Defendants' Statements Are Actionable....................................33

a. Defendants' Statements Are Not Corporate Optimism ........................................................................33

b. PSLRA Safe Harbor Does Not Apply ............................37

(1) Defendants' Statements Are Not Forward-Looking ................................................................37

(2) Statements Were Knowingly False When Made ....................................................................39

(3) Statements Were Not Accompanied by Meaningful Cautionary Language.......................39

3. Scienter......................................................................................41

**Page**

a.   Allegations of Subjective Falsity Demonstrates
Scienter ..........................................................................42

b.   The Magnitude of Damage Supports Scienter ...............46

c.   The Timing of the Revelation of Truth Supports
Scienter ..........................................................................48

d.   Defendants' Motives Bolster Scienter............................49

e.   The Rite Aid Defendants Failed to Counter
Plaintiff's Strong Inference of Scienter..........................50

f.   The Walgreens Defendants Failed to Counter
Plaintiff's Strong Inference of Scienter..........................52

C.   The Complaint Adequately Pleads Loss Causation ............................54

D.   The Complaint Adequately Pleads a §20(a) Claim.............................55

E.   Defendants' Standing Arguments Are Meritless ................................57

III.   CONCLUSION.............................................................................................58

# TABLE OF AUTHORITIES

**Page**

## CASES

*Ashcroft v. Iqbal*,
    556 U.S. 662 (2009)............................................................................8

*Asher v. Baxter Int'l Inc.*,
    377 F.3d 727 (7th Cir. 2004) ............................................................52

*Bauer v. Eagle Pharm., Inc.*,
    C.A. No. 16-3091(JLL), 2017 WL 2213147
    (D.N.J. May 19, 2017) ......................................................................38

*Bell Atl. Corp. v. Twombly*,
    550 U.S. 544 (2007)............................................................................8

*Berson v. Applied Signal Tech., Inc.*,
    527 F.3d 982 (9th Cir. 2008) ............................................................36

*Bonomo v. Nova Fin. Holdings, Inc.*,
    C.A. No. 11-4762, 2012 WL 2196305
    (E.D. Pa. June 15, 2012) ...................................................................40

*Burges v. BancorpSouth, Inc.*,
    No. 3-14-1564, 2015 WL 4198795
    (M.D. Tenn. July 10, 2015) .........................................................37, 38

*City of Dearborn Heights Act 345 Police & Fire Ret. Sys. v. Align
    Tech., Inc.*,
    856 F.3d 605 (9th Cir. 2017) ..............................................11, 13, 22

*City of Edinburgh Council v. Pfizer, Inc.*,
    754 F.3d 159 (3d Cir. 2014) .............................................................51

*Com. of Pa. Dep't of Pub. Welfare v. U.S. Dep't HHS*,
    101 F.3d 939 (3d Cir. 1996) ...................................................9, 18, 33

*Davidoff v. Farina*,
    No. 04 Civ. 7617, 2005 WL 2030501
    (S.D.N.Y. Aug. 22, 2005)..................................................................51

- iv -

**Page**

*Dura Pharms., Inc. v. Broudo*,
  544 U.S. 336 (2005)........................................................................54

*ECA, Local 134 IBEW Joint Pension Tr. of Chi. v. JP Morgan Chase Co.*,
  553 F.3d 187 (2nd Cir. 2009) .....................................................49, 50

*Elam v. Neidorff*,
  544 F.3d 921 (8th Cir. 2008) ......................................................48, 49

*Fla. State Bd. of Admin. v. Green Tree Fin. Corp.*,
  270 F.3d 645 (8th Cir. 2001) .............................................................47

*Frater v. Hemispherx Biopharma, Inc.*,
  996 F. Supp. 2d 335 (E.D. Pa. 2014)..........................................44, 49

*Freudenberg v. E*Trade Fin. Corp.*,
  712 F. Supp. 2d 171 (S.D.N.Y. 2010) .........................................41, 44

*GSC Partners CDO Fund v. Washington*,
  368 F.3d 228 (3d Cir. 2004) ..............................................................49

*Herzog v. GT Interactive Software Corp.*,
  No. 98 CIV. 0085 (DNE), 1999 WL 1072500
  (S.D.N.Y. Nov. 29, 1999)...........................................................49, 50

*In re Advanta Corp. Sec. Litig.*,
  180 F.3d 525 (3rd Cir. 1999) ......................................................35, 38

*In re Alpharma Inc. Sec. Litig.*,
  372 F.3d 137 (3d Cir. 2004) .......................................................49, 50

*In re Amarin Corp. PLC Sec. Litig.*,
  689 F. App'x 124 (3d Cir. 2017) ................................................11, 14

*In re Amarin Corp. PLC Sec. Litig.*,
  No. 13-6663, 2016 WL 1644623
  (D.N.J. Apr. 26, 2016) ......................................................................11

- v -

**Page**

*In re Burlington Coat Factory Sec. Litig.*,
  114 F.3d 1410 (3d Cir. 1997) ..........................................................................35

*In re Cambrex Corp. Sec. Litig.*,
  No. 03-CV-4896(WJM), 2005 WL 2840336
  (D.N.J. Oct. 27, 2005).....................................................................................42

*In re Cell Pathways, Inc. Sec. Litig.*,
  2000 WL 805221 (E.D. Pa. June 20, 2000).....................................................38

*In re Discovery Labs. Sec. Litig.*,
  No. 06-1820, 2007 WL 789432 (E.D. Pa. Mar. 15, 2007),
  *aff'd*, 276 F. App'x 154 (3d Cir. 2008).......................................................35, 46

*In re Enzymotec Sec. Litig.*,
  No. CV145556(JLL)(MAH), 2015 WL 8784065
  (D.N.J. Dec. 15, 2015) ...............................................................................37, 41

*In re Lucent Techs., Inc. Sec. Litig.*,
  217 F. Supp. 2d 529 (D.N.J. 2002)............................................................37, 41

*In re MannKind Sec. Actions*,
  835 F. Supp. 2d 797 (C.D. Cal. 2011) .................................................19, 44, 45

*In re Merck & Co., Inc. Sec., Derivative & "ERISA" Litig.*,
  543 F.3d 150 (3d Cir. 2008) ............................................................................11

*In re MobileMedia Sec. Litig.*,
  28 F. Supp. 2d 901, 930 (D.N.J. 1998).............................................................39

*In re Nuvelo, Inc. Sec. Litig.*,
  668 F. Supp. 2d 1217 (N.D. Cal. 2009)............................................................51

*In re Petrobras Sec. Litig.*,
  116 F. Supp. 3d 368 (S.D.N.Y. 2015) ..............................................................13

*In re Scholastic Corp. Sec. Litig.*,
  252 F.3d 63 (2d Cir. 2001) ..............................................................................46

*In re Sprint Corp. Sec. Litig.*,
    232 F. Supp. 2d 1193 (D. Kan. 2002)...........................................................*passim*

*In re Stone & Webster, Inc. Sec. Litig.*,
    414 F.3d 187 (1st Cir. 2005).............................................................................38

*In re Tel–Save Sec. Litig.*,
    No. 98-CV-3145, 1999 WL 999427
    (E.D. Pa. Oct. 19, 1999)............................................................................44, 55

*In re Urban Outfitters, Inc. Sec. Litig.*,
    103 F. Supp. 3d 635 (E.D. Pa. 2015)................................................................54

*In re Urban Outfitters, Inc., Sec. Litig.*,
    No. CV 13-5978, 2016 WL 1043014
    (E.D. Pa. Feb. 29, 2016) ....................................................................................57

*In re Veritas Software Corp. Sec. Litig.*,
    No. 04-831-SLR, 2006 WL 1431209
    (D. Del. May 23, 2006)......................................................................................39

*In re ViroPharma Inc. Sec. Litig.*,
    21 F. Supp. 3d 458 (E.D. Pa. 2014)..................................................................36

*In re Viropharma, Inc. Sec. Litig.*,
    No. 02-1627, 2003 WL 1824914
    (E.D. Pa. Apr. 7, 2003) ...............................................................................43, 51

*In re Wilmington Tr. Sec. Litig.*,
    29 F. Supp. 3d 432 (D. Del. 2014)...............................................................16, 55

*Institutional Inv'rs Grp. v. Avaya, Inc.*,
    564 F.3d 242 (3d Cir. 2009) .......................................................................*passim*

*Jaroslawicz v. M&T Bank Corp.*,
    Civ. No. 15-897-RGA, 2017 WL 4856864
    (D. Del. Oct. 27, 2017) ...............................................................................13, 40

**Page**

*Lane v. Page,*
    581 F. Supp. 2d 1094 (D.N.M. 2008) ................................................56

*Lormand v. US Unwired, Inc.,*
    565 F.3d 228 (5th Cir. 2009) .............................................................21

*Martin v. GNC Holdings, Inc.,*
    No. 2:15-CV-01522, 2017 WL 3974002
    (W.D. Pa. Sept. 8, 2017) ...................................................................55

*Matrixx Initiatives, Inc. v. Siracusano,*
    563 U.S. 27 (2011) ..............................................................................9

*McCabe v. Ernst & Young, LLP,*
    494 F.3d 418 (3d Cir. 2007) .............................................................54

*Nat'l Junior Baseball League v. Pharmanet Dev. Grp. Inc.,*
    720 F. Supp. 2d 517 (D.N.J. 2010) ...................................................54

*Omnicare, Inc. v. Laborers District Council Construction Industry
    Pension Fund,*
    __ U.S. __, 135 S. Ct. 1318 (2015).............................................*passim*

*Podany v. Robertson Stephens, Inc.,*
    318 F. Supp. 2d 146 (S.D.N.Y. 2004) ..............................................43

*Rehm v. Eagle Fin. Corp.,*
    954 F. Supp. 1246 (N.D. Ill. 1997) ..................................................46

*Rescue Mission of El Paso, Inc. v. K-Sea Transp. Partners L.P.,*
    No. 12-CV-00509 WHW, 2013 WL 3087078
    (D.N.J. June 14, 2013) ......................................................................52

*Rothman v. Gregor,*
    220 F.3d 81 (2d Cir. 2000) ...............................................................47

*Rubinstein v. Gonzalez,*
    241 F. Supp. 3d 841 (N.D. Ill. 2017)....................................29, 43, 45

**Page**

*Rubinstein v. Gonzalez*,
   No. 14-CV-9465, 2016 WL 1213931
   (N.D. Ill. Mar. 29, 2016)..........................................................................28, 36

*S.E.C. v. Goldstone*,
   No. 12-257 JB/GBW, 2015 WL 5138242
   (D.N.M. Aug. 22, 2015)....................................................................................43

*Schueneman v. Arena Pharms., Inc.*,
   840 F.3d 698 (9th Cir. 2016) ............................................................................21

*Se. Pa. Transp. Authority v. Orrstown Fin. Servs., Inc.*,
   No. 1:12-cv-00993, 2015 WL 3833849
   (M.D. Pa. June 22, 2015) ..................................................................................35

*SEC v. Pirate Investor LLC*,
   580 F.3d 233 (4th Cir. 2009) ............................................................................42

*Semerenko v. Cendant Corp.*,
   223 F.3d 165 (3d Cir. 2000) .............................................................................39

*Steiner v. MedQuist Inc.*,
   No. CIV. 04-5487 (JBS), 2006 WL 2827740
   (D.N.J. Sept. 29, 2006) .....................................................................................42

*Stratte-McClure v. Morgan Stanley*,
   784 F. Supp. 2d 373 (S.D.N.Y. 2011) ..............................................................44

*Strougo v. Barclays PLC*,
   105 F. Supp. 3d 330 (S.D.N.Y. 2015) ........................................................12, 46

*Tellabs, Inc. v. Makor Issues & Rights, Ltd.*,
   551 U.S. 308 (2007)......................................................................................8, 49

*Tongue v. Sanofi*,
   816 F.3d 199 (2d Cir. 2016) .............................................................................14

**Page**

*Universal Am. Corp. v. Partners Healthcare Sols. Holdings, L.P.*,
    176 F. Supp. 3d 387 (D. Del. 2016)....................................................48

*Walck v. Am. Stock Exch., Inc.*,
    687 F.2d 778 (3d Cir. 1982) ............................................................57

*Weiner v. Quaker Oats Co.*,
    129 F.3d 310 (3d Cir. 1997) ............................................................50

*Winer Family Tr. v. Queen*,
    503 F.3d 319 (3d Cir. 2007) ...............................................52, 57, 58

## STATUTES, RULES AND REGULATIONS

Federal Rules of Civil Procedure
    Rule 9(b) ...........................................................................................55

15 U.S.C.
    §78j(b)............................................................................................8, 11
    §78t(a) .........................................................................................55, 56

17 C.F.R.
    §230.405............................................................................................56

## SECONDARY AUTHORITIES

Dale A. Oesterle, *Regulating Hedge Funds*,
    1 Entrepreneurial Bus. L.J. 1, 20 (2006). .........................................53

1424407_1

This case is about Defendants'[1] efforts to mislead shareholders, and potential shareholders, about the level of regulatory risk faced by the proposed merger between Rite Aid and Walgreens (the "Merger").

