# IN THE UNITED STATES DISTRICT COURT
## FOR THE MIDDLE DISTRICT OF PENNSYLVANIA

JERRY HERING, individually and on behalf
of all other similarly situated,

       Plaintiffs,

   v.

RITE AID CORPORATION, *et al.*,

       Defendants.

**1:15-CV-2440**

**Hon. John E. Jones III**

## <u>MEMORANDUM & ORDER</u>

### July 11, 2018

Plaintiff Jerry Hering brings this action against Defendants Rite Aid Corporation, John T. Standley, David R. Jessick, Joseph B. Anderson, Jr., Bruce G. Bodaken, Kevin E. Lofton, Myrtle S. Potter, Michael N. Regan, Frank A. Savage, Marcy Syms (collective, the "Rite Aid Defendants"), and Walgreens Boots Alliance, Inc., Stefano Pessina, and George R. Fairweather (collectively, the "Walgreens Defendants"). Presently before the Court are two Motions to Dismiss Plaintiff's Amended Complaint filed by the Rite Aid Defendants, (Doc. 89), and the Walgreens Defendants, (Doc. 93). For the reasons that follow, we shall grant the Rite Aid Defendants' motion and deny the Walgreens Defendants' motion.

# I.    FACTUAL BACKGROUND

Plaintiff brings this action based on alleged false or misleading statements made by the defendants during the class period of October 27, 2015, to June 28, 2017.  Plaintiff alleges the following facts in his Amended Complaint, which we assume to be true.

On October 27, 2015, Rite Aid and Walgreens jointly announced that they had entered a merger agreement (the "original merger agreement") under which Walgreens would purchase Rite Aid for $9.00 per share in cash.  (Doc. 83, ¶ 2). As part of the original merger agreement, Rite Aid directors would be permitted to rollover most of their options and their restricted stock and performance units into Walgreens stock.  (*Id.* at ¶ 3).  The value of this equity rollover ranged from approximately $120,000 to $25 million.  (*Id.*).  In the press release announcing the proposed merger, Defendant Standley stated that the merger would provide "significant value" to Rite Aid shareholders.  (*Id.* at ¶ 64).  The press release further noted that the companies expected to close the transaction "in the second half of calendar 2016."  (*Id.*).

Days later, Rite Aid filed Form 8-K with the United States Securities and Exchange Commission ("SEC"), which attached a "script" for meetings with Rite Aid associates, as well as talking points and a FAQ section.  (*Id.* at ¶ 65).  The attachments to the Form 8-K reiterated that the original merger agreement would

provide shareholders with "significant value." (*Id.*). The attachments also noted that, although Rite Aid could not "speculate on the decisions of any regulatory agency," both companies had "extensive consultation with anti-trust counsel, and based upon the complementary nature of the market profiles of both companies, and the amount of pharmacy counters in the U.S., we do not believe the combination should cause regulatory concern." (*Id.* at ¶ 66). In the event that the merger encountered regulatory issues, the script explained, then the original merger agreement provided that "Walgreens Boots Alliance can divest some stores if needed to obtain FTC approval." (*Id.* at ¶ 65). The original merger agreement, in fact, provided for a divestiture of up to 1000 stores. (*Id.* at ¶ 67). During a presentation to the Credit Suisse Healthcare Conference on November 10, 2015, a Walgreens officer stated, with respect to the store divestitures, that they "believe that it's probably about half that number. We don't really know, but we believe that's probably the right number." (*Id.* at ¶ 67; Doc. 99, Ex. 11, p. 3).[1] Defendant Fairweather repeated the 500-store expected divestiture at a Morgan Stanley Global Consumer & Retail Conference on November 17, 2015. (Doc. 83, ¶ 67; Doc. 99, Ex. 2, p. 3) (noting that they "have to go through the regulatory process. We're anticipating that store divestitures will be less than 500, although our

---

[1] Plaintiff does not attach any documents to his Amended Complaint. However, Plaintiff quotes from documents throughout his allegations that the Defendants have attached in their motions. Because the documents are incorporated by reference and integral to Plaintiff's Amended Complaint, we will consider them here.

contract provides for up to 1,000, but we don't anticipate that will be the case. But clearly we will have to work with the relevant authorities as we go through this.").

On December 18, 2015, Rite Aid filed a proxy with the SEC and mailed the same to shareholders on December 28, 2015, seeking shareholder approval for the original merger agreement. (Doc. 83, ¶ 69). The proxy highlights various factors leading the Rite Aid Board to recommend approval, including "[t]he fact that the $9.00 all-cash per share merger consideration will provide certainty of value and liquidity to Rite Aid stockholders. . . ." (*Id.*). On that note, the proxy specifies that the consideration would represent "a premium of: 48% to Rite Aid's closing price as of October 26, 2015, the last trading day prior to the date on which public announcement of the execution of the merger agreement was made; and 44% to Rite Aid's thirty (30) calendar day volume weighted average price as of October 26, 2015." (Doc. 101, Ex. A, p. 62). The proxy also highlighted Walgreen's commitment to obtaining antitrust approval and assumption of the risks, as well as "the commitment to sell up to 1,000 stores of Rite Aid or [Walgreens] . . . ." (Doc. 83, ¶ 69) (alteration added).