The Merger was a planned combination of two national drugstore chains. Investors and securities analysts knew there was a significant risk that the Merger would not pass antitrust review.  As Walgreens later noted, "a complex transaction [like the Merger] between two large players in the same industry is precisely the type of transaction that could raise antitrust issues warranting a closer look."  Walgreen Mot. at 26 n.17.[2]  Nonetheless, when the Merger was announced and up until the Merger was abandoned, Defendants fraudulently downplayed the risk.

Defendants told investors that they did not believe the Merger should cause regulatory concern, based on claimed non-public facts in their possession.  Defendants represented that there was a minimal level of overlap between Rite Aid and Walgreens

---

[1]    "Defendants" collectively includes Rite Aid Corporation ("Rite Aid"), John T. Standley ("Standley"), David R. Jessick, Joseph B. Anderson, Jr., Bruce G. Bodaken, Kevin E. Lofton, Myrtle S. Potter, Michael N. Regan, Frank A. Savage, and Marcy Syms (the "Rite Aid Defendants") and Walgreens Boots Alliance, Inc. ("Walgreens"), Stefano Pessina ("Pessina") and George R. Fairweather ("Fairweather") (the "Walgreens Defendants").

[2]    The Walgreens Defendants' Memorandum of Law in Support of Their Motion to Dismiss Plaintiff's Amended Complaint (ECF No. 98) ("Walgreens Mot."); The Rite Aid Defendants' Opening Brief in Support of Their Motion to Dismiss the Amended Complaint (ECF No. 100) ("R.A. Mot.") (collectively, the "Motions").

stores, and that the Merger Agreement provided for sufficient divestitures to quell any concerns the FTC may have.

Even after "extensive discussions" with the FTC, and learning that the FTC would be unlikely to approve the Merger because of the substantial market overlap, Defendants maintained their public assurances of no "regulatory concern" and insisted they were "as confident as ever" about the deal.  When the Merger failed to obtain approval, and Defendants were forced to propose a revised merger ("Revised Merger"), they still refused to acknowledge any significant regulatory risk.

Defendants' false and misleading statements caused Rite Aid's stock to trade, post-announcement, at a level that did not accurately reflect the uncertainty of the completion of the Merger.  In fact, Defendants later ***conceded*** that Rite Aid stock traded at artificially inflated levels during the pendency of the Merger precisely because it "reflected market expectations of the likelihood that the merger would occur on the terms of the original merger agreement . . . ."  ¶¶105-108.[3]  When the truth of the regulatory hurdles emerged, Rite Aid stock price plummeted by over 54% from its Class Period high.

---

[3]     All "¶" and "¶¶" references are to the First Amended Direct Shareholder Class Action Complaint for Violations of the Securities Exchange Act of 1934 (ECF No. 83) ("Complaint").

1424407_1

As set forth below, Plaintiff has more than adequately plead violations of Federal Securities Laws.   Defendants' arguments to the contrary rely on mischaracterizations of the Complaint and misapplication of the appropriate legal standards.  When the allegations in the Complaint are accepted as true and read in the light most favorable to Plaintiff, as they must, Defendants' Motions should be denied.

## I.   FACTS

### A.   Defendants Announce the Merger and Downplay Regulatory Risks

There were three national drugstore chains in the U.S. in 2015.[4]  On October 27, 2015, Defendants announced the Merger for $9.00 per share and immediately allayed anticipated investor concerns over the antitrust risk.  ¶¶2, 64, 66.  The Rite Aid Defendants stated they did "not believe the combination should cause regulatory concern" based on "the market profiles of both companies," "the amount of pharmacy counters in the U.S.," the "the retail pharmacy footprints" and the "minimal level of overlap" between the businesses.  ¶¶65-66, 122.  Although the Merger Agreement provided for divestment of up to 1,000 stores, the Walgreen Defendants told investors the most likely scenario would call for fewer than 500.  ¶67.

---

[4]     *See* Statement of Commissioner Terrell McSweeny Regarding the Walgreens/Rite Aid Transaction ("Commissioner Letter") (Declaration of Deborah R. Gross filed herewith ("Gross Decl."), Ex. A).

1424407_1

On December 18, 2015, Rite Aid filed a proxy statement ("2015 Proxy") soliciting shareholder approval. Defendants portrayed minimal regulatory risk. ¶69. They also stated that Walgreens would assume the risks, if needed. ¶73.

### B.    The FTC Informs Defendants of Significant Issues

From December 2015 to September 2016, Defendants held extensive discussions with the FTC. ¶80. On December 10, 2015, Defendants received a second request from the FTC. ¶79. In December 2015 and January 2016, Defendants represented that: (i) the second request was a "standard part of the regulatory process"; (ii) the process was progressing "as we expected and planned"; (iii) there was no information "to change our view"; (iv) they were "confident" that the deal would "go through in the terms that we have anticipated"; (v) the deal was expected to complete in the second half of 2016 as announced; and (vi) Walgreens' integration team was up and running in anticipation of the Merger. ¶¶80-81.

From January to April 2016, Defendants submitted documents and data in response to the second request, and continued to have "extensive discussions" with the FTC. ¶83. Per the terms of the Merger Agreement, Walgreens led the discussions and made all strategic decisions in the review process, with the aid and cooperation of Rite Aid. ¶¶95, 116-118.

In April 2016, Pessina said the Merger was proceeding as expected, "with the regulatory approval process progressing in line with the timetable we had expected."

- 4 -

¶84. Pessina said store divestitures were "obviously [at the] top of mind for investors" and assured investors that "[n]othing has changed," that the process was proceeding in "an absolute normal way," and that everything was "exactly online with [what] we were expecting." *Id*.

From late April to August 2016, the FTC told Defendants that the Merger would have anticompetitive effects, identified specific geographic areas of concern regarding overlapping operations, and discussed significant store divestitures. ¶85. During this *same* period, the Walgreen Defendants continued to tell investors that there were no issues with the regulatory process: (i) the Merger was "progressing as planned"; (ii) "everything will be done" under the original timeline; and (iii) Walgreens' integration team was continuing its work. ¶¶86-87.

## C.    Defendants Double Down

On October 20, 2016, Defendants issued a joint release, announcing an extended Merger end date – from October 27, 2016 to January 27, 2017. ¶88. Media outlets reported that the Merger was encountering regulatory turbulence. Defendants repudiated these reports, purportedly based on their own inside information: "no idea about the sources of this news, but for sure if we could talk, . . . our news would be different," ¶89, "we have a different opinion than certain journalists who are writing things we don't recognize . . . . [s]o, just to reassure you, if we say that we are confident, it is because *what we know* makes us very confident." ¶90. Walgreens'

Chief Operating Officer told investors: "we don't recognize what's written in the press, to be honest. . . .  We remain, as we did from day one, confident about [doing] strategic deal for us."  ¶92.  Walgreens' Global Chief Financial Officer ("CFO") stated: "nothing really has changed" and "[w]e are very clear – from what we said in September, we expect the deal to complete."  ¶94.

### D.    The Truth Comes Out

On December 20, 2016, Defendants issued a joint release announcing an agreement to sell 865 Rite Aid stores to Fred's Inc., in "respon[se] to concerns identified by the FTC."  ¶96.

On January 5, 2017, Walgreens' CFO said they were "actively engaged in discussions with the FTC and are still working towards a close of the acquisition in the early part of this calendar year."  ¶97.  Pessina stated: "We are clearly making progress, and while I would always like to move faster and do more, we must be measured and ensure we work at a pace with which we are confident we can deliver for our customers and our shareholders. . . ."  ¶98.

But according to a proxy statement, *filed after the fact on March 3, 2017* ("2017 Proxy"), Rite Aid's attorneys concluded just a day later on January 6, 2017 that "the FTC would not recommend approval of the divestiture transaction by the [January 27, 2017] end date."  ¶127.

On January 20, 2017, *Bloomberg* issued an article, "Walgreens Faces U.S. Antitrust Concerns Over Rite Aid Fix," reporting that regulators were unlikely to approve the deal, *id.*, causing Rite Aid stock to fall by 20% over two trading days on unusually high volume.  ¶¶17, 102.

During a January 24, 2017 meeting, Walgreens stated it would not agree to a long-term extension of the Merger without a decrease in consideration, and Rite Aid immediately caved without conducting any valuation analysis.  ¶¶54-55.

Six days later, on January 30, 2017, Defendants announced the Revised Merger that cut the consideration to between $6.50 to $7.00 per share – ***even though Walgreens maintained its same commitment to divest 1,000 stores***.  ¶¶56-57.  On this news, Rite Aid stock plummeted by 17%.  ¶103.  By market close on February 2, 2017, Rite Aid stock declined to $5.25 per share.  *Id*.

### E.    Defendants Terminate the Revised Merger

The Walgreen Defendants again assured investors they were confident in the Revised Merger: "I am still positive on this deal" and "I am still optimistic that we will bring this deal to a successful conclusion"; "We believe that we can [certify compliance] in the coming weeks."  ¶100.

Two months later, on June 29, 2017, Defendants terminated the Revised Merger and entered into an asset purchase agreement, causing Rite Aid's stock to drop by over 26%.  ¶104.

Defendants ultimately conceded that Rite Aid stock traded at artificially inflated levels during the pendency of the Merger because it "reflected market expectations of the likelihood that the merger would occur on the terms of the original merger agreement . . . ." ¶¶105-108.

## II.   ARGUMENT

### A.   Legal Standards

The Court must treat pleaded facts as true and draw all reasonable inferences in plaintiff's favor. *Tellabs, Inc. v. Makor Issues & Rights, Ltd.*, 551 U.S. 308, 321, 324 (2007).[5]  Rather than parse allegations for individual analysis, the "court[] must consider the complaint in its entirety." *Id.* at 322.  A claim must be plausible, but that "is not akin to a 'probability requirement.'"  *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009).  "[A] well-pleaded complaint may proceed even if it strikes a savvy judge that actual proof of those facts is improbable, and 'that a recovery is very remote and unlikely.'" *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 556 (2007).

### B.   The Complaint States a §10(b) Claim

To state a claim under §10(b), Plaintiff must allege: "'(1) a material misrepresentation or omission; (2) scienter; (3) a connection between the misrepresentation or omission and the purchase or sale of a security; (4) reliance upon

---

[5]     Unless otherwise noted, all emphasis is added, and citations and footnotes are omitted.

the misrepresentation or omission; (5) economic loss; and (6) loss causation.'"

*Matrixx Initiatives, Inc. v. Siracusano*, 563 U.S. 27, 37-38 (2011).[6]

### 1.    Defendants' Misrepresentations and Omissions

### a.    Start of Class Period to 2015 Proxy

The statements in this section were made by Defendants in connection with the

announcement of the Merger:

1.    <u>Rite Aid Defendants</u>[7]: (October 27, 2015 press release announcing Merger) "[t]he transaction is **expected to close in the second half of calendar 2016**," after "the expiration or termination of applicable waiting periods under the Hart-Scott-Rodino Antitrust Improvements Act of 1976." ¶64.

2.    <u>Rite Aid Defendants</u>: (October 29, 2015 Form 8-K – "script") "**based upon the complementary nature of the market profiles of both companies**, and the amount of pharmacy counters in the U. S., **we do not believe the combination should cause regulatory concern**." ¶65.

3.    <u>Rite Aid Defendants</u>: (October 29, 2015 Form 8-K – "script") "under the terms of the merger agreement, **Walgreens Boots Alliance can divest some stores if needed to obtain FTC approval**." ¶65.

4.    <u>Rite Aid Defendants</u>: (October 29, 2015 Form 8-K – "<u>FAQs</u>") "**We believe there will be a minimal level of overlap**, as Walgreens and Rite Aid have largely complementary retail pharmacy footprints in the U.S." ¶66.

5.    <u>Rite Aid Defendants</u>: (October 29, 2015 Form 8-K – "<u>FAQs</u>") "**any reason why this deal wouldn't happen, such as anti-trust issues; . . . based upon the market profiles of both companies**, and the amount of

---

[6]    Defendants do not challenge, and have waived argument on, elements (3), (4) and (5). *Com. of Pa. Dep't of Pub. Welfare v. U.S. Dep't HHS*, 101 F.3d 939, 945 (3d Cir. 1996).

[7]    The maker(s) of each statement are underlined.  Liability only flows to the maker of each statement.

pharmacy counters in the U.S., ***we do not believe the combination should cause regulatory concern***." ¶66.

6.    <u>Walgreens</u>: (November 10, 2015 Credit Suisse Healthcare Conference) Gourlay commented on 1,000-store divestiture cap; "***[We] believe that it's probably about half that number***." ¶67.

7.    <u>Walgreens and Fairweather</u>: (November 17, 2015 Morgan Stanley Global Consumer & Retail Conference) "***We're anticipating that store divestitures will be less than 500, although our contract provides for up to 1,000, but we don't anticipate that will be the case***." ¶67.