The proxy listed numerous potentially negative factors that the Rite Aid Board considered, including "the risk that other regulatory agencies may not approve the merger. . . . The risk that the merger could be delayed or not completed. . . . [and] The fact that [Walgreens] is not required to accept divestiture

4

and other remedies imposed by governmental authorities (i) that would result in the divestiture of more than 1,000 [Walgreens] and Rite Aid stores. . . ." (*Id.* at ¶ 71) (alterations added).

On December 10, 2015, Rite Aid and Walgreens each received a second request for information from the FTC related to the original merger agreement. (*Id.* at ¶ 79). The following day, the two companies issued a joint press release advising of the second request and characterizing the request as a "standard part of the regulatory process in connection with the FTC's review." (*Id.* at ¶ 80). The press release also reiterated that the companies "expect the transaction to close in the second half of calendar 2016." (*Id.*).

On January 7, 2016, Walgreens held an earnings call for its first fiscal quarter of 2016. (*Id.* at ¶ 81). During the call, Defendant Pessina reiterated that the "transaction is progressing as we expected and planned. We continue to anticipate completing the acquisition in the second half of calendar-year 2016. The transaction remains subject to approval by Rite Aid's shareholders, regulatory clearances, and other customary closing conditions." (*Id.*; Doc. 99, Ex. 6, p. 3). Defendant Pessina went on to state that Walgreens was "continuing to work closely with the regulators. You will have seen, as we expected, that we have received a second request from the FTC for additional information. This is a standard part of the regulatory process in connection with the FTC's review."

(Doc. 83, ¶ 81; Doc. 99, Ex. 6, p. 3).  Defendant Pessina informed the callers that Walgreens "appointed a highly experienced integration team which has been up and running since the end of November.  They are now well underway on preliminary planning work."  (Doc. 83, ¶ 81; Doc. 99, Ex. 6, p. 3).  He also confirmed that they believed store divestitures would number fewer than 500. (Doc. 83, ¶ 81).

Later, on January 27, 2016, at Walgreens's annual shareholder meeting, Defendant Pessina continued to predict that the transaction would close in the second half of 2016 and stated that the process "is proceeding as we had anticipated."  (*Id.* at ¶ 82).  From January through April 2016, Rite Aid and Walgreens provided the FTC with information and documents responsive to the FTC's second request.  (*Id.* at ¶ 83).

Walgreens held an earnings call for the second quarter of 2016 on April 5, 2016.  (*Id.* at ¶ 84).  During the call, Defendant Pessina stated that "the regulatory approval process [was] progressing in line with the timetable we had expected." (*Id.*).  Defendant Pessina further remarked:

> Nothing has changed, except the fact we are collaborating, and as the time is passing, probably the solution will be closer, because at the end of the day, we knew from the very beginning that this would have been a very long process, that would have been asked for many, many documents and information. We are going through the process.
>
> The process is developing and [*sic*] an absolute normal way and so we hope that, sooner or later, we will have an indication on where we are,

but of course, we cannot put a day or even a month for this indication
because it depends very much on how deeply the FTC wants to
analyze all of the documents that we have given. But it's nothing
atypical, exactly online with what we were expecting.

(Doc. 99, Ex. 7, p. 3). From late April to August 2016, the FTC began to identify

geographic areas of concern where Walgreens and Rite Aid operations overlapped.

(Doc. 83, ¶ 85).

During Walgreens's July 6, 2016, third quarter earnings call, Defendant

Pessina again stated that the Rite Aid merger was "progressing as planned. As you

know, we are in the process of seeking a regulatory approval. In part, our

integration team is continuing its work on preliminary planning." (*Id.* at ¶ 86; Doc.

99, Ex. 8, p. 3). Later in the call, Defendant Pessina returned to the question of

store divestitures and reiterated that they believe the number will be "around 500"

and then maintained his prediction that the deal would close "by December,"

noting, "But of course, it doesn't depend on us. The FTC will let us know when

they are ready." (Doc. 83, ¶ 86; Doc. 99, Ex. 8, p. 4).

On September 8, 2016, Walgreens issued a press release announcing its

discussions with the FTC and noting that, due to "certain issues raised in those

discussions," Walgreens may "be required to divest more than the 500 stores

previously communicated" while still continuing "to expect that fewer than 1,000

stores will be required to be divested. In addition, the company continues to

believe that the acquisition will close in the second half of calendar 2016." (Doc. 83, ¶ 87; Doc. 99, Ex. 5, p. 2).