8.    Defendants: (2015 Proxy) "The Board of Directors' belief that the merger and related transactions with WBA would be completed successfully, based on, among other things, . . . ***the level of commitment by WBA to obtaining applicable consents and approvals under antitrust and similar laws and assuming the risks related to certain conditions and requirements that may be imposed by regulators in connection with securing such approvals up to a specified threshold, including the commitment to sell up to 1,000 stores of Rite Aid or WBA and take certain other limited actions, in each case, in order to avoid or vacate any order that would prevent or materially delay the merger***." ¶69.

9.    Defendants: (2015 Proxy) Standley expressed Rite Aid's view during Merger negotiations that "***any definitive agreement would need to provide for a high degree of certainty in terms of WBA's obligation to obtain antitrust approvals***." ¶73.

### (1)    Statements 1-9 Are Actionable Opinions

Statements 1-9 were opinion statements conveying Defendants' belief that the

Merger faced minimal risk.

Under *Omnicare, Inc. v. Laborers District Council Construction Industry Pension Fund*, __ U.S. __, 135 S. Ct. 1318 (2015), statements of belief are actionable if either: (1) the speaker did not actually hold the stated belief (*i.e.* opinion was "subjectively false" and "objectively false"); (2) the opinion contains "embedded

- 10 -

statements of fact" that were untrue; *or* (3) the speaker omitted material facts about its "inquiry into or knowledge concerning a statement of opinion" that "conflict with what a reasonable investor would take from the statement itself." *Id.* at 1326-29[8]; *see also Align Tech.*, 856 F.3d at 615-16. Here, Statements 1-9 are challenged under the first prong. *See* ¶¶68, 70.

   *Objective Falsity*. Numerous objective facts demonstrate that the Merger posed significant regulatory risk that could not be addressed by Walgreens' promise to divest 1,000 stores. Indeed, securities analysts highlighted the substantial market overlap between Rite Aid and Walgreens stores, which would require significant divestitures. For instance, Cowen and Company noted the "significant overlap between the two

---

[8]      *Omnicare*'s "reasoning is equally applicable to Section 10(b) and Rule 10b-5 claims." *City of Dearborn Heights Act 345 Police & Fire Ret. Sys. v. Align Tech., Inc.*, 856 F.3d 605, 616 (9th Cir. 2017). Although the Third Circuit has not applied *Omnicare* to a §10(b) claim, *In re Amarin Corp. PLC Sec. Litig.*, 689 F. App'x 124, 132 n.12 (3d Cir. 2017), at least two district courts in this Circuit have done so: *In re Hertz Glob. Holdings, Inc. Sec. Litig.*, No. CV 13-7050, 2017 WL 1536223, at *12 (D.N.J. Apr. 27, 2017) (Gross Decl., Ex. B); *In re Amarin Corp. PLC Sec. Litig.*, No. 13-6663, 2016 WL 1644623, at *8 (D.N.J. Apr. 26, 2016). Defendants also cite *Omnicare* and thus concede its applicability here. R.A. Mot. at 5, 26, 29-30. In any event, Defendants' misleading statements remain actionable under prior Third Circuit precedent as well. *See In re Merck & Co., Inc. Sec., Derivative & "ERISA" Litig.*, 543 F.3d 150, 166 (3d Cir. 2008) ("'misrepresentations in an opinion' or belief [are] actionable . . . [if] the statement was 'issued without a genuine belief or reasonable basis'").

companies, particularly in the northeast,"[9] and Barclays questioned the benefits of scale based on the "substantial store overlap which we see as significant in about 30 markets" and expressed "no doubt this will necessitate an FTC review" and that "[p]redicting how many stores will need to be divested is difficult if not impossible."[10]

Moreover, when criticizing Defendants' ultimate deal (after the Merger was terminated) to sell only 1,932 Rite Aid stores, FTC Commissioner McSweeny expressed concerns that the deal would "lead to higher drug prices and a deterioration in non-price aspects of competition."[11]  The Commissioner's views were based on the same market profiles that existed when the Merger was announced, and they show that the Merger would have faced significant regulatory risk even if Walgreens had agreed to divest more than 1,000 stores.  Moreover, the same non-public facts that gave rise to the FTC's concerns – overlapping market profiles, geographic overlap, and overlap in products and services – existed and were known to Defendants at the time they made statements 1-9 by virtue of their own overlap studies and analyst skepticism over the Merger.  ¶¶65-66, 112.  This demonstrates that Defendants' contrary

---

[9]     *Cowen and Company*, Walgreens Boots Alliance Equity Research Report at 1 (Oct. 27, 2015) (Gross Decl., Ex. C).

[10]    *Barclays*, Walgreens Boots Alliance Equity Research Report at 4 (Oct. 29, 2015) (Gross Decl., Ex. D).

[11]    Commissioner Letter.

assurances of minimal risk that could be assuaged by divesting 1,000 stores were objectively false.

***Subjective Falsity***.  These facts also demonstrate subjective falsity because they demonstrate contrary facts known to Defendants at the time they represented the regulatory risk as minimal.  Defendants admitted that they had access to and considered objective data like market profiles, geographic overlap, and overlap in products and services, when they made the statements at issue.  *Id.*  Thus, when Defendants told investors the regulatory risk was minimal, they were aware of facts directly contradicting that representation.  This is sufficient to show subjective falsity. *See In re Petrobras Sec. Litig.*, 116 F. Supp. 3d 368, 380-81 (S.D.N.Y. 2015) (allegation that "management was professing its opinion that the company's internal controls were effective, [while it] was well aware of the extensive corruption in the Company's procurement activities" were "sufficient to infer that the Company disbelieved the alleged statements at the time they were made").[12]

---

[12]      Defendants' authorities are distinguishable.  In *Jaroslawicz v. M&T Bank Corp.*, Civ. No. 15-897-RGA, 2017 WL 4856864, at *6-*7 (D. Del. Oct. 27, 2017) (R.A. Mot. at 29), defendants stated, "'we should be able to obtain all required regulatory approvals in a timely manner, ***we cannot be certain when or if we will obtain them***.'"  Unlike here, plaintiffs did "not allege that Defendants had material information in their possession at the time . . . that did not fairly align with the . . . opinion," and did "not plead . . . particular facts about what Defendants did or did not do in forming the compliance opinion."  *Id.*  Here, Defendants misrepresented not their ability to obtain regulatory approval, but the level of regulatory approval risk. And Plaintiff pleads specific facts that were known to Defendants at the time that did

- 13 -

### (2)    Statements 2, 4-5 Contain Statements of Facts

Under *Omnicare*'s second prong, embedded facts in opinions are actionable if false. *Omnicare*, 135 S. Ct. at 1327. For example, if a CEO states "'I believe our TVs have the highest resolution available because we use a patented technology to which our competitors do not have access,'" that statement "may be read to affirm not only the speaker's state of mind . . . but also an underlying fact: that the company uses a patented technology." *Id*. Accordingly, liability would follow if the company did not in fact use a patented technology. *Id*.

Here, statements 2, 4 and 5 contained the following embedded facts: (i) the companies had complementary market profiles; (ii) there was "minimal level of overlap" between the two businesses; and (iii) the amount of pharmacy counters in the U.S. demonstrated no reason for regulatory concern. If these facts were true, the FTC

---

not fairly align with their opinion. *Amarin*, 689 F. App'x at 126-27 (R.A. Mot. at 30-31) is distinguishable because there, defendants represented that an "outcomes trial" would not be required for FDA approval and failed to disclose the FDA's earlier indication that this would be a "review issue," but they reasonably believed the issue would be decided in their favor based on objective facts. *Id*. at 127. Here, Defendants misrepresented objective facts to misleadingly suggest that the review would be resolved favorably when they knew the risk was substantial. *Tongue v. Sanofi*, 816 F.3d 199, 212 (2d Cir. 2016) (R.A. Mot. at 31) is distinguishable because there, unlike here, "nowhere in the complaints [did] Plaintiffs allege that the risks arising out of the FDA feedback were out of the ordinary, or presented a special challenge not of the kind normally confronted by pharmaceutical companies seeking FDA approval for their drugs." *Id*.

- 14 -

would have approved the Merger.  The fact that the FTC did not, demonstrates the falsity of these embedded facts.

### b. Statements between December 2015 and September 2016

The statements in this section were made by Defendants while they were engaged in extensive discussions with the FTC.

### (1)   False Statements of Fact

10.   <u>Rite Aid and Walgreens</u>: (December 11, 2015 joint press release) characterizing second request as a "***standard part of the regulatory process in connection with the FTC's review***." ¶80.[13]

11.   <u>Walgreens and Pessina</u>: (January 7, 2016 Walgreens earnings call) "***I would reiterate that this transaction is progressing as we expected and planned***." ¶81.

12.   <u>Walgreens and Pessina</u>: (January 7, 2016 Walgreens earnings call) characterizing second request as "***a standard part of the regulatory process in connection with the FTC's review***." ¶81.

13.   <u>Walgreens and Pessina</u>: (January 7, 2016 Walgreens earnings call) a "highly experienced integration team" was "now ***well underway on preliminary planning work***." ¶81.

---

[13]   The Rite Aid Defendants' assertion that "none of the purportedly false and misleading statements made after the 2015 Proxy Statement were made by the Rite Aid Defendants," R.A. Mot. at 25, ignores this statement was made jointly by both companies.  And their efforts to "join and incorporate" Walgreens' Motion should be rejected because it violates Local Rule 7.08 ("No brief may incorporate by reference all or any portion of any other brief.").  Walgreens' efforts to "join in and fully incorporate the Rite Aid Defendants' Motion," Walgreens Mot. at 1, should likewise be rejected.

14.     <u>Walgreens and Pessina</u>: (January 7, 2016 Walgreens earnings call) "***We don't have any reason to*** change ***our view***" that store divestitures would be less than 500.  ¶81.

15.     <u>Walgreens and Pessina</u>: (January 27, 2016 Walgreens' annual shareholders meeting) the review process was "***proceeding as we had anticipated*** and we continue to expect the transaction to complete at some point in the ***second half of this calendar year***."  ¶82.

16.     <u>Walgreens and Pessina</u>: (April 5, 2016 Walgreens earnings call) "***our agreement to acquire Rite Aid is continuing as we expect, with the regulatory approval process progressing in line with the timetable we had expected***."  ¶84.

17.     <u>Walgreens and Pessina</u>: (April 5, 2016 Walgreens earnings call) the issue of store divestitures is "obviously [at the] top of mind for investors" but "***nothing has changed***" from earlier pronouncements, and "[t]he process is developing and an absolute normal way . . . . ***But it's nothing atypical, exactly online with what we were expecting***."  ¶84.

18.     <u>Walgreens and Pessina</u>: (July 6, 2016 Walgreens earnings call) the "***proposed acquisition of Rite-Aid is progressing as planned***" and that the "***integration team is continuing its work on preliminary planning***."  ¶86.

Statements (like these) that create a false impression are actionable.  *In re Wilmington Tr. Sec. Litig.*, 29 F. Supp. 3d 432, 448 (D. Del. 2014) (misstatements that "created the false impression that the commercial loan portfolio was 'holding up well'" when in reality the portfolio was experiencing significant deterioration were adequately pled).

The above statements falsely portrayed the "progress" of the regulatory process and the nearness of regulatory approval.  The trajectory of the regulatory process based on Defendants' statements is completely different from the actual trajectory of the how the regulatory process in fact played out, as illustrated by this chart:

- 16 -



From December 2015 through September 2016, Defendants stated repeatedly that the regulatory review was proceeding just as anticipated, that the transaction was expected to close under the same terms and timeline (second half of 2016), and suggested that the approval was near (*e.g.*, integration teams were up and running).

However, at the start of this period, in December 2015, Defendants received a second request from the FTC, indicating regulatory concern.  A second request is not standard; one was made in ***only 3.7 percent*** of transactions in 2014.[14]  *Compare* ¶¶10, 13 (characterization of second request as "standard").[15]

---

[14]   *See* Commissioner Letter (Gross Decl., Ex. A).

[15]   Rite Aid's suggestion that this statement was based on the advice of counsel is false and misleading.  R.A. Mot. at 30 n.10 (citing Ex. F at 59).  The December 11,

- 17 -

Moreover, from January to April 2016, the FTC had extensive discussions with Rite Aid and Walgreens' counsel indicating further concerns.  ¶83.  From late April 2016 to August 2016, the FTC identified specific areas of concerns (*i.e.*, specific geographic areas of overlap) and informed Defendants that Walgreens would have to divest certain stores.  ¶85.[16]  The FTC also told Defendants that the Merger would likely have anticompetitive effects under §7 of the Clayton Act, which they failed to disclose.  *Id.*

Walgreens led the discussions and made all strategic decisions in the review process with the aid and cooperation of Rite Aid.  ¶¶95, 116-118.  Thus, Defendants were acutely aware of the FTC's growing concerns.  Yet, they refused to acknowledge the increased risk and continued to downplay the true risk.  They told investors that the increased divestitures were necessary, not to maintain and restore competition, but rather, merely to "expedite [the] process."[17]  Defendants also insisted that total store divestitures would still be fewer than 1,000, and that the Merger could be approved and close in under three months.