Several weeks later, on October 20, 2016, the companies issued a joint press release announcing that they had extended the merger agreement end date from October 27, 2016, to January 27, 2017. (Doc. 83, ¶ 88). In a Walgreens earnings call that same day, Defendant Fairweather stated that they "remain actively engaged with the FTC on its review. Today, we still expect that the most likely outcome will be that the parties will be required to divest between 500 and 1,000 stores. We believe that we will be able to execute agreements to divest these stores to potential buyers pending FTC approval, by the end of calendar year 2016. I now expect to close the acquisition in early calendar 2017." (*Id.*; Doc. 99, Ex. 9, p. 3). When asked why he was confident in an early 2017 close, Defendant Pessina responded: "Nothing has changed, we just have a delay in the execution of the deal. This is our perception, we have always been optimistic because we have never seen an attitude from the FTC, which was an absolute negative. . . ." (Doc. 83, ¶ 89). Defendant Pessina continued

> For what we see today, we see just a long administrative process, but we don't see substantial differences from what we were expecting. Yes, probably more stores, a little more stores here and there, but at the end of the day – as far as I can see today, as far as we can see today, we are absolutely confident that we can create, that we can do the deal and we can create the value. Just this value will be a little postponed on time.

(*Id.*).

On that October 2016 earnings call, Defendant Pessina also began to engage with journalists who were reporting regulatory turbulence.  (*Id.*)  ("I know that we read on the papers are different news, no idea about the sources of this news, but for sure if we could talk, and of course you know that we cannot . . . our news would be different.").  Defendant Pessina continued his dialogue with journalists during a November 8, 2016, healthcare conference, stating, "we have a different opinion than certain journalists who are writing things we don't recognize or people we – or about people we have never heard of.  So, just to reassure you, if we say that we are confident, it is because what we know makes us very confident."  (*Id.* at ¶ 90).  Later in the conference, when asked about other potential acquisitions, Defendant Pessina stated that "we have to focus on Rite Aid.  It will take some time to get there.  We will have a very laborious integration.  We have a team who is working with – been working for some time, some integration on the process.  And it will take a lot of energy to do so."  (*Id.* at ¶ 91; Doc. 99, Ex. 4, p. 3).

At a conference on November 17, 2016, Defendant Fairweather stated that they were "very clear" that the deal would complete, but that store divestitures would "now be in the range of 500 to 1000" and that the transaction had "perhaps taken a little bit longer than we had thought in the first place.  There's lots of stuff

in the papers but it is amazing where it comes from." (Doc. 83, ¶ 94). Defendant

Fairweather was supported by another Walgreens officer who remarked that

Walgreens has "enough clarity on what we have to do in terms of remedies with

the FTC to be – to have opened the data room for sale of pharmacies to potential

buyers." (*Id.* at ¶ 95).

On December 20, 2016, the companies jointly issued a press release

announcing an agreement with Fred's Inc. to sell 865 Rite Aid stores for $950

million in cash related to the original merger agreement. (*Id.* at ¶ 96).

On January 5, 2017, during a Walgreens earnings call, Defendant

Fairweather continued to express that the Rite Aid transaction was making "good

progress towards complet[ion]." (*Id.* at ¶ 97). Defendant Pessina later said on the

call that Walgreens did not have a "Plan B" in the event the original merger

agreement was not approved: "[W]e don't want even to think of the fact that this

could not be approved after so many months, when we have given a lot of

information, and we have had a very good relationship with the people of the FTC.

. . . So we are not thinking of a Plan B today." (*Id.* at ¶ 98).

Later that month, however, on January 30, 2017, Rite Aid and Walgreens

announced that they had terminated the original merger agreement and entered a

revised merger agreement, under which the per-share consideration was reduced to

between $7.00 and $6.50, depending on the number of store divestitures required.

(*Id.* at ¶ 99). The revised merger agreement extended the merger deadline to July 31, 2017. (*Id.*). Rite Aid subsequently issued another proxy seeking shareholder approval of the revised merger agreement, in which Rite Aid acknowledged that its stock had been trading at prices that did not represent "an accurate reflection of the value of Rite Aid because such stock price reflected market expectations of the likelihood that the merger would occur on the terms of the original merger agreement and did not reflect the value of Rite Aid as an independent company." (*Id.* at ¶ 107).

On a Walgreens earnings call on April 5, 2017, Defendant Pessina remained "optimistic that we will bring this deal to a successful conclusion. But there is no doubt that the process of getting clearance for the transaction is taking longer than we expected. We are constantly and currently collaborating with FTC, Rite Aid and Fred's to get the necessary approvals and close the transaction. At the same time, we are working to be in a position to certify compliance. We believe that we can achieve this in the coming weeks and are still working toward our revised time table to obtain a clearance by the end of July." (*Id.* at ¶ 100; Doc. 99, Ex. 1, p. 3).

On June 29, 2017, however, the companies announced that they had terminated the revised merger agreement and had entered an asset purchase agreement whereby Walgreens would simply purchase a specified number of Rite Aid stores. (Doc. 83, ¶¶ 104, 109).

## II.    PROCEDURAL HISTORY

Plaintiff originally initiated this lawsuit by filing a Complaint on December 18, 2015, the day that Rite Aid filed its proxy related to the original merger agreement.  (Doc. 1).  Plaintiff claimed the proxy was false and misleading in violation of §§14(a) and 20(a) of the Securities and Exchange Act of 1934 (the "1934 Act"), 15 U.S.C. §§ 78n(a) and 78t(a), as well as Rule 14a-9 promulgated by the SEC, 17 C.F.R. § 240.14a-9.  On January 14, 2016, Plaintiff filed a Motion for Preliminary Injunction to block the shareholder vote on the original proxy.  (Doc. 12).  We denied the preliminary injunction on January 28, 2016.  (Doc. 42).