---

2015 joint press release said no such thing.  This false assertion cites a statement made later, in the March 3, 2017 proxy statement (after this case was filed).

[16]    FTC Commissioner McSweeny later expressed these concerns in a public letter. *See* Commissioner Letter (Gross Decl., Ex. A).

[17]    Defendants do not address this statement, so any argument is waived.  *Com. of Pa. Dep't of Pub. Welfare*, 101 F.3d at 945.

Walgreens' after-the-fact disclosure that it "proposed the divestiture of certain Rite Aid stores as a cure to maintain or restore competition in certain areas," ¶85, was a clear sign that the Merger faced more risk than Defendants led investors to expect. This reality directly contradicted Defendants' statements that the Merger was "progressing as planned," that the process presented "nothing atypical," and was "exactly online with what we were expecting," that "nothing has changed," that the initial estimate of 500 store divestitures was "correct," that the "integration team is continuing its work on preliminary planning," that the Merger was capable of closing by December (*i.e.*, within five months),[18] and that "[w]e don't have any reason to change our view." *See In re MannKind Sec. Actions*, 835 F. Supp. 2d 797, 811 (C.D. Cal. 2011) ("'When the FDA tells a company about the problems with a product, and the company nonetheless continues to make confident statements about the product, courts have inferred scienter and falsity.'").

### (2)    False Statements of Opinion

19.    <u>Rite Aid and Walgreens</u>: (December 11, 2015 joint press release) "[b]oth companies expect the transaction to close in the second half of calendar 2016." ¶80.

20.    <u>Walgreens and Pessina</u>: (January 7, 2016 Walgreens earnings call) regarding whether store divestitures would be less than 500, "***We are still***

---

[18]    Indeed, the 2017 Proxy states that it took from January to April 2016 just for the companies to provide information in response to the second request, which left only six months for the FTC to review those documents and the Merger, and to issue an approval.  2015 Proxy at 59 (R.A. Mot., Ex. A).

*confident that this will go through in the terms that we have anticipated*." ¶81.

21.   <u>Walgreens and Pessina</u>: (July 6, 2016 Walgreens earnings call) regarding the store divestitures, "*We still believe that our initial estimate is correct*.  We still believe that, at the end, we will stay in the range of the stores that we initially indicated, around 500.  *And time-wise, we still believe that we will be able to really do the deal, finish the deal, by the end of this calendar year, as we said so, by December, we believe that everything will be done*." ¶86.

22.   <u>Walgreens</u>: (September 8, 2016 Walgreens press release) Walgreens was "exploring potential divestiture remedies" and "*[i]n order to expedite that process*, . . . the most likely outcome will be that the parties will be required to divest more than the 500 stores previously communicated, *but still continues to expect that fewer than 1,000 stores will be required to be divested*."  ¶87.

23.   <u>Walgreens</u>: (September 8, 2016 Walgreens press release) "the company continues to believe that the acquisition *will close in the second half of calendar 2016*."  ¶87.

These statements conveyed the message that the regulatory process was progressing in a favorable way under the originally expected timeframe, but framed as opinions.

The objective falsity of these statements is demonstrated by the same facts demonstrating the falsity of statements 10-18, above (*i.e.*, facts showing that the regulatory process in fact was not going smoothly, that the FTC had issued serious concerns, *etc.*).

The subjective falsity of these statements is demonstrated by numerous facts showing that Defendants in fact *knew* that the regulatory process was not proceeding

- 20 -

smoothly, and that it was increasingly clear that the Merger would not pass regulatory review on the timeline and terms represented.

Accordingly, Defendants they knew that their statements regarding the nearness of the regulatory approval were false.

### (3)   Omissions During this Period

Defendants are liable for omissions during this period on two theories.

First, "[b]y voluntarily choosing to speak about the merger's viability, the defendants were under a duty to be honest and forthright." *In re Sprint Corp. Sec. Litig.*, 232 F. Supp. 2d 1193, 1220 (D. Kan. 2002); *see also Schueneman v. Arena Pharms., Inc.*, 840 F.3d 698, 706 (9th Cir. 2016) ("'[O]nce defendants cho[o]se to tout' positive information to the market" they must "'do so in a manner that wouldn't mislead investors,' including disclosing adverse information that cuts against the positive information."); *Lormand v. US Unwired, Inc.*, 565 F.3d 228, 248 (5th Cir. 2009) ("The omission of a known risk, its probability of materialization, and its anticipated magnitude, are usually material to any disclosure discussing the prospective result from a future course of action."). Since they chose to make affirmative statements downplaying the regulatory risk, the Walgreens Defendants had a duty to disclose facts showing that the regulatory process was not proceeding as planned.

Second, under *Omnicare*'s third prong, opinion statements can be actionable based on what they omit.  Under this theory, a plaintiff is not required to plead subjective falsity and objective falsity – the focus instead is on what the reader understands from the statement in question. *Align Tech*., 856 F.3d at 615.  "[W]hether a statement is 'misleading' depends on the perspective of a reasonable investor." *Omnicare*, 135 S. Ct. at 1327.  "[A] reasonable investor may, depending on the circumstances, understand an opinion statement to convey facts about how the speaker has formed the opinion-or, otherwise put, about the speaker's basis for holding that view." *Id*. at 1328.  "And if the real facts are otherwise, but not provided, the opinion statement will mislead its audience." *Id*.

For example, an issuer states, '"[w]e believe our conduct is lawful.'" *Id*. at 1328-29.  In the context of the securities market, a reasonable investor would expect that this statement was not a mere "off-the-cuff judgment" but one that: (1) was formed from "some meaningful legal inquiry"; and (ii) "fairly aligns with the information in the issuer's possession at the time." *Id*. at 1328-30.  If the issuer makes the statement without conducting the meaningful legal inquiry expected under the circumstances – *e.g.*, "without having consulted a lawyer" – the issuer is liable for omitting that fact. *Id*. at 1328.  In addition, if the issuer does not disclose material information undercutting the opinion – *e.g*., "lawyers' contrary advice, or with

***knowledge that the Federal Government was taking the opposite view***" – then the issuer is liable as well.  *Id*. at 1329.

Here, as discussed above, Defendants ***knew*** the FTC was taking the opposite view.   They were privy to more and more non-public facts, including direct communications from the FTC that it would not approve the Merger (and why). Defendants' failure to disclose these facts demonstrating that the regulatory process was not proceeding as planned, that the FTC had expressed specific concerns, *etc*., subjects them to liability under the *Omnicare* omissions theory.

### c.   Statements and Omissions From October 2016 to November 2016

During this period, Pessina and other Walgreens representatives admitted that the regulatory review timeline had shifted slightly so that the transaction was now expected to close early 2017.   At this point, analysts and/or journalists began expressing doubts as to the certainty of the transaction clearing regulatory review. ¶¶89-90.   The Walgreen Defendants made the statements in this section in this context, and in specific response to those expressions of doubt.

### (1)   Statements of Fact or Embedded Facts

24.   <u>Walgreens Defendants</u>: (October 20, 2016 Walgreens earnings call) regarding the extension of the Merger end date and Walgreens' inclusion of Rite Aid accretion in its fiscal 2017 guidance, "Rite Aid, yes, I agree with you that it is taking more than we expected. ***But, I have to tell you that as you have seen from our presentation and from the fact that we have included some part of Rite Aid potential profit now in our guidance, from this you can really understand that we are confident, as confident as we were before about***

- 23 -

*this dead Nothing has changed*, we just have a delay in the execution of the deal.  This is our perception, *we have always been optimistic because we have never seen an attitude from the FTC, which was an absolute negative*, of course they were inquiring.  They were detailed.  They were asking a lot of questions.  Sometimes they were taking time to respond, but at the end of the day, I believe we have a good collaboration – we're having a good collaboration.  We try to respond to all of their needs.  This takes time.  *But at the end, we are still confident*. . . .  For what we see today, we see just a long administrative process, but *we don't see substantial differences from what we were expecting.  Yes, probably more stores, a little more stores here and there, but at the end of the day – as far as I can see today, as far as we can see today, we are absolutely confident that we can create, that we can do the deal and we can create the value.  Just this value will be a little postponed on time*." ¶89.

25.  <u>Walgreens Defendants</u>: (October 20, 2016 Walgreens earnings call) *"I know that we read on the papers are different news, no idea about the sources of this news, but for sure if we could talk, and of course you know that we cannot (laughter) our news would be different*." ¶89.

26.  <u>Walgreens and Pessina</u>: (November 8, 2016 Credit Suisse Healthcare Conference) "*we have a different opinion than certain journalists who are writing things we don't recognize or people we – or about people we have never heard of.  So, just to reassure you, if we say that we are confident, it is because what we know makes us very confident*." ¶90.

27.  <u>Walgreens and Pessina</u>: (November 8, 2016 Credit Suisse Healthcare Conference) "I don't believe that there is any technical reason why this deal should not go through.  Of course, everything is possible politically.  But, until now, *we have seen a careful, diligent, but absolutely not hostile attitude of the FTC.  And we are collaborating.  We are presenting our barriers.  And I believe that so far, so good*." ¶90.

28.  <u>Walgreens and Fairweather</u>: (November 17, 2016 Jefferies Healthcare Conference) "*nothing really has changed other than it's just perhaps taken a little bit longer than we had thought in the first place.  There's lots of stuff in the papers but it is amazing where it comes from*." ¶94.

29.  <u>Walgreens</u>: (November 17, 2016 Jefferies Healthcare Conference) "*just to be clear on where we are in the process and we have spoken about*

*this – I mean we have enough clarity on what we have to do in terms of remedies with the FTC to be – to have opened the data room for sale of pharmacies to potential buyers*." ¶95.

These statements falsely represented that: (i) nothing had occurred that set the regulatory process off the original track; (ii) the FTC had provided absolutely ***no*** indication that the Merger would not pass regulatory review; and (iii) investors should not give analysts and/or journalists concerns any weight because they were contradicted by non-public facts in Defendants' possession. These representations were false as Defendants received extensive feedback from the FTC during this period, demonstrating that the FTC was imminently poised to reject the Merger on the original terms. Indeed, directly contradicting these statements, on December 20, 2016, Rite Aid and Walgreens issued a joint press release announcing the Fred's deal that they later acknowledged was intended "to respond to concerns identified by the FTC." ¶96.

### (2) False Statements of Opinion

30. <u>Walgreens and Fairweather</u>: (October 20, 2016 Walgreens earnings call) regarding the extension of the Merger end date, Fairweather said "***the most likely outcome will be that the parties will be required to divest between 500 and 1,000 stores***." ¶88.

31. <u>Walgreens Defendants</u>: (October 20, 2016 Walgreens earnings call) regarding the extension of the Merger end date, Fairweather said Walgreens "will be able to execute agreements to divest these stores to potential buyers pending FTC approval, by the end of calendar year 2016." ¶88.

32.  <u>Walgreens and Pessina</u>: (November 8, 2016 Credit Suisse Healthcare Conference) "*we continue to be very positive in spite of the opinion of certain people who apparently are not particularly well informed*."  ¶90.

33.  <u>Walgreens and Pessina</u>: (November 8, 2016 Credit Suisse Healthcare Conference) Walgreens has to "focus on Rite Aid" and the integration process, and "[t]he synergies will come in quite in line with what we have announced to the market in the following two years, particularly our fiscal 2018 and 2019" and "all of that will become available as we move through the next two to five years for the drug stores of Rite Aid that we expect to be able to purchase in the back end of this year or early next year."  ¶91.

34.  <u>Walgreens</u>: (November 15, 2016 Morgan Stanley Consumer Conference) "the process continues, the process has never stopped.  It's a process that clearly has taken longer than we had anticipated.  We happened to sell potentially to a few more pharmacies than we anticipated.  We have buyers.  When I say we have buyers, not a buyer, we have buyers.  *We believe these buyers – we believe strongly these buyers meet the criteria the SEC have laid down*."  ¶92.

35.  <u>Walgreens</u>: (November 15, 2016 Morgan Stanley Consumer Conference) "we don't recognize what's written in the press, to be honest.  We don't recognize the names or the people talking about it.  So we don't know what that's being said.  *We remain, as we did from day one, confident about [doing] strategic deal for us*."  ¶92.

36.  <u>Walgreens and Fairweather</u>: (November 17, 2016 Jefferies Healthcare Conference) "*We are very clear – from what we said in September, we expect the deal to complete*.  We have been absolutely consistent on that from day one when we announced it.  *As we said back in September and reinforced in our results, we do expect the store divestitures to now be in the range of 500 to 1000*."  ¶94.

37.  <u>Walgreens and Fairweather</u>: (November 17, 2016 Jefferies Healthcare Conference) "We expect to be able to sign the divestiture agreements before the end of this calendar year and to be able to complete the transaction in the first quarter, so it is – sorry, early in the new year, in the calendar year."  ¶94.

These statements, and statements 24-27 above, conveyed the message that the regulatory process was progressing favorably, substantially under the same terms and timeline, but they were framed as opinions.