On January 21, 2016, the Rite Aid Defendants filed a Motion to Dismiss for Failure to State a Claim.  (Doc. 37).  On March 24, 2016, before the motion was fully briefed, Plaintiff filed an unopposed motion to stay the litigation pending the consummation of the merger.  (Doc. 56).  We granted the stay on April 14, 2016, (Doc. 57), and terminated the pending motion to dismiss.

On March 17, 2017, Plaintiff filed a Motion to Lift Stay, (Doc. 58), which the parties briefed.  (Docs. 60, 61, 63, 64).  On July 12, 2017, in light of the dissolution of the pending merger, we ordered Plaintiff to indicate what claims he believed he still had.  (Doc. 68).  On August 4, 2017, after receiving letters from all parties, (Docs. 69-71), we lifted the stay and ordered Plaintiff to file a motion for leave to amend his complaint.  (Doc. 72).

Plaintiff filed his Motion for Leave to File an Amended Complaint on September 22, 2017. (Doc.76). We granted Plaintiff's motion on November 27, 2017, (Doc. 82), and Plaintiff filed his Amended Complaint on December 11, 2017. (Doc. 83). The Amended Complaint states violations of §§ 10(b) and 20(a) of the 1934 Act, 15 U.S.C. §§ 78j(b) and 78t(a), as well as Rule 10b-5 promulgated by the SEC, 17 C.F.R. § 240.10b-5.

The Rite Aid Defendants and Walgreens Defendants filed separate Motions to Dismiss on February 14, 2018. (Docs. 89, 93). The motions have been fully briefed and are ripe for our review.

## III. STANDARD OF REVIEW

In deciding a motion to dismiss under Rule 12(b)(6), "a court must 'accept as true all [factual] allegations in the complaint and all reasonable inferences that can be drawn therefrom, and view them in the light most favorable to the plaintiff.'" *OFI Asset Mgmt. v. Cooper Tire & Rubber*, 834 F.3d 481, 489 (3d Cir. 2016) (quoting *Kanter v. Barella*, 489 F.3d 170, 177 (3d Cir. 2007)). In a typical Rule 12(b)(6) analysis, "it is sufficient to plead facts that do no more than raise an allegation to the level of plausibly warranting relief." *Id.* at 490 (citing *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 570 (2007)). In securities fraud actions, however, "plaintiffs must 'satisfy the heightened pleading rules codified in' the

PSLRA [Private Securities Litigation Reform Act]." *Id.* (quoting *Institutional*

*Investors Grp. v. Avaya, Inc.*, 564 F.3d 242, 252 (3d Cir. 2009)).

The PSLRA requires a plaintiff to "specify each statement alleged to have

been misleading, the reason or reasons why the statement is misleading, and, if an

allegation regarding the statement or omission is made on information and belief,

the complaint shall state with particularity all facts on which that belief is formed."

*Id.* (quoting 564 F.3d at 276). "This standard 'requires plaintiffs to plead the who,

what, when, where and how: the first paragraph of any newspaper story.'" *Id.*

(quoting 564 F.3d at 253). In addition, the complaint "must also 'state with

particularity facts giving rise to a strong inference that the defendant acted with the

required state of mind,' U.S.C. § 78u-4(b)(2)(A), specifically 'scienter,' which is

defined in this context as a 'knowing or reckless' mental state 'embracing intent to

deceive, manipulate, or defraud.'" *Id.* (quoting 564 F.3d at 252).

Plaintiff here alleges violations of §§ 10(b) and 20(a) of the 1934 Act, as

well as Rule 10b-5 promulgated by the SEC.[2]  The United States Supreme Court

has "prescribed a three-step process for considering a motion to dismiss in a §

10(b) action." *Id.* (quoting *Winer Family Trust v. Queen*, 503 F.3d 319, 327 (3d

Cir. 2007) (citing *Tellabs, Inc. v. Makor Issues & Rights, Ltd.*, 551 U.S. 308, 322-

23 (2007))). "First, as with all motions under Rule 12(b)(6), we must 'accept all

---

[2] Our analysis focuses on § 10(b) and Rule 10b-5, which was promulgated according to the
authority of § 10(b). Section 20(a) attaches liability to persons in control of violators, or those
who aid and abet violations. Thus, Plaintiff's § 20(a) claim is derivative of his § 10(b) claim.

factual allegations in the complaint as true.'" *Id.* (quoting 551 U.S. at 322). "Second, we 'must consider the complaint in its entirety, as well as other sources courts ordinarily examine when ruling on Rule 12(b)(6) motions to dismiss, in particular, documents incorporated into the complaint by reference, and matters of which a court may take judicial notice.'" *Id.* (quoting 551 U.S. at 322). Finally, "in determining whether the pleaded facts give rise to a 'strong' inference of scienter, the court must take into account plausible opposing inferences." *Id.* (quoting 551 U.S. at 323). "Only a complaint that provides sufficiently particularized factual pleading and gives rise to a strong inference of scienter can survive a motion to dismiss." *Id.*

## IV.   DISCUSSION

Defendants argue that Plaintiff fails to allege false or misleading statements or omissions and fails to adequately plead scienter. With respect to false or misleading statements, the Defendants suggest that the statements are opinions or expressions of optimism that are not actionable. They also contend that many of the statements are protected under the PSLRA's "safe harbor" provision for forward-looking statements. We will begin with Plaintiff's allegations of false or misleading statements.