The objective falsity of these statements is demonstrated by the same facts demonstrating the falsity of statements of fact made during this period (discuss above), *i.e.*, that the FTC had expressed serious concerns with the Merger, that there were specific hurdles that needed to be overcome to pass regulatory review, making a close under the original timeline increasingly unlikely, *etc.*

The subjective falsity of these statements is demonstrated by the Walgreen Defendants' active participation in the regulatory process, ¶¶95, 116-118, and their knowledge and access to non-public facts concerning that process, such as specific feedback from the FTC.  The Walgreen Defendants in fact held themselves out as persons with special knowledge of the regulatory process and explicitly discredited (ultimately accurate) media reports of the significant regulatory trouble that the Merger was encountering, characterizing the reports as "the opinion of certain people who apparently are not particularly well informed," and telling investors that they had "no idea about the sources of this news" and that "it is amazing where it comes from." *See, e.g.*, ¶¶89-90, 94.  The Walgreen Defendants told investors that their own insider information was more reliable than these media reports: "if we could talk, . . . our

news would be different" and "just to reassure you, if we say that we are confident, it is because what we know makes us very confident." *See, e.g.*, ¶¶89, 124.

The Walgreen Defendants concluded these misleading statements by insisting that there was no "technical reason why this deal should not go through" and suggesting that the only reason the Merger would not be approved would be political: "everything is possible politically." ¶90. The only Merger risk that the Walgreen Defendants ultimately acknowledged was that the Merger could "be a little postponed on time." ¶89.

The Walgreen Defendants' assurances that they were "as confident as ever" about the deal, and its inclusion of Rite Aid accretion (which had no reasonable basis), while failing to disclose the fact that the FTC scrutiny of the deal had increased, thus requiring additional store divestitures, made the significant regulatory risks that were now materializing appear to be minimal, which was false and misleading. *See Rubinstein v. Gonzalez*, No. 14-CV-9465, 2016 WL 1213931, at *10 (N.D. Ill. Mar. 29, 2016) (statements that defendants were "'more energized than ever about our two companies coming together,'" "'more confident than ever about the potential of our combined organizations,'" "'[w]e have a very busy few months ahead as we work on our integration planning,'" and that they "'look[ed] forward to working with [Shire employees] much more closely in the near future'" were false or misleading);

- 28 -

*Rubinstein v. Gonzalez*, 241 F. Supp. 3d 841, 854 (N.D. Ill. 2017) (same); *see also Sprint*, 232 F. Supp. 2d at 1199.

### (3)    Omissions During This Period

The Walgreen Defendants are liable on an omissions theory for their statements during this period.  They were actively involved in the regulatory process and/or were regularly apprised of the developments and the substance of the FTC's feedback, ¶¶95, 116-118, and they are liable for: (i) staying silent and failing to correct their previous statements and the continuing statements by the Walgreen Defendants; and (ii) omitting facts in their possession (such as feedback from the FTC) that contradicted the Walgreen Defendants' representations that the Merger was proceeding substantially as originally planned.  *Sprint*, 232 F. Supp. 2d 1199; *Omnicare*, 135 S. Ct. at 1327-29.

### d.    Statements and Omissions From December 2016 to the End of the Class Period

The statements in this section were made: (i) after the December 20, 2016 press release where Defendants disclosed that they entered into the Fred's deal in response "to concerns identified by the FTC" (¶96); and (ii) after Walgreens and Rite Aid entered into the Revised Merger.

### (1)    False Statements of Fact or Embedded Facts

38.    <u>Rite Aid, Walgreens, and Pessina</u>: (December 20, 2016 joint press release announcing agreement to sell 865 stores) "***With this agreement, we are***

- 29 -

***moving ahead with important work necessary to obtain approval of our
acquisition of Rite Aid***." ¶96.

39.   <u>Walgreens and Fairweather</u>: (January 5, 2017) "We continue to
make good progress towards completing our Rite Aid transaction, and today we
have raised the lower end of our adjusted earnings per share guidance for FY 17
[which included Rite Aid accretion]." ¶97.

40.   <u>Walgreens and Fairweather</u>: (January 5, 2017) "we are actively
engaged in discussions with the FTC, and are ***still working towards a close of
the acquisition in the early part of this calendar year***, having announced the
Fred's agreement on December 20, 2016." ¶97.

41.   <u>Walgreens and Pessina</u>: (January 5, 2017) highlighted "the
progress we have announced at the end of December, regarding the proposed
transaction with Rite Aid, in having reached a conditional agreement with
Fred's," and insisted that the FTC review process allowed Pessina to "remain as
convinced as ever of the strategic benefits of the proposed Rite Aid transaction"
and that "[w]e are clearly making progress, and while I would always like to
move faster and do more, we must be measured and ensure we work at a pace
with which ***we are confident we can deliver for our customers and our
shareholders, on all the plans and strategies we have discussed with you***."
¶98.

42.   <u>Walgreens and Pessina</u>: (January 5, 2017) "we don't want even to
think of the fact that this could not be approved after so many months, when we
have given a lot of information, and ***we have had a very good relationship with
the people of the FTC . . . . So we are not thinking of a Plan B today***." ¶98.

These statements conveyed the message that the Fred's deal was a positive step

towards regulatory approval, and that the companies were very close to obtaining

approval.  However, the Merger was not making "good progress" and the regulatory

process was not proceeding so that the transaction could be closed in the "early part of

this calendar year."

In fact, on January 6, 2017, Rite Aid's attorneys concluded that "the FTC would not recommend approval of the divestiture transaction by the [January 27, 2017] end date" – a fact that was not disclosed until much later (*i.e.*, in a March 3, 2017 proxy).[19]

¶127.  Two weeks later, on January 20, 2017, *Bloomberg* issued an article indicating that the FTC was unlikely to approve the deal.  *Id*.  ***A mere ten days*** later, Walgreens terminated the Merger and entered into the Revised Merger.

## (2)    False Statements of Opinion

43.    <u>Walgreens and Pessina</u>:  (April 5, 2017) "I am still optimistic that we will bring this deal to a successful conclusion" and that "[w]e believe that we can [certify compliance] in the coming weeks." and reassuring investors that the Revised Merger Agreement would be more likely to satisfy regulators: "***The changes to the deal that we agreed in January demonstrate our absolute commitment to ensure all transactions meet our demanding financial and strategic requirements while allowing us the ability to address any reasonable demand that may be made of us in obtaining regulatory approval***."  ¶100.

44.    <u>Walgreens and Pessina</u>: (April 5, 2017) Pessina provided the following response to the question, "***[W]here exactly aren't you and the FTC seeing eye to eye?," Pessina responded with: "I am still positive on this deal. I believe that we have a strong argument for – to defend this deal" and "[w]e are collaborating very well with the FTC.  And as I said, we are preparing our facts to be ready to certify compliance, if we decide to do so***."  ¶100.

These statements conveyed the message that the Walgreens Defendants believed that the Revised Merger had little risk of not clearing regulatory approval.

---

[19]    The same facts that led to this conclusion also existed on January 5 when the Walgreens Defendants made these statements, and because Walgreens took the primary role in negotiations, it is plausible that it learned that the Merger would not be approved even before Rite Aid did.

The objective falsity of these statements is demonstrated by the fact that just two months later, on June 29, 2017, Defendants were forced to terminate the Revised Merger.  ¶104.  This demonstrates that the Revised Merger continued to have significant risk, in contradiction to what was represented.

Subjective falsity of these statements can be inferred through the Walgreens Defendants' continuing active participation in the regulatory process.  It can also be inferred from the fact that when later asked about the regulatory review process for the asset purchase agreement, Walgreens' General Counsel answered – "We're not able to comment on how the FTC may or may not see any particular facet of this transaction." ¶109.  This answer demonstrates, by contrast to their previous statements, that the Walgreen Defendants knew the difference between statements downplaying risk and statements describing risk in a measured way – from which it can be inferred that the Walgreens Defendants' previous statements downplaying risk were deliberate.

### (3)    Omissions During This Period

During this period, the Walgreen Defendants were actively involved in the regulatory process and/or were regularly apprised of the developments and the substance of FTC's feedback in the regulatory process during this period.  In this context, Defendants are liable for: (i) staying silent and failing to correct their previous statements and the continuing statements by the Walgreen Defendants; and (ii) omitting facts in their possession (such as the feedback from the FTC) that

contradicted the Walgreen Defendants' representations that the Revised Merger was nearing regulatory approval.

### 2. Defendants' Statements Are Actionable

Defendants do not now dispute that there is significant market overlap between Rite Aid and Walgreens stores or that a divestiture plan providing for only 1,000 stores was insufficient to restore competition lost in the Merger.[20]  Instead, they urge alternative readings of their false and misleading statements and hide behind conclusory assertions that their statements are expressions of optimism or forward looking statements protected by the PSLRA's safe harbor.[21]  These assertions are misplaced.

### a. Defendants' Statements Are Not Corporate Optimism

The Walgreens Defendants urge the Court to interpret their false and misleading statements as "corporate optimism" because they told investors that the Merger was generally subject to "regulatory clearance" with statements like: (1) "[w]e are currently going through the regulatory process," and continue to "work closely with the regulators," "it doesn't depend on us . . . [t]he FTC will let us know when they are

---

[20]    In fact, Defendants do not even address the false and misleading statement regarding "minimal overlap," which means they have waived any argument with respect to this statement. *Com. of Pa. Dep't of Pub. Welfare*, 101 F.3d at 945.

[21]    Walgreens Mot. at 18-25.

ready," and "It will be up to [the FTC] to decide whether they have enough people or not to judge on the quality of this deal"; (2) "we are collaborating" with the FTC and "remain actively engaged with the [FTC]," and (3) they were "exploring potential divestiture remedies to address certain issues," "we don't know exactly how many stores and where," and "the most likely outcome will be that the parties will be required to divest more than the 500 stores."[22]

But none of these statements cured Defendants' false and misleading assurances that the regulatory risk was minimal. To the contrary, Defendants' use of innocuous terms like "collaborating" when describing their interactions with the FTC (¶¶90, 100), and their suggestion that the only determining factor to regulatory approval would be "whether [the FTC has] enough people . . . to judge the quality of this deal," served to further downplay the regulatory risk in the mind of investors.[23]

The Walgreens Defendants insist that they cannot be liable for putting a "positive spin" to investors on an unfavorable development, Walgreen Mot. at 25 n.16, but their statements went far beyond "spin." Instead, they affirmatively misrepresented the level of market overlap, which was certain to cause some regulatory concern, and they affirmatively misrepresented the regulatory risk as

---

[22]   Walgreens Mot. at 21-27.

[23]   Walgreens Mot. at 21 n.14. The Right Aid Defendants do not explicitly raise this defense, but if they had, it would fail for these same reasons.

causing "no concern" when journalist, securities analysts, and the market would have otherwise assumed that the Merger faced significant risk.[24]

The case law Walgreens cites actually highlights the difference between nonactionable "positive spin" and the facts alleged here. In *In re Discovery Labs. Sec. Litig.*, No. 06-1820, 2007 WL 789432 (E.D. Pa. Mar. 15, 2007), *aff'd*, 276 F. App'x 154 (3d Cir. 2008), despite defendants' efforts to downplay the seriousness of the FDA's determination that the company was not in compliance, the market did not believe their assurances, and the company's stock price declined dramatically. The court held that it was "sufficient that the markets were aware that [there] was a serious setback." *Id.* at *3. Here, Defendants were successful in misleading the market. Indeed, Defendants later conceded that Rite Aid stock traded at artificially inflated levels during the pendency of the Merger because it "reflected market expectations of the likelihood that the merger would occur on the terms of the original merger

---

[24]    *In re Burlington Coat Factory Sec. Litig.*, 114 F.3d 1410, 1427 (3d Cir. 1997) (Walgreens Mot. at 18) is distinguishable as the company's statement that it "believe[d] [it could] continue to grow net earnings at a faster rate than sales" related to no objective facts. *Se. Pa. Transp. Authority v. Orrstown Fin. Servs., Inc.*, No. 1:12-cv-00993, 2015 WL 3833849 (M.D. Pa. June 22, 2015) (R.A. Mot. at 31 n.11) is distinguishable because here, unlike there, defendants misrepresented objective facts. And *In re Advanta Corp. Sec. Litig.*, 180 F.3d 525, 538 (3rd Cir. 1999) (Walgreens Mot. at 25 n.16; R.A. Mot. at 31 n.11) is distinguishable because there, unlike here, "the complaint offer[ed] no information other than the differences between the two statements of the firm's condition" to suggest that a financial deterioration was attributable to fraud. Here, the Complaint pleads specific facts demonstrating Defendants' fraud.

agreement . . . ." ¶¶105-108.  The fact that Rite Aid's stock price at one point traded just 50 cents below the Merger price indicates that the market expected a low level of risk.  Defendants' statements are actionable.  *See Rubinstein*, 2016 WL 1213931, at *10 (refusing to conclude on the pleadings that statements were "'mere puffing'" or "'corporate optimism'" where defendants stated they were "'more energized than ever about our two companies coming together,'" "'more confident than ever about the potential of our combined organizations,'" "'[w]e have a very busy few months ahead as we work on our integration planning,'" and that they "look[ed] forward to working with [Shire employees] much more closely in the near future" were false or misleading at the time made).