### A.   False or Misleading Statements or Omissions

Section 10(b) makes it unlawful "[t]o use or employ, in connection with the purchase or sale of any security registered on a national securities exchange or any security not so registered . . . any manipulative or deceptive device or contrivance in contravention of such rules and regulations as the Commission may prescribe . . . ." 15 U.S.C. § 78j(b). The SEC promulgated Rule 10b-5, which states in relevant part that it is unlawful "[t]o make any untrue statement of a material fact or to omit to state a material fact necessary in order to make the statements made, in light of the circumstances under which they were made, not misleading. . . ." 17 C.F.R. § 240.10b-5. Importantly, the statement or omission, whether false or misleading, must pertain to a *material fact.* This stands in contrast to "statements of subjective analysis or extrapolation, such as opinions, motives and intentions, or general statements of optimism. . . ." *In re Aetna, Inc. Sec. Litig.*, 617 F.3d 272, 283 (3d Cir. 2010). "Such statements 'constitute no more than puffery and are understood by reasonable investors as such.'" *Id.* (quoting *In re Advanta Corp. Sec. Litig.*, 180 F.3d 525, 538 (3d Cir. 1999)).

Similarly, "a sincere statement of pure opinion is not an 'untrue statement of material fact,' regardless whether an investor can ultimately prove the belief wrong." *Omnicare, Inc. v. Laborers Dist. Council Constr. Indus. Pension Fund*, 135 S.Ct. 1318, 1327 (2015). To establish liability for an opinion, therefore, a plaintiff must show that the fact of the speaker's belief is itself untrue – that is, the

speaker knows his or her stated belief to be baseless. *Id.* at 1326. Alternatively, where opinion statements themselves contain and are supported by facts embedded within them, then the falsity of the embedded facts can render the statement false.

Where a statement is allegedly misleading because of some omitted facts, the standard turns to whether the omission would influence a reasonable investor, that is, whether there is a "substantial likelihood that the disclosure of the omitted fact would have been viewed by the reasonable investor as having significantly altered the 'total mix' of information made available." *Advanta*, 180 F.3d at 538 (quoting *TSC Indus., Inc. v. Northway, Inc.*, 426 U.S. 438, 449 (1976)).

The PSLRA further immunizes certain statements from § 10(b) liability if they are "forward-looking" The immunity applies if one of two scenarios is true: "either the 'forward-looking statement is . . . identified as [such], and is accompanied by meaningful cautionary statements identifying important factors that could cause actual results to differ materially from those in the forward-looking statement' or the plaintiff fails to prove the forward-looking statement 'was made with actual knowledge by [the speaker] that the statement was false or misleading. . . .'" *OFI Asset Mgmt*, 834 F.3d at 490 (quoting 15 U.S.C. § 78u-5(c)(1)). However, a "vague or blanket (boilerplate) disclaimer which merely warns the reader that the investment has risks will ordinarily be inadequate to prevent misinformation. To suffice, the cautionary statements must be substantive

and tailored to the specific future projections, estimates or opinions in the [documents] which the plaintiffs challenge." *Id.* at 491 (quoting *GSC Partners CDO Fund v. Washington*, 368 F.3d 228, 243 n.3 (3d Cir. 2004)).

The Defendants here argue that many of the statements are immunized by the safe harbor provision. The Defendants further argue that even statements that are not immunized are otherwise not actionable as opinions or statements of corporate optimism. We will begin with the application of the safe harbor provision.

### 1. Safe Harbor Applicability

The PSLRA defines a forward-looking statement in broad terms, including, but not limited to: "a statement containing a projection of revenues, income (including income loss), earnings (including earnings loss) per share, capital expenditures, dividends, capital structure, or other financial items"; "a statement of the plans and objectives of management for future operations"; or "a statement of future economic performance, including any such statement contained in a discussion and analysis of financial condition by the management or in the results of operations included pursuant to the rules and regulations of the Commission." 15 U.S.C. § 78u-5(i)(1)(A)-(C). Determining whether a statement is forward-looking, however, can be a surgical process. "[A] mixed present/future statement is not entitled to the safe harbor with respect to the part of the statement that refers

to the present." *Avaya*, 564 F.3d at 255 (quoting *Makor Issues & Rights, Ltd. v. Tellabs Inc.*, 513 F.3d 702, 705 (7th Cir. 2008)).

### a.        Statements of Rite Aid Defendants

The statements in Plaintiff's allegations that can be fairly attributed to the Rite Aid Defendants are those included in joint press releases and SEC filings, including the 2015 and 2017 proxies. Those statements pertain to: (1) the value of the merger to shareholders, (2) the expected timing of consummating the transaction, (3) the market profiles of the two companies as it relates to overlap of operations and potential for regulatory concern, (4) Walgreens's commitment to divest up to 1000 stores, and (5) the second FTC request and Rite Aid's characterization that it was a standard part of the review process.