Ultimately, Defendants' efforts to urge alternative and innocent readings of their statements are improper because such factual disputes are inappropriate for a motion to dismiss where all inferences must be drawn in plaintiff's favor.  *In re ViroPharma Inc. Sec. Litig.*, 21 F. Supp. 3d 458, 470 n.20 (E.D. Pa. 2014) (denying motion to dismiss and rejecting defendants' alternative version of the facts, noting plaintiff is entitled "to discovery to flesh out the truth of the narrative"); *Berson v. Applied Signal Tech., Inc.*, 527 F.3d 982, 986 (9th Cir. 2008) (reversing dismissal of complaint and rejecting defendants' alternative interpretation of statements on motion to dismiss as "hardly" the "most plausible" interpretation).

### b.      PSLRA Safe Harbor Does Not Apply

Defendants attempt to hide behind the PSLRA's safe harbor for forward-looking statements.  R.A. Mot. at 32-33; Walgreens Mot. at 37-38.  Their efforts are unavailing.

### (1)      Defendants' Statements Are Not Forward-Looking

First, Defendants' statements are not forward-looking.  Rite Aid actually concedes that its statement regarding the FTC's second request being "standard" is not forward-looking.  R.A. Mot. at 35 n.13.  And Defendants' other statements relate to: (1) the present level of regulatory risk; (2) the current market profiles and overlap between Rite Aid and Walgreens stores; (3) the complexity of the Merger being minimal such that it could close in short order; and (4) that media reports of regulatory turbulence were less reliable than Defendants' insider information.  Each of these statements relates to present and historical fact, which are "are not entitled to PSLRA's safe harbor at [the motion to dismiss] stage." *In re Enzymotec Sec. Litig.*, No. CV145556(JLL)(MAH), 2015 WL 8784065, at *11 (D.N.J. Dec. 15, 2015); *see also In re Lucent Techs., Inc. Sec. Litig.*, 217 F. Supp. 2d 529, 557 (D.N.J. 2002) ("[S]ince these statements depict, in part, the Company's past and current performance, safe-harbor protections are inapplicable").[25]

---

[25]      *Burges v. BancorpSouth, Inc.*, No. 3-14-1564, 2015 WL 4198795, at *3 (M.D. Tenn. July 10, 2015) (R.A. Mot. at 33) is distinguishable.  There, the statement at

- 37 -

Even if Defendants mixed their statements of present fact with statements regarding the future, they are not forward-looking because "'a mixed present/future statement is not entitled to the safe harbor with respect to the part of the statement that refers to the present.'" *Institutional Inv'rs Grp. v. Avaya, Inc.*, 564 F.3d 242, 255 (3d Cir. 2009); *see also In re Stone & Webster, Inc. Sec. Litig.*, 414 F.3d 187, 213 (1st Cir. 2005) ("The mere fact that a statement contains some reference to a projection of future events cannot sensibly bring the statement within the safe harbor if the allegation of falsehood relates to non-forward-looking aspects of the statement.").

Defendants' statements are also not forward-looking because they are materially false and misleading due to omissions, which "'do not constitute forward looking statements protected by the safe harbor.'" *In re Cell Pathways, Inc. Sec. Litig.*, 2000 WL 805221, at *11 (E.D. Pa. June 20, 2000). Specifically, omissions

---

issue was simply that the merger was expected to receive regulatory approval and be completed by a specific date. Here, Defendants grossly mischaracterized the regulatory risk as minimal when, in fact, it was significant. And those statements were based on misrepresentations of objective facts. Even *Burges* recognizes that "When an alleged misrepresentation concerns 'hard information'-typically historical information or other factual information that is objectively verifiable-it is actionable if a plaintiff pleads facts showing that the statement concerned a material fact and that it was objectively false or misleading." *Id.*; *Bauer v. Eagle Pharm., Inc*., C.A. No. 16-3091(JLL), 2017 WL 2213147, at *8-*9 (D.N.J. May 19, 2017) (R.A. Mot. at 33) also involved mere statements that the company would receive FDA approval, not a mischaracterization of the level of risk, which is what is alleged here. And *Advanta*, 180 F.3d at 536 (Walgreens Mot. at 38) is distinguishable because, unlike here, the complaint did not plead that defendants "had actual knowledge of her statement's falsity." *Id.*

related to the true market profiles and overlap between Defendants' stores, the complexity of the Merger, and the significant regulatory risk that the Merger faced.

### (2)   Statements Were Knowingly False When Made

Defendants' statements also do not qualify for safe harbor protection because, as noted above, they were false when made and were issued without any reasonable basis. *See In re Veritas Software Corp. Sec. Litig.*, No. 04-831-SLR, 2006 WL 1431209, at *7 (D. Del. May 23, 2006) ("[T]he safe harbor provision does not afford corporations a free pass to lie to investors. . . . Consistent with Third Circuit case law, an opinion about future events is actionable if it lacks a reasonable basis when made.").

### (3)   Statements Were Not Accompanied by Meaningful Cautionary Language

Defendants' statements do not qualify for the safe harbor because they were not accompanied by meaningful cautionary language.  Cautionary language must be tailored and specific for the safe harbor to apply. *See Semerenko v. Cendant Corp*., 223 F.3d 165, 182 (3d Cir. 2000). The warnings must specifically address the risks, as mere boilerplate warnings are not sufficient. *Id*. And warning of potential risks is insufficient if the event creating the risk is already happening. *See In re MobileMedia Sec. Litig.*, 28 F. Supp. 2d 901, 930 (D.N.J. 1998) ("Warnings of possible adverse events are insufficient to make omissions of present knowledge of certain future

- 39 -

events legally immaterial."); *see also Sprint*, 232 F. Supp. 2d at 1222 ("'[T]he inclusion of general cautionary language regarding a prediction would not excuse the alleged failure to reveal known material, adverse facts.'").

Defendants' purported cautionary statements were generic and boilerplate and were not meaningful because they were not specific to the high regulatory risk that Defendants failed to disclose.  Walgreens does not even claim that its statements included meaningful cautionary language.  And Rite Aid's purported cautionary language generally warned that: (1) "[t]here can be no assurance that the merger will be completed"; (2) "regulatory approvals[] may not be satisfied or waived, on a timely basis or otherwise"; and (3) that "a governmental entity may prohibit, delay or refuse to grant approval for the consummation of the transaction."  R.A. Mot. at 34.  But these "cautionary statements" failed to warn investors that the regulatory risk was much more significant than Defendants represented.[26]  *See Sprint*, 232 F. Supp. 2d at 1222 (in light of "defendants' alleged omission of the FCC's decision to suspend its

---

[26]     *Bonomo v. Nova Fin. Holdings, Inc.*, C.A. No. 11-4762, 2012 WL 2196305, at *8 (E.D. Pa. June 15, 2012) (R.A. Mot. at 35) is distinguishable.  There, the alleged false statement related to whether a planned acquisition would occur.  Here, defendants misrepresented not whether the Merger would close, but that the risk was minimal when it was significant.  *M&T Bank*, 2017 WL 4856864 (R.A. Mot. at 35) is also distinguishable.  The statement at issue there was simply that the defendants "should be able to obtain all required regulatory approvals" and complete the merger "in a timely manner."  *Id*. at *7.  Again, the allegations here do not pertain to Defendants' failure to obtain regulatory approval.  It is the level of risk that Defendants misrepresented.

- 40 -

investigation, merely warning the market that FCC opposition 'may jeopardize or delay completion of the merger' fails to convince the court that all possible risks were adequately disclosed").

Moreover, Defendants' generic warnings of regulatory risk were made when that risk had already materialized, and courts have routinely held that warnings of what might happen in the future are insufficient if the risks were then occurring at the time. *Enzymotec*, 2015 WL 8784065, at *11 (safe harbor did not apply where plaintiff alleged "risks had already come to pass and that it was therefore unreasonable to make generalized warnings when Defendants knew, or should have known, of the specific regulations and their likely effect"); *Freudenberg v. E*Trade Fin. Corp.*, 712 F. Supp. 2d 171, 193 (S.D.N.Y. 2010) (The law does not provide shelter for defendants who warn investors to "'walk slowly because there might be a ditch ahead when [they knew] with near certainty that the Grand Canyon lies one foot away.'").

The question of whether cautionary language is meaningful, however, is ultimately fact intensive and generally inappropriate for a motion to dismiss. *Lucent Techs.*, 217 F. Supp. 2d at 557.

### 3.    Scienter

Scienter is a "'mental state embracing intent to deceive, manipulate, or defraud,' and requires a knowing or reckless state of mind." *Institutional Investors Group v. Avaya*, 564 F.3d 242, 252 (3d Cir. 2009). "'The inference that the defendant

- 41 -

acted with scienter need not be irrefutable, *i.e.*, of the "smoking-gun" genre, or even the most plausible of competing inferences.'" *Id.* at 267.   Courts should not '"scrutinize each allegation in isolation but to assess all the allegations holistically.'" *Id.* at 268.  The inquiry "will ultimately rest not on the presence or absence of certain types of allegations but on a practical judgment about whether, accepting the whole factual picture painted by the Complaint, it is at least as likely as not that defendants acted with scienter." *Id.* at 269.

### a.   Allegations of Subjective Falsity Demonstrates Scienter

"To adequately plead scienter, it is sufficient for plaintiffs to allege that defendants had knowledge of facts or access to information that contradicts their statements." *In re Cambrex Corp. Sec. Litig.*, No. 03-CV-4896(WJM), 2005 WL 2840336, at *11 (D.N.J. Oct. 27, 2005); *Steiner v. MedQuist Inc.*, No. CIV. 04-5487 (JBS), 2006 WL 2827740, at *17 (D.N.J. Sept. 29, 2006) (when allegations are '"based on non-disclosure of facts, evidence that the defendants had actual knowledge of the facts is sufficient to show scienter'"); *SEC v. Pirate Investor LLC*, 580 F.3d 233, 243 (4th Cir. 2009) (publishing "statements when in possession of facts suggesting that the statements are false is '*classic* evidence of scienter'").

Thus, although falsity and scienter are typically different elements, they converge in a case alleging: (i) false statements of opinion based on objective and subjective falsity; and (ii) scienter based on knowledge or access to facts contradicting

- 42 -

Defendants' statements.   Subjective falsity examines "whether the Defendants believed that their statements were false when made." *S.E.C. v. Goldstone*, No. 12-257 JB/GBW, 2015 WL 5138242, at *1 (D.N.M. Aug. 22, 2015).  "These same issues of material fact affect scienter, because the Defendants acted with scienter if they knew that their statements were false when they made them." *Id.*; *Podany v. Robertson Stephens, Inc.*, 318 F. Supp. 2d 146, 154 (S.D.N.Y. 2004) ("in false statement of opinion cases such as these, the falsity and scienter requirements are essentially identical").

Here, as noted above, Plaintiff alleges numerous facts demonstrating subjective falsity, which also demonstrates scienter.  For example, the Complaint alleges that Defendants had access to nonpublic data demonstrating significant overlap in their businesses. *In re Viropharma, Inc. Sec. Litig.*, No. 02-1627, 2003 WL 1824914, at *9 (E.D. Pa. Apr. 7, 2003) (scienter found where defendants had "access to several documents which contained the facts that allegedly made the Defendants' statements materially misleading").

The Complaint alleges that regulatory risk was of paramount concern to investors and Defendants. *See Rubinstein*, 241 F. Supp. 3d at 856 ("given the fast paced nature of merger and acquisitions, one could expect AbbVie to have given immediate consideration to any legal changes that would or might impact any of the deal's strategic rationale – and, in view of the size of the potential transaction and

- 43 -

termination fee, to have devoted considerable resources to the issue."); *In re Tel–Save Sec. Litig.*, No. 98-CV-3145, 1999 WL 999427, at *5 (E.D. Pa. Oct. 19, 1999) ("Knowledge concerning a company's key businesses or transactions may be attributable to the company, its officers and directors."); *MannKind*, 835 F. Supp. 2d at 815 (inference of scienter based on "Defendants' positions within MannKind[,] . . . access to information contradicting those statements[, and] the company's interactions with the FDA regarding [drug] approval were absolutely integral to the company's success, and it would therefore 'be absurd to suggest that management was without knowledge of the matter'").

The Complaint alleges that Defendants were updated on the negative developments in the regulatory process, including during board meetings. *See Freudenberg*, 712 F. Supp. 2d at 198 ("These meetings, where the problems at issue were directly discussed with Defendants, evidence scienter.").