Plaintiff argues, first, that these statements do not qualify for the safe harbor because they are not forward-looking. (Doc. 106, p. 37). The first group of statements relates to the dollar value of the merger to shareholders, if the merger were to be approved under the terms of the original merger agreement. This appears to be plainly forward-looking. Similarly, the second group of statements attempts to predict when the transaction would be completed. Plaintiff argues that these statements actually convey "the complexity of the Merger being minimal such that it could close in short order," which constitute statements of present fact. We disagree. Plaintiff's argument speculates as to a hidden meaning or

implication underlying the statements.  On their face, however, the statements simply attempt to predict a time table for completing the transaction and, thus, are forward-looking.

The third group of statements appears to mix present fact with a forward-looking assessment.  The statements surmised that the present market profiles likely would not create future regulatory concern.  In other words, while Rite Aid's analysis as to the level of regulatory concern at issue was a forward-looking statement inasmuch as it anticipated a future FTC conclusion, the statement regarding the market profiles of the two companies represented a present fact indicating that the companies' operations did not significantly overlap.  As such, only the portion of the statement relating to regulatory concern could potentially fall within the safe harbor.

Finally, the fourth and fifth groups of statements appear to relate to present facts.  Statements that Walgreens had committed to potentially divesting 1000 stores are not forward-looking because they relate to Walgreens's *present commitment*, not its eventual, possible actions.  Likewise, Rite Aid's characterization of the second FTC request also is not forward-looking, as Rite Aid concedes.  (Doc. 100, p. 35, n.13).

Our next step in determining the applicability of the safe harbor is to determine whether the forward-looking statements – the value of the merger to

shareholders, the expected timeframe for closing, and the potential for regulatory concern – were either accompanied by meaningful cautionary statements or were not shown by Plaintiff to have been knowingly false when made. The statements regarding the value of the merger and expected closing timeframe were made both in a press release announcing the original merger agreement and in the initial SEC filing. The statement related to potential regulatory concern also appeared in the SEC filing. As to the SEC filing, the Form 8-K includes an extensive section identifying the relevant statements as forward-looking and listing nine detailed factors that could lead to a materially different result. (Doc. 101, Ex. 4, p. 3). Thus, as to the statements in the SEC filing, we find that they are immunized by the safe harbor provision of the PSLRA.

As to the same statements made in the original press release, the Court has not been provided a copy of the press release and, as such, we have no way of knowing if the statements were accompanied by meaningful cautionary statements. We must therefore consider whether Plaintiff has pled facts showing that the statements were known to be false or misleading when made. The two statements at issue are the value of the merger to shareholders and the anticipated timetable for closing. Plaintiff does not allege any particular facts suggesting that Rite Aid knew these statements were false or misleading. Plaintiff, in fact, does not allege any facts at all suggesting that Rite Aid knew the predicted timeframe was false.

Plaintiff merely alleges, with respect to the "value" statements, that the merger consideration did not reflect the growth potential of Rite Aid and was the result of a flawed sales process. First, it is difficult to imagine why it would be false or misleading to call a 48% premium a "significant value" even if it could have been higher. Second, Plaintiff does not allege how Rite Aid would have known that its statement would mislead investors into thinking that the merger consideration was the best possible result of the sales process. Thus, Plaintiff has failed to allege that Rite Aid knew the statements to be false and, therefore, the safe harbor applies.

### b. Statements of Walgreens Defendants

The statements of the Walgreens Defendants can also be grouped, as several statements are frequently repeated at different times. Preliminarily, we note that our conclusion related to the forward-looking statements in the joint press releases holds equally for the Walgreens Defendants. Of the remaining statements of Walgreens, many were made orally during earnings calls or conferences. The PSLRA distinguishes forward-looking statements in written documents from those that are made orally.

> Under the [PSLRA], an issuer is not liable for any oral forward-looking statements if (1) the issuer informs the audience that the statement is forward-looking and that actual results may differ materially from the predictions; (2) the issuer orally directs the audience to other 'readily available' written documents that contain the additional information about important factors relating to the forward-looking statement; and (3) the identified documents set forth satisfactory cautionary statements.

*EP Medsystems, Inc. v. EchoCath, Inc.*, 235 F.3d 865, 873 n.3 (3d Cir. 2000)

(citing 15 U.S.C. § 78u-5(c)(2)(B)).  Of the oral statements made by Walgreens,

we find that most of them pertain to the Walgreens Defendants' present assessment

of the regulatory review process, including (1) their confidence that the deal would

close, (2) their belief that the present posture of the review was in line with what

they expected, (3) their interpretation of the FTC's attitude toward the transaction,

(4) their disagreement with journalists about the review process, (5) their

characterization of the FTC's second request for information, (6) the present

efforts of the integration team, and (7) their position on having a contingency plan.

In other words, these statements relate to the Walgreens Defendant's *present*

*impressions* about the regulatory review process.  We do not find that these are

properly defined as forward-looking and, thus, they fall outside the safe harbor.