The Complaint alleges that Defendants were informed of the ***specific concerns*** raised by the FTC. *Frater v. Hemispherx Biopharma, Inc.*, 996 F. Supp. 2d 335, 349 (E.D. Pa. 2014) ("statements characterizing the feedback . . . received from the FDA . . . imply that speakers knew the entirety of the FDA's feedback, including its concurrent warning that it would be unusual for a resubmitted NDA to succeed"); *Stratte-McClure v. Morgan Stanley*, 784 F. Supp. 2d 373, 388-89 (S.D.N.Y. 2011) (scienter where "SEC raised detailed questions" in a letter that "creat[ed] the inference

- 44 -

that [defendant] was aware of regulatory concerns"); *MannKind*, 835 F. Supp. 2d at 811 ("'When the FDA tells a company about the problems with a product, and the company nonetheless continues to make confident statements about the product, courts have inferred scienter and falsity.'").[27]

The Complaint alleges that Defendants: spoke often; used strong language expressing confidence, certainty, and clarity; and directly repudiated specific analyst and media reports of regulatory turbulence. *Avaya*, 564 F.3d at 269-70 ("the most powerful evidence of scienter is the content and context of [defendants'] statements themselves" and "[g]iven the specificity and repetition of the analysts' questions, [defendant's] position as Chief Financial Officer, and the alleged state of Avaya's business at the time the questions were asked, there is a strong inference that [defendant's] behavior reached the threshold of recklessness"); *Rubinstein*, 241 F. Supp. 3d at 856 ("This suggests that . . . [the defendant] knew that there were public concerns that the merger would be called off due to the Notice, and calls into question whether he expressed his support for the merger not because [the acquiror] was actually still 'more energized' or 'more confident' about it than ever . . . but instead to appease worried [company] employees.").

---

[27]     The Walgreen Defendants suggest that they never claimed they knew what the FTC would do.  Walgreens Mot. at 14-15.  This misses the point.  The point is that Defendants had access to facts ***contradicting their own statements***.

- 45 -

Finally, the Complaint alleges that Defendants did not offer their opinions as off-the-cuff personal judgments, but as conclusions based on objective and contemporaneously known facts. *Strougo v. Barclays PLC*, 105 F. Supp. 3d 330, 351 (S.D.N.Y. 2015) (scienter found where, *inter alia*, defendant '"held himself [out] to the public as intimately knowledgeable'"); *In re Scholastic Corp. Sec. Litig.*, 252 F.3d 63, 76-77 (2d Cir. 2001) (allegations of what defendants actually knew, "while at the same time making public statements that painted a different picture," were "consistent with recklessness").[28]

These facts demonstrate that Defendants made statements and omissions knowing that they were false and supports a strong inference of scienter.

### b.    The Magnitude of Damage Supports Scienter

The magnitude of the damage caused by the revelation of truth supports an inference of recklessness. *Rehm v. Eagle Fin. Corp.*, 954 F. Supp. 1246, 1256 (N.D. Ill. 1997) ("The more serious the error, the less believable are defendants' protests that they were completely unaware of [the Company's] true financial status and the stronger is the inference that defendants must have known about the discrepancy.");

---

[28]    In contrast, in *Discovery*, the court found no scienter where: (1) plaintiff conceded that defendant "lacked adequate expertise" in compliance; and (2) the records that purportedly put defendants on notice of non-compliance were not the type of records that would contain non-compliance information. *Discovery*, 2007 WL 789432, at *2. Here, Plaintiff specifically alleged that Defendants held themselves out as knowledgeable, and the discussions with the FTC were precisely the type of communications that would have conveyed regulatory concerns to Defendants.

*Fla. State Bd. of Admin. v. Green Tree Fin. Corp.*, 270 F.3d 645, 666 (8th Cir. 2001) (the sheer size of the fraud "adds to the inference that the defendants must have been aware the problem was brewing"); *Rothman v. Gregor*, 220 F.3d 81, 92 (2d Cir. 2000) ("magnitude of this write-off renders less credible the proposition" that defendants were unaware of problems).

*Sprint* is instructive.  There, plaintiffs alleged that defendants knew the DOJ was unlikely to approve a merger, "that the FCC was suspending its investigation into the merger, and that the EC had 'serious concerns' regarding the merger." *Sprint*, 232 F. Supp. 2d at 1226.  Plaintiffs further alleged that defendants did not disclose this information and "issued an optimistic statement regarding regulatory approval so that Sprint shareholders would vote in favor of the merger."  *Id*.  In finding an inference of scienter, the court explained: "***the information received from the DOJ, FCC, and the EC was significant such that the Sprint defendants were reckless in not disclosing this information and in issuing a favorable statement about regulatory approval***."  *Id*.

As in *Sprint*, Defendants' failure to disclose the risks known to them resulted in significant losses to shareholder value once that information was revealed.  ¶¶102-104.  These facts create "a strong inference of reckless conduct." *Sprint*, 232 F. Supp. 2d at 1226.

### c.   The Timing of the Revelation of Truth Supports Scienter

The fact that the revelation of truth followed closely after Defendants' denials casts doubt on their innocence. *Avaya*, 564 F.3d at 271 ("the temporal proximity of McGuire's March denials to the end of the quarter . . . strengthens the inference of scienter"); *Universal Am. Corp. v. Partners Healthcare Sols. Holdings, L.P.*, 176 F. Supp. 3d 387, 395-96 (D. Del. 2016) ("temporal proximity of the misrepresentations in relation to the truth's revelation may also be considered in determining whether alleged facts give rise to a strong inference of scienter").

Here, the first revelation of truth (*Bloomberg*'s article) came only two weeks after Defendants' final statement of "confidence" in the Merger. ¶127. The second revelation (termination of the Merger) occurred ***ten days*** later. *Id.* The third revelation (termination of the Revised Merger) occurred two months after Defendants' final statements of confidence in the Revised Merger. ¶104.

The timing of this revelation, ***combined*** with Defendants' close communications with the FTC, gives rise to a strong inference that they ***must have*** known that their statements were false or misleading. The alternative suggests that the FTC, did not even hint to any concerns then surprised Defendants with the truth at the last minute – which is implausible.[29] *Universal*, 176 F. Supp. 3d at 395 ("'when

---

[29]   *Elam*, cited by the Walgreen Defendants, supports Plaintiff's position. There, the court confirmed that "close proximity" between false statement and "decline in

multiple promised events fail to occur, there is a point where a strong inference of fraud can be made'").

### d. Defendants' Motives Bolster Scienter

Motive is not necessary but can be relevant to the holistic review of scienter. *Avaya*, 564 F.3d at 276-77; *Tellabs*, 551 U.S. at 325 ("motive can be a relevant consideration, and personal financial gain may weigh heavily in favor of a scienter inference").

Here, bolstering a finding of scienter, the Complaint alleges that the Rite Aid Defendants were motivated to minimalize the antitrust risks to garner shareholder approval of the Merger and secure individual change-in-control benefits not shared with stockholders.  ¶50; *Frater*, 996 F. Supp. 2d at 350 ("change of control bonus provision gave Carter personal incentives relating to a stock sale in a way that departs from executives' typical compensation incentives").  This "is not a generalized motive shared by all companies but is . . . uniquely related to each individual defendant." *Sprint*, 232 F. Supp. 2d at 1225.[30]  The Rite Aid Defendants' desire for these benefits

---

stock value ***is relevant to scienter***."  *Elam v. Neidorff*, 544 F.3d 921, 930 (8th Cir. 2008).  Unlike here, however, where the ***flow of information*** with the FTC suggests that defendants must have known that the Merger faced high regulatory risk, plaintiff there offered no such facts to show how the statements in that case raised an inference of knowledge.

[30]     *GSC*, *Alpharma*, *Herzog* and *ECA* are inapposite because they are cases where the plaintiff attempted to establish motive merely by pointing to general corporate opportunities present in all scenarios.  *See GSC Partners CDO Fund v. Washington*,

is further demonstrated by their persistence in pursuing their compensation packages in the Revised Merger, without sufficient regard for the commensurate decrease in shareholder value.  ¶¶57-60, 112, 115.

With respect to the Walgreen Defendants, the Complaint alleges that they "misled investors to gain shareholder approval of the deal and continued to mislead investors in order to rebut criticism of the deal's viability, which threatened to tarnish Pessina's strong deal-making reputation."  ¶112.  Pessina's ambition to maintain his deal-making reputation is further demonstrated by his resistance to any questions on the viability of the Merger.  ¶¶10, 56; *Weiner v. Quaker Oats Co.*, 129 F.3d 310, 318 n.8 (3d Cir. 1997) (allegations that "management took advantage of specific opportunities to communicate with the investment community in order to inflate the price of Quaker stock, fend off a widely-rumored potential takeover, and preserve management's own jobs . . . adequately alleged scienter").

### e.    The Rite Aid Defendants Failed to Counter Plaintiff's Strong Inference of Scienter

The Rite Aid Defendants do not offer their own competing inference of the facts ***as alleged***.  Instead, they assert that they could not be motivated to consummate

---

368 F.3d 228, 237 (3d Cir. 2004) (general allegations of corporate opportunities; insufficient connection between misstatement and achieving motive); *In re Alpharma Inc. Sec. Litig.*, 372 F.3d 137, 149 (3d Cir. 2004) (same); *Herzog v. GT Interactive Software Corp.*, No. 98 CIV. 0085 (DNE), 1999 WL 1072500, at *9 (S.D.N.Y. Nov. 29, 1999) (same); *ECA, Local 134 IBEW Joint Pension Tr. of Chi. v. JP Morgan Chase Co.*, 553 F.3d 187, 201 (2nd Cir. 2009) (same).

the Merger to secure benefits while simultaneously knowing the Merger would fail. R.A. Mot. at 37.   That misconstrues the Complaint.   Plaintiff alleges, not that Defendants knew the Merger would fail, but that they knew that the Merger posed significant risks but downplayed those risks to gain shareholder approval.   Without passing that first hurdle, they would have zero opportunity to obtain their personal benefits.   The Rite Aid Defendants were willing to pass on the full regulatory risk to investors in order to secure that opportunity.

Thus, "the question is not whether the . . . defendants knew that the merger ultimately would be blocked; rather, the question is whether [they] knew that the nondisclosure of certain information, coupled with [previous] optimistic statement[s] that the merger would go through, would mislead its shareholders."   *Sprint*, 232 F. Supp. 2d at 1226[31]; *In re Nuvelo, Inc. Sec. Litig.*, 668 F. Supp. 2d 1217, 1230 (N.D. Cal. 2009) ("the SAC need not allege that defendants knew SONOMA-2 would fail; the SAC need merely allege that defendants misled investors by omitting to disclose a material risk that SONOMA-2 would fail"); *Viropharma*, 2003 WL 1824914, at *5

---

[31]     In *Davidoff* and *Pfizer* (cited by the Rite Aid Defendants): (i) plaintiff **specifically alleged** that defendants knew a particular thing would happen; and (ii) the facts were inconsistent with the defendants' purported knowledge.   *Davidoff v. Farina*, No. 04 Civ. 7617, 2005 WL 2030501, at *5, *11 n.19 (S.D.N.Y. Aug. 22, 2005); *City of Edinburgh Council v. Pfizer, Inc.*, 754 F.3d 159, 164, 168-71 (3d Cir. 2014).   Here: (i) the Rite Aid Defendants knew the Merger had higher risk than represented; and (ii) Defendants' desire to close the Merger is **consistent** with knowledge of the risk.

- 51 -

(finding of scienter based on information withheld from public statements; whether defendant can "predict the FDA's decision is irrelevant").  "[F]or the truth was bound to come out quickly, but the securities laws forbid foolish frauds along with clever ones."  *Asher v. Baxter Int'l Inc*., 377 F.3d 727, 728 (7th Cir. 2004).[32]

### f.     The Walgreens Defendants Failed to Counter Plaintiff's Strong Inference of Scienter

The Walgreen Defendants assert that:  (i) they did not have motive to "deliberately" inflate Rite Aid's stock price; and (ii) they could not seek to inflate Rite Aid's stock price while simultaneously seeking to acquire Rite Aid at a discount. Walgreens Mot. at 12-13.

This argument fails for two reasons.  First, while the motive to artificially inflate stock prices can provide scienter in some cases (*e.g*., cases where defendants conduct insider stock sales), that is not Plaintiff's theory here.  In this case, scienter is based on the fact that Defendants knew or had access to facts contradicting the statements and omissions at issue.  Thus, the entire premise of this argument – that this case claims that Defendants wanted to inflate Rite Aid's stock price – is flawed.

---

[32]     The Rite Aid Defendants' characterization of "group pleading" should be rejected.  The Complaint sets forth each statement, the maker, and why it was false. By contrast, plaintiffs in *Winer* and *Rescue Mission* (cited by the Rite Aid Defendants) expressly relied on the "group pleading" doctrine.  *See Winer Family Tr. v. Queen*, 503 F.3d 319, 334 (3d Cir. 2007); *Rescue Mission of El Paso, Inc. v. K-Sea Transp. Partners L.P*., No. 12-CV-00509 WHW, 2013 WL 3087078, at *28 (D.N.J. June 14, 2013).