        In addition to the above statements, however, Walgreens also clearly made

forward-looking statements related to the expected timetable for closing the deal

and the anticipated number of store divestitures.  In considering the call transcripts

provided by the Walgreens Defendants, we note that we only have portions of

those transcripts.  As such, if the necessary language was provided on the calls but

appears on pages not provided to the Court, then we obviously cannot find, at this

stage, that the safe harbor requirements were satisfied.  With that being said, we

find that the safe harbor requirements for oral forward-looking statements were

satisfied on the third quarter 2016 earnings call on July 6, 2016, where Defendant Pessina opines on store divestitures. Listeners were informed that the call would include forward-looking statements, alerted to circumstances that could result in different results, and directed to Walgreens' most recent Form 10-K for a further discussion of risk factors. Although callers were apparently provided with a "Safe Harbor statement" on the Credit Suisse Healthcare Conference call on November 10, 2015, we have not been provided with the statement and cannot determine if it satisfies the safe harbor requirements. We find, therefore, that the forward-looking statement in July 6, 2016, call is immunized by the safe harbor provision. However, at this stage, we cannot find that the remaining forward-looking statements are similarly immunized because we have incomplete information as to what was said on the calls.

Following our safe harbor analysis, we are left with the remaining alleged false or misleading statements:

*Rite Aid Defendants*

(1) That Walgreens and Rite Aid had complementary market profiles (stated in the Form 8-K attachments)

(2) That the FTC's second request for information was a standard part of the review process (stated in a joint press release issued on December 10, 2015)

*Walgreens Defendants*

(1) Opinions regarding the expected number of store divestitures (stated during Credit Suisse Healthcare Conference call on November 10, 2015; Morgan Stanley conference call on November 17, 2015; earnings call on October 20, 2016; conference call on November 17, 2016)

(2) That the review process was progressing as planned (stated during earnings call on January 7, 2016; annual shareholders meeting on January 27, 2016; earnings call on April 5, 2016; earnings call on October 20, 2016; earnings call on January 5, 2017)

(3) Estimating the timetable for closing the deal (stated during earnings call on January 7, 2016; annual shareholders meeting on January 27, 2016; earnings call on October 20, 2016)

(4) That the FTC's second request for information was a standard part of the review process (stated during earnings call on January 7, 2016)

(5) That an integration team was assembled and engaged in preliminary planning work (stated during earnings call on January 7, 2016; earnings call on October 20, 2016)

(6) Downplaying or disputing contrary reports from journalists signaling regulatory turbulence (stated during earnings call on October 20, 2016; conference call on November 17, 2016)

(7) Inside knowledge of FTC attitude gave confidence that the deal would

close (stated during earnings call on October 20, 2016; conference call

on November 17, 2016; earnings call on January 5, 2017; earnings call

on April 5, 2017)

Having identified the statements not immunized by the safe harbor

provision, we will turn next to our § 10(b) analysis.

## 2.      Opinions or Corporate Optimism

Of the remaining statements, several appear to be sincere opinions, including

statements about the number of stores to be divested and the anticipated time table

for closing the deal.  As noted above, opinions are actionable if the speakers know

the opinions to be based on false information.  Plaintiff argues that the Defendants

knew of the FTC's concerns, and that these statements created a false impression

that downplayed the regulatory risk.  First, Plaintiff does not allege particular facts

suggesting that the Defendants knew these opinions to be baseless.  Plaintiff

alleges that the FTC identified geographic areas of concern from January to April

2016 and communicated those concerns to the Defendants.  Thus, prior to that

period, or early in that period, statements about store divestitures or the closing

timeframe logically would be based on less than the full extent of the FTC's

concerns.  Furthermore, the Defendants obviously did not consider there to be *no*

geographic overlap, as the original merger agreement allowed for the divestiture of

up to 1000 stores.  The estimates for both statements, in fact, changed over time, as the FTC advanced in its review.

To the extent that Plaintiff suggests that the statements created a false impression, we disagree.  A false impression would be a misleading statement, which turns on the effect of the statement on a reasonable investor.  In this case, we do not find that a reasonable investor would have relied on these clear estimates, particularly because the Defendants openly admitted that they did not know how many stores would need to be divested, or when the deal would close.  A reasonable investor would understand these statements, which evolved over time, as best estimates and nothing more.  For these statements, Plaintiff has failed to meet the exacting pleading standard of the PSLRA.

Plaintiff argues that other statements also created a false impression, including statements that the review process was progressing as expected, that an integration team was engaged in preliminary planning work, and that a second FTC request was a standard part of the process.[3]  Again, these statements, which likely are non-specific enough as to be immaterial and, thus, not actionable, nevertheless reflect the subjective analysis of the Defendants related to the progress of the

---

[3] Plaintiff attempts to discredit the statement about the second FTC request as objectively and statistically false.  However, the Amended Complaint contains no statistical allegations, and Plaintiff's reliance on an extraneous document – a letter authored by an FTC commissioner – as evidence of the statistics is misplaced, as the commissioner's letter is not incorporated by reference or otherwise integral to the Amended Complaint.  Similarly, we will disregard Plaintiff's "chart" purporting to show the "likelihood of approval" as extraneous and unfounded.

review process.  We find that a reasonable investor would not rely on these statements, in part, because they offer nothing concrete on which to rely. Indicating that the review, including a second request for information, was proceeding as expected does not provide any reasonable guidance about the level of regulatory risk.  Likewise, a reasonable investor would understand that a complex merger likely would require the early efforts of an integration team. There mere fact that an integration team was engaged in preliminary work does not suggest one way or another the level of regulatory risk.  Thus, we find that Plaintiff has failed to meet his pleading standard with these statements, as well.