Second, it is entirely consistent that the Merger consideration was unfair and Rite Aid's stock traded at an artificially high level after the announcement of the Merger because the latter is not dependent on the former.  After the announcement of a deal, the current market price will typically trade below the deal price "represent[ing] the market's assessment of likelihood that the merger [will] close." Dale A. Oesterle, *Regulating Hedge Funds*, 1 Entrepreneurial Bus. L.J. 1, 20 (2006). "[T]he smaller the spread the higher the probability the deal would close and the higher the spread the lower the probability that the deal would close."  *Id.*

Consistent with this notion, after the announcement of the Merger, Rite Aid's stock price stopped short of the $9 per share Merger price based on the perception of at least some closing risk.  The key point here, however, is the spread was much smaller, *i.e.*, Rite Aid's stock price traded at a far higher level than it would have if Defendants had correctly and accurately disclosed the true scope of the serious antitrust problems faced by the Merger.  Defendants inaccurately downplayed the problems, thus impacting the closing risk incorporated into Rite Aid's stock price. Indeed, as noted above, Defendants earlier conceded that Rite Aid stock traded at improperly inflated levels during the pendency of the Merger for this very reason. ¶¶105-108.

In short, like the Rite Aid Defendants, the Walgreen Defendants fail to offer any competing inference. Defendants cannot dispute the strong inference of scienter on the facts as alleged.

### C.    The Complaint Adequately Pleads Loss Causation

"'[L]oss causation' [is] a causal connection between the material misrepresentation [or omission] and the loss [suffered]." *Dura Pharms., Inc. v. Broudo*, 544 U.S. 336, 341-42 (2005). A plaintiff must simply provide "some indication of the loss and the causal connection that the plaintiff has in mind." *Id.* at 347. The Supreme Court rejected any heightened pleading standard for loss causation, to not "impose a great burden upon a plaintiff." *Id.* at 346-47; *McCabe v. Ernst & Young, LLP*, 494 F.3d 418, 428 (3d Cir. 2007) (loss causation satisfied if "'misrepresentation touches upon the reasons for the investment's decline in value'"). Causation is "'usually reserved for the trier of fact.'" *In re Urban Outfitters, Inc. Sec. Litig.*, 103 F. Supp. 3d 635, 655 (E.D. Pa. 2015).

The Complaint sufficiently alleges loss causation by alleging that Defendants misrepresented the regulatory risks, and that Rite Aid's stock declined after the: (1) January 20, 2017 *Bloomberg* article; (2) January 30, 2017 termination of the Merger; and (3) June 29, 2017 termination of the Revised Merger. ¶130.[33] No more is needed.

---

[33]    These allegations specifically tie the revelation of information to the market correction, differentiating this case from those cited by the Rite Aid Defendants involving stock drops following negative financial results. *See Nat'l Junior Baseball*

*Sprint*, 232 F. Supp. 2d at 1228 (loss causation found from allegation that "defendants omitted material information and made numerous misrepresentations regarding the likelihood the merger would be consummated and that, as a result, plaintiffs paid artificially inflated prices for Sprint publicly traded securities" and "when the truth regarding the merger was finally revealed, the price of Sprint's stock fell"); *Wilmington*, 29 F. Supp. 3d at 450 (loss causation may be pled "by alleging either a corrective disclosure of a previously undisclosed truth that causes a decline in the stock price or the ***materialization of a concealed risk that causes a stock price decline***").

### D.    The Complaint Adequately Pleads a §20(a) Claim

The heightened pleading requirements of Rule 9(b) of the Federal Rules of Civil Procedure do not apply to §20(a) claims. *In re Tel-Save Sec. Litig.*, No. 98 CV 3145, 1999 WL 999427, at *6 (E.D. Pa. Oct. 19, 1999). The Rite Aid Defendants, as directors and executives of Rite Aid who were responsible for the false and misleading statements in Rite Aid press releases and in the 2015 Proxy are liable as control persons. *Id*. ("Allegations that a director signed a fraudulent SEC filing and

---

*League v. Pharmanet Dev. Grp. Inc.*, 720 F. Supp. 2d 517, 558, 561 (D.N.J. 2010) (allegations did "not adequately demonstrate a market correction of the artificial inflation caused by Defendants' misrepresentations"); *Martin v. GNC Holdings, Inc.*, No. 2:15-CV-01522, 2017 WL 3974002, at *19 (W.D. Pa. Sept. 8, 2017) ("'disappointing earnings or other indications of the "true financial condition" of the company, without any evidence of a link between the disclosure and the fraud, is not a corrective disclosure'").

- 55 -

was in a position to exercise control over the primary violator are sufficient to withstand a motion to dismiss.").

The Walgreens Defendants exercised contractual control over Rite Aid. Specifically, under the Merger agreement, the Walgreens Defendants were required to, and, in fact, did, "make all strategic decisions and lead all discussions, negotiations and other proceedings, and coordinate all activities with respect to any requests that may be made by, or any actions, consents, undertakings, approvals, or waivers that may be sought by or from, the FTC or other governmental entities." ¶118; *see also* 2015 Proxy at 100 (R.A. Mot., Ex. A). These facts plead a §20(a) claim. *See* 17 C.F.R. §230.405 ("Control . . . means the possession, direct or indirect, of the power to direct or cause the direction of the management and policies of a person, whether through the ownership of voting securities, ***by contract***, or otherwise."); *Lane v. Page*, 581 F. Supp. 2d 1094, 1131-32 (D.N.M. 2008) ("contractual relationships" between acquiror and target in merger conferred power to direct policies). The Walgreens Defendants' objection that they lacked "ultimate authority" over Rite Aid ignores these facts and the law and, thus, should be rejected.[34]

---

[34]   To the extent Defendants challenge the §20(a) claim for failure to plead an underlying violation, that challenge fails, as discussed above.

1424407_1

### E.     Defendants' Standing Arguments Are Meritless

Defendants' assertion that Plaintiff lacks standing to pursue claims based on misstatements after August 16, 2016 (the date of his last stock purchase) is misplaced. Walgreens Mot. at 32 n.23; R.A. Mot. at 26 n.8.  Plaintiff purchased Rite Aid stock after Defendants' false and misleading statements artificially inflated the stock price, thus, he has standing to pursue claims based on misstatements and omissions made both before and after his August 16, 2016 purchase.  *See In re Urban Outfitters, Inc., Sec. Litig.*, No. CV 13-5978, 2016 WL 1043014, at *2 n.2 (E.D. Pa. Feb. 29, 2016) (finding that lead plaintiff could pursue "representations and nondisclosures before and after his August 6, 2013 purchase").  "Agreeing with Defendants would require lead plaintiffs for each representation even when they are essentially similar or we would need a lead plaintiff for each day of the class period or the last day of the class period."  *Id.*

Defendants' case law is inapposite because in those cases, the plaintiff did not make ***any purchases*** during the class period.  *See Walck v. Am. Stock Exch., Inc.*, 687 F.2d 778, 790 (3d Cir. 1982) (plaintiff's "charges relate exclusively to fraudulent and deceptive inducements to purchase Trans-Lux stock and to ***retain it when it would have been prudent to sell***"); *Winer Family Tr. v. Queen*, 503 F.3d 319, 324 (3d Cir. 2007) (plaintiff's "***only remaining claims*** were based on statements made by defendants after the date of Winer's stock purchase"); *see also Urban Outfitters*, 2016

WL 1043014, at *2 n.2 (distinguishing *Winer*: "the lead plaintiff could not allege any pre-purchase representations as a matter of law thus leaving him with a fraud claim based entirely on representations after his purchase").  Defendants' standing argument lacks legal support and should be rejected.

The Court should also reject the Rite Aid Defendants' second attempt to force Plaintiff to reissue PSLRA notice, R.A. Mot. at 26 n.8, in an effort to replace Plaintiff and his counsel here with other representatives that might be willing to dismiss this case for nothing more than attorneys' fees because the Complaint created no new group of class members who were excluded under the initial PSLRA notice.  *See* Reply In Support of Lead Plaintiff's Motion for Leave to File an Amended Complaint at 7-16 (ECF No. 80).

## III.    CONCLUSION

Plaintiff respectfully request that the Court deny Defendants' Motions.

DATED:  May 1, 2018                    Respectfully submitted,

                                       KAUFMAN, COREN & RESS, P.C.
                                       DEBORAH R. GROSS
                                       (Pa. ID No. 44542)


                                       s/ Deborah R. Gross
                                       _____
                                       DEBORAH R. GROSS

- 58 -

Two Commerce Square, Suite 3900
2001 Market Street
Philadelphia, PA 19103
Telephone: 215/735-8700
bmather@kcr-law.com

Local Counsel

ROBBINS GELLER RUDMAN
  & DOWD LLP
STUART A. DAVIDSON
MARK J. DEARMAN
CHRISTOPHER GOLD
120 East Palmetto Park Road, Suite 500
Boca Raton, FL 33432
Telephone: 561/750-3000
561/750-3364 (fax)

ROBBINS GELLER RUDMAN
  & DOWD LLP
RANDALL J. BARON
DAVID T. WISSBROECKER
655 West Broadway, Suite 1900
San Diego, CA  92101
Telephone: 619/231-1058
619/231-7423 (fax)

Lead Counsel for Plaintiff and the Proposed
Class

HAGENS BERMAN SOBOL SHAPIRO LLP
REED R. KATHREIN
715 Hearst Avenue, Suite 202
Berkeley, CA  94710
Telephone: 510/725-3000
510/725-3001 (fax)

HAGENS BERMAN SOBOL SHAPIRO LLP
KARL P. BARTH
1918 8th Avenue, Suite 3300
Seattle, WA  98101
Telephone:  206/623-7292
206/623-0594 (fax)

Additional Counsel for Plaintiff

<u>CERTIFICATE OF SERVICE</u>

I hereby certify that on May 1, 2018, I authorized the electronic filing of the foregoing with the Clerk of the Court using the CM/ECF system which will send notification of such filing to the e-mail addresses denoted on the attached Electronic Mail Notice List, and I hereby certify that I caused to be mailed the foregoing document or paper via the United States Postal Service to the non-CM/ECF participants indicated on the attached Manual Notice List.

I certify under penalty of perjury under the laws of the United States of America that the foregoing is true and correct.  Executed on May 1, 2018.

*s/ Deborah R. Gross*
DEBORAH R. GROSS

KAUFMAN, COREN & RESS, P.C.
Two Commerce Square, Suite 3900
2001 Market Street
Philadelphia, PA 19103
Telephone:  215/735-8700
dgross@kcr-law.com

1424407_1

## Mailing Information for a Case 1:15-cv-02440-JEJ Hering v. Rite AID Corporation et al

### Electronic Mail Notice List

The following are those who are currently on the list to receive e-mail notices for this case.

- **Thomas G. Collins**
  thomas.collins@bipc.com,cynthia.ziegler@bipc.com

- **Stuart A Davidson**
  sdavidson@rgrdlaw.com,jdennis@rgrdlaw.com,e_file_sd@rgrdlaw.com,e_file_fl@rgrdlaw.com

- **Mark J Dearman**
  mdearman@rgrdlaw.com,9825585420@filings.docketbird.com,e_file_sd@rgrdlaw.com,e_file_fl@rgrdlaw.com

- **Simone L Delerme**
  delermes@pepperlaw.com,hesss@pepperlaw.com

- **Brian P. Downey**
  downeyb@pepperlaw.com,boringk@pepperlaw.com

- **Cliff C. Gardner**
  cliff.gardner@skadden.com,jennifer.voss@skadden.com

- **Christopher Chagas Gold**
  cgold@rgrdlaw.com,4703056420@filings.docketbird.com,jdennis@rgrdlaw.com,e_file_sd@rgrdlaw.com,e_file_fl@rgrdlaw.com

- **Deborah R Gross**
  dgross@kcr-law.com,jhannigan@kcr-law.com

- **Howard J. Kaufman**
  hkaufman@kcr-law.com,jhannigan@kcr-law.com

- **Jessica R. Kunz**
  jessica.kunz@skadden.com,veronica.bartholomew@skadden.com,cherie.krebs@skadden.com,mlcwil@skadden.com,lauren.karpinski@skadden.com,ecf-142c15ead948@ecf.pacerpro.com

- **Benjamin M. Mather**
  bmather@kcr-law.com,emullen@kcr-law.com,dgross@kcr-law.com

- **Robert S. Saunders**
  rob.saunders@skadden.com

- **Kristen R. Seeger**
  kseeger@sidley.com,kristen-seeger-6650@ecf.pacerpro.com,efilingnotice@sidley.com

- **Nilofer Umar**
  numar@sidley.com,efilingnotice@sidley.com,nilofer-umar-6698@ecf.pacerpro.com,ddrown@sidley.com

- **Jennifer C Voss**
  JENNIFER.VOSS@SKADDEN.COM

### Manual Notice List

The following is the list of attorneys who are **not** on the list to receive e-mail notices for this case (who therefore require manual noticing). You may wish to use your mouse to select and copy this list into your word processing program in order to create notices or labels for these recipients.

```
Randall          J Baron
Robbins Geller Rudman & Dowd LLP
655 West Broadway
Suite 1900
San Diego, CA 92101-3301

David            T Wissbroecker
Robbins Geller Rudman & Dowd LLP
655 West Broadway
Suite 1900
San Diego, CA 92101-3301
```