The final statements again reflect opinions or corporate optimism.  Starting October 20, 2016, the Walgreens Defendants began to express confidence that the deal would close and questioned newspaper reports of regulatory turbulence.  With these statements, Plaintiff's allegations have more merit.  At the time the statements were made, the end date for the original merger agreement already had been pushed back by three months.  In one instance, in April 5, 2017, the statement of confidence was made even after the merger agreement had been revised. Furthermore, Walgreens alluded to their "inside knowledge" of the FTC's review and their close collaboration with the FTC as a basis for dismissing contradictory reports from journalists.  The Walgreens Defendants also noted that their

confidence in the deal closing had not changed since the beginning, despite the obvious effects of the FTC's concerns.

Because the statements directly questioned contradictory reports and purportedly were based on non-public information from the FTC, we find that a reasonable investor could have been misled into thinking that the review process was progressing better than it was. At a time when approval of the transaction may have been legitimately in doubt, the Walgreens Defendants' statements alluded to secret knowledge that created a false sense of security. Therefore, with respect to these particular statements,[4] we find that Plaintiff has satisfied the first element of a § 10(b) claim. We now turn to whether Plaintiff adequately pled scienter.

## B. Scienter

We will consider scienter only with respect to the statements that have been adequately pled as false or misleading. As noted earlier, Plaintiff must plead a "strong inference" of scienter.

> It does not suffice that a reasonable factfinder plausibly could infer from the complaint's allegations the requisite state of mind. Rather, to determine whether a complaint's scienter allegations can survive threshold inspection for sufficiency, a court . . . must engage in a comparative evaluation; it must consider, not only inferences urged by the plaintiff, . . . but also competing inferences rationally drawn from the facts alleged. An inference of fraudulent intent may be plausible, yet less cogent than other, nonculpable explanations for the

---

[4] These include statements downplaying or disputing contrary reports from journalists that the review was not going well, made on October 20, 2016, and November 17, 2016, as well as statements expressing confidence based on "inside" knowledge of the review, made on October 20, 2016, November 17, 2016, January 5, 2017, and April 5, 2017.

> defendant's conduct.  To qualify as "strong" . . . we hold, an inference
> of scienter must be more than merely plausible or reasonable – it must
> be cogent and at least as compelling as any opposing inference of
> nonfraudulent intent.

*Tellabs, Inc.*, 551 U.S. at 314.  As noted above, the Walgreens Defendants

ventured into actionable territory when they openly contradicted news reports of

regulatory trouble by alluding to their non-public "inside" knowledge of the FTC's

review.  Plaintiff alleges that Walgreens, by the time of the statements, had ample

reason to understand that the merger was in trouble.  Indeed, once the FTC raised

concerns and the original terms of the merger needed to be revised, one would

expect the Walgreens Defendants to soften their aggressively confident stance.

Instead, the Walgreens Defendants seemed to double-down and disputed reports

that the transaction may falter.

Scienter is satisfied by either knowledge *or* recklessness.  We do not know

what the Walgreens Defendants knew or did not know based on their internal

discussions with the FTC.  However, based on the allegations as a whole, we find a

strong inference at least of recklessness.  These statements were made in close

proximity to both the revision of the merger agreement and the ultimate decision to

terminate the merger.  Moreover, the statements were made specifically to

counteract reports that the merger may not be approved, making them more than

mere statements of corporate optimism.  There may be plausible alternative

explanations, but at this early stage, we find that Plaintiff has pled sufficient facts

to strongly infer that Walgreens was at least reckless in making statements that would mislead a reasonable investor about the level of regulatory risk.[5]

## V.    CONCLUSION

For the foregoing reasons, we shall grant the Rite Aid Defendants' motion and deny the Walgreens Defendants' motion.

**NOW, THEREFORE, IT IS HEREBY ORDERED THAT:**

1. Defendants Rite Aid Corporation, John T. Standley, David R. Jessick, Joseph B. Anderson, Jr., Bruce G. Bodaken, Kevin E. Lofton, Myrtle S. Potter, Michael N. Regan, Frank A. Savage, and Marcy Syms's Motion to Dismiss, (Doc. 89), is **GRANTED.**

2. Defendants Walgreens Boots Alliance, Inc., George R. Fairweather, and Stephano Pessina's Motion to Dismiss, (Doc. 93), is **DENIED**.

_s/ John E. Jones III_
John E. Jones III
United States District Judge

---

[5] Liability under § 20(a) is derivative of liability under § 10(b).  Because § 10(b) liability remains at issue, we find it prudent at this stage to permit the § 20(a) claim to move forward